UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. : 07-60534-CIV-DIMITROULEAS
MAGISTRATE JUDGE: ROSENBAUM

HOWARD K. STERN,

      Plaintiff,

vs.

JOHN M. O'QUINN and
JOHN M. O'QUINN & ASSOCIATES PLLC
d/b/a The O'Quinn Law Firm

      Defendants.

_____/

## PLAINTIFF HOWARD K. STERN'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, FORUM NON CONVENIENS, AND IMPROPER VENUE

Plaintiff Howard K. Stern ("Stern") hereby respectfully submits this Memorandum of Law in Opposition to Defendants John M. O'Quinn ("O'Quinn") and John M. O'Quinn & Associates PLLC d/b/a The O'Quinn Law Firm's (the "O'Quinn Law Firm") (collectively, "Defendants") Motion to Dismiss Plaintiff's First Amended Complaint for Lack of Personal Jurisdiction, Forum Non Conveniens, and Improper Venue (the "Motion").

### PRELIMINARY STATEMENT

In February 2007, O'Quinn traveled to Florida to engage in the practice of law in connection with a hearing in Broward County to determine custody of the body of Anna Nicole Smith for purposes of her burial. O'Quinn, a Houston, Texas lawyer, represented Virgie Arthur, Ms. Smith's biological mother, in that proceeding. Stern had initiated the Florida proceedings in his capacity as the then-nominated executor under the Last Will and Testament of Ms. Smith. The proceedings had to be filed in Broward County because that was the jurisdiction in which

Ms. Smith's body was located after she died unexpectedly in Hollywood, Florida. O'Quinn represented Arthur in the custody hearing and in the subsequent appeal in Florida.

While he was present in Florida for the proceedings, with the authorization of the O'Quinn Law Firm, O'Quinn gave several interviews about the proceedings and about Stern. In at least two (2) of the interviews which were broadcast live from Florida, O'Quinn falsely accused Stern of murdering Ms. Smith and her son, Daniel. O'Quinn later gave a number of additional interviews, with the authorization of the O'Quinn Law Firm, in which he also made false statements that Stern had a financial motive to murder Ms. Smith and Daniel. All of these false statements about Stern were designed to damage a Florida litigant. Additionally, the O'Quinn Law Firm's agents have spent time in Florida investigating the death of Ms. Smith and attempting to influence Florida authorities to open a criminal investigation into the death of Ms. Smith, which the O'Quinn Law Firm hoped would result in the prosecution of Stern in Florida.

Florida has more interest in adjudicating this action than any other state. This slander and false light invasion of privacy action directly involves Florida for many reasons: (1) Ms. Smith died in Florida; (2) Ms. Smith's death was investigated by Florida medical and law enforcement authorities; (3) Ms. Smith's death was the subject of a private investigation conducted in Florida by Defendants' agents; (4) the majority of the witnesses with the most knowledge regarding the truth or falsity of Defendants' factual allegations about Stern reside in Florida; (5) Defendants' actionable statements were first published in Florida; (6) the statements made by Defendants about a Florida litigant – Stern – were in direct conflict with Florida authorities' conclusions that Ms. Smith's death was accidental; and (7) Defendants' statements were clearly intended to, among other things, influence Florida litigation.

Defendants could reasonably anticipate that their tortuous acts would cause them to be haled into court in Florida, the state with the most connections to this case.

## STATEMENT OF FACTS

**A.    THE DEATHS OF ANNA NICOLE SMITH AND DANIEL**

Ms. Smith was a world-renowned actress and model. Stern was her long-time companion and attorney. (First Amendment Complaint ("Am. Compl.") at ¶¶ 3-4.) Stern is now the duly appointed executor of Ms. Smith's estate pursuant to her will.

On September 7, 2006, while she was living in the Bahamas, Ms. Smith gave birth to her second child, a daughter named Dannielynn. Ms. Smith's twenty-year-old son, Daniel, came to the Bahamas to visit his mother and his new sister shortly after she was born. Daniel died unexpectedly in his mother's hospital room on September 10, 2006, from an apparent cardiac dysrhythmia after taking a combination of methadone, Zoloft and Lexapro. (Am. Compl. at ¶¶ 28-29.) Stern did not murder Daniel or give him any drugs, no criminal charges have been filed against Stern in connection with Daniel's death, and there is no evidence that Stern had any involvement in Daniel's death. (Am. Compl. at ¶¶ 30-32.) An inquest into the cause of Daniel's death is currently proceeding in the Bahamas.

On February 8, 2007, Ms. Smith was found unconscious in her room at the Seminole Hard Rock Hotel & Casino in Hollywood, Florida. (Am. Compl. at ¶ 37.) Florida Emergency Medical Services providers unsuccessfully attempted to revive Ms. Smith, and she was later pronounced dead in a Broward County hospital. Her death received international media coverage and triggered an extensive investigation by Florida law enforcement authorities and the Broward County coroner into the cause of her death. The Broward County Chief Medical Examiner Joshua A. Perper consulted with a number of experts in Florida in connection with the autopsy.

The official autopsy report was released on March 26, 2007, and concluded that Ms. Smith died "of acute combined drug intoxication" and that "[a]bscesses of buttocks, and viral enteritis were contributory causes of death." (Am. Compl. at ¶ 41.) Her death was ruled to be an

"ACCIDENT." In a March 26, 2007, press conference held in Fort Lauderdale, Florida, Seminole Chief of Police Charles Tiger stated: "We are convinced, based on extensive review of the evidence, that this case is an accidental overdose with no other criminal element present." (Am. Compl. at ¶ 42.) Stern did not murder Ms. Smith, no criminal charges have been filed against him in connection with her death, and there is no evidence that he had any involvement in her death. (Am. Compl. at ¶¶ 38-40.)

**B.    DEFENDANTS' ACTIVITIES IN FLORIDA**

Shortly after Ms. Smith's death, Stern filed a petition in Broward County Circuit Court to carry out Ms. Smith's intent to be buried in the Bahamas beside her son. Ms. Smith's biological mother, Virgie Arthur ("Arthur"), opposed Stern's petition for custody. Arthur's son, an FBI agent, asked O'Quinn to represent Ms. Arthur in that litigation as a favor. (Jurisdictional Deposition of John O'Quinn dated August 16, 2007, the original of which has been previously filed with the Court ("O'Quinn Depo."), at 8-9.)

O'Quinn, along with Neil McCabe ("McCabe"), another attorney with the O'Quinn Law Firm, then traveled to Florida and appeared *pro hac vice* in the custody litigation as Arthur's attorneys. A hearing was held from February 16 through February 22, 2007. At the conclusion of the hearing, the probate court awarded legal custody of Ms. Smith's body to Richard Milstein, as the Guardian Ad Litem for Ms. Smith's daughter, Dannielynn. O'Quinn and McCabe were also present with Arthur in Florida during her unsuccessful February 28, 2007 appeal of the ruling to the 4th District Court of Appeals. (Am. Compl. at ¶¶ 51-53.)

O'Quinn did not appear in Florida solely for the purpose of providing legal representation to Arthur in the custody hearings. He also acted as Arthur's media spokesperson while he was in Florida and fielded over fifty (50) media requests for interviews in connection with his representation of Arthur. (O'Quinn Depo. at 25, 30, 56, 95, 141.) O'Quinn purportedly

represents Arthur on a *pro bono* basis and admits that the O'Quinn Law Firm paid all of the expenses incurred in Florida by O'Quinn, other employees from the O'Quinn Law Firm, Arthur, Arthur's husband, and a friend or relative of Arthur. Those expenses included private airplanes, limousine services, hotel rooms and meals. (O'Quinn Depo. at 13-15, 48-52; Jurisdictional 30(b)(6) Deposition of O'Quinn Law Firm ("Law Firm Depo."), the original of which is being filed with this Court, at 13-18.) O'Quinn even retained Florida counsel to represent Ms. Arthur in her appeal in Florida, and the O'Quinn Law Firm paid the legal fees of that Florida law firm. (O'Quinn Depo. at 21, 48; Law Firm Depo. at 20-21.) O'Quinn estimates spending at least $400,000 in out-of-pocket expenses for Ms. Arthur, a substantial portion of which was spent in Florida. (O'Quinn Depo. at 15.)[1]

The O'Quinn Law Firm has had its investigators conduct numerous activities in Florida in connection with Ms. Smith's death and its attempts to slander Stern. (See O'Quinn Depo. at 54-55, 72-73, 143.) Don Clark ("Clark"), an employee of the O'Quinn Law Firm, was sent to Florida three (3) to four (4) times in connection with the hearing, the appeal, and an investigation into the death of Ms. Smith. (O'Quinn Depo. at 74; Law Firm Depo. at 27.) In addition to his physical presence in Florida, Clark has had numerous communications with various Florida officials in an attempt to influence Florida's investigation into the death of Ms. Smith. Clark had at least one telephone call with the Broward County Medical Examiner's Office. (See Declaration of L. Lin Wood dated January 14, 2008 ("Wood Dec."), being filed separately with

---

[1] The O'Quinn Law Firm's 30(b)(6) representative, Christian Steed, was not prepared to testify during his deposition as to the amounts expended by the O'Quinn Law Firm in Florida, the exact dates on which various employees or agents of the firm were in Florida, or the total length of time spent by employees or agents of the firm in Florida. Mr. Steed – who did not work on the case and who was actually on vacation in Puerto Vallarta during the Florida hearing – spent only thirty (30) minutes reviewing a summary report of the firm's expenditures in Florida and did not talk to any other member of the firm about what activities were conducted by the firm in Florida to prepare for his deposition. (Law Firm Depo. at 30-31.)

the Court, at ¶ 10 and Exhibit C (Handwritten note dated March 8, 2007, produced by Broward County Medical Examiner's Office).) Clark also requested from the Florida State Attorney's office "assistance in initiating an independent criminal investigation into the death of Anna Nicole Smith." (See Wood Dec. at ¶ 11 and Exhibit D (Letter from Don Clark to Hon. Michael J. Satz dated July 23, 2007).) The O'Quinn Law Firm had subsequent conversations with the Florida State Attorney's Office about Clark's request for assistance. (See Wood Dec. at ¶ 12 and Exhibit E (Letter from Brian T. Cavanagh to Don Clark dated August 2, 2007).) Clark even threatened a Florida attorney with a Bar complaint or a civil action in Florida in connection with her representation of Stern. (See Wood Dec. at ¶¶ 13-14 and Exhibits F and G (Letter from Don Clark to Krista Barth and Letter from Krista Barth to Don Clark dated March 20, 2007).) All of these actions were authorized by, and taken on behalf of, the O'Quinn Law Firm. (Law Firm Depo. at 49, 51, 73-74.)

Additionally, Clark purportedly engaged an assistant, Wilma Vicedomine ("Vicedomine"), to assist him with his investigation in Florida into the death of Ms. Smith. (Law Firm Depo. at 59-60.) Vicedomine traveled to Florida on two (2) to three (3) separate occasions at the expense of the O'Quinn Law firm and purportedly performed some type of "research" services on behalf of Defendants in Florida. (See Law Firm Depo. at 60-61.) Vicedomine's "research" services were authorized by, and conducted on behalf of, the O'Quinn Law Firm. (Law Firm Depo. at 74-75.)

## C.    O'QUINN PARTICIPATES IN MEDIA INTERVIEWS IN FLORIDA

The O'Quinn Law Firm authorized O'Quinn, McCabe, and Clark to speak with the media while they were in Florida about the firm's representation of Arthur. (Law Firm Depo. at 22-23, 58.) During the Florida custody hearing, O'Quinn began falsely accusing Stern in media interviews of murder and providing drugs to Ms. Smith. While he was in Florida, O'Quinn gave

a number of interviews to reporters from MSNBC, Fox News Channel and CNN about the hearing and specifically about Stern, and those interviews were broadcast nationally, including in Florida: [2]

- On February 19, 2007, O'Quinn gave a live interview to Rita Cosby at the courthouse in Fort Lauderdale, and that interview was broadcast nationally on MSNBC. (O'Quinn Depo. at 102, 125-26; see also Am. Compl. at ¶¶ 88-93.)

- On February 20, 2007, O'Quinn gave a remote interview from Plantation, Florida, on CNN's nationally broadcast show, Larry King Live, during which he said that Ms. Smith was "under the control of this Rasputin-type guy, Stern. . . ." (See Wood Dec. at ¶ 8 and transcript attached at Exhibit A.)

- On February 21, 2007, O'Quinn did a remote interview from Ft. Lauderdale, Florida, with CBS' Hannah Storm, which was broadcast on The Early Show, during which he accused Stern of "obviously not telling the truth" and said that Stern "furnished [Ms. Smith] the drugs." (See Wood Dec. at ¶ 8 and transcript attached at Exhibit A.)

- On February 21, 2007, O'Quinn gave a live interview to Greta Van Susteren in Fort Lauderdale, and the interview was broadcast nationally on Fox News. (O'Quinn Depo. at 82-83; see also Am. Compl. at ¶¶ 105-110.)

- On February 23, 2007, O'Quinn did a remote interview with NBC's Matt Lauer on the Today Show from Miami discussing the proceedings. (See Wood Dec. at ¶ 8 and transcript attached at Exhibit A.)

---

[2] Defendants' contention throughout their Motion that O'Quinn gave only two (2) interviews in Florida ignores the plain evidence in this case, including interview transcripts and O'Quinn's own testimony. Indeed, Stern believes that third party discovery in this case will establish that O'Quinn participated in many more accusatory interviews conducted in Florida.

- On February 23, 2007, O'Quinn did a remote interview from Plantation, Florida, on CNN's Larry King Live, during which he discussed the outcome of the hearing and the appeal. (See Wood Dec. at ¶ 8 and transcript attached at Exhibit A.)

- O'Quinn testified that he also did a remote interview with NBC's Matt Lauer in which O'Quinn was physically present in his hotel lobby in Fort Lauderdale. (O'Quinn Depo. at 168-69.)

- O'Quinn believes that he may have also given an interview to a member of the print media while he was in Florida. (O'Quinn Depo. at 154-55.)

Additionally, on February 22, 2007, Clark gave an interview on CNN's Nancy Grace, which appears to have been conducted remotely from Florida, during which he said that "there's a possibility that there could be criminal charges" against Stern. (See Wood Dec. at ¶ 9 and transcript attached at Exhibit B.) McCabe and Clark may have given other interviews while they were in Florida about the custody hearing and Stern. (Law Firm Depo. at 22-23.) Stern expects to obtain information about such interviews during the course of discovery in this case.

O'Quinn also gave a number of other media interviews in other states, all of which he knew would be broadcast nationally, including in Florida. (O'Quinn Depo. at 170-72.)

## ARGUMENT AND CITATION OF AUTHORITIES

### I.   THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS.

This Court should deny Defendants' motion to dismiss because Defendants are subject to personal jurisdiction in this Court.[3] The determination of whether a court has personal jurisdiction over a non-resident defendant requires a two-part analysis. Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990). The court must first determine whether jurisdiction exists under the

---

[3] Defendants have made no separate argument regarding jurisdiction as it relates to the O'Quinn Law Firm, apparently conceding that jurisdiction over one defendant confers jurisdiction over the other defendant. In any event, it is clear that several employees of the O'Quinn Law Firm engaged in various contacts in Florida in connection with the firm's representation of Ms. Arthur.

state long-arm statute. Id. If the state long-arm statute confers jurisdiction, the court must then

decide whether the exercise of personal jurisdiction would violate Constitutional due process.

See, e.g., Mut. Serv. Ins. Co. v. Frit Indus., Inc., 358 F.3d 1312, 1319 (11th Cir. 2004).[4]

**A.  DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION PURSUANT TO FLORIDA'S LONG-ARM STATUTE BECAUSE THEY COMMITTED A TORT IN FLORIDA.**

Federal courts must apply Florida law when interpreting Florida's long-arm statute. See,

e.g., Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A., 421 F.3d 1162, 1166-67 (11th

Cir. 2005). That statute provides in relevant part:

> (1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself ... to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
>
> > (b) Committing a tortious act within this state.

Fla. Stats., § 48.193. In determining whether the long-arm statute applies, the court "must

construe the allegations in the Complaint as true, to the extent they are uncontroverted by

defendant's affidavits or deposition testimony." Morris v. SSE, Inc., 843 F.2d 489, 492 (11th Cir.

1988). When the complaint and supporting evidence conflict with the defendant's affidavit, the

court must construe all reasonable inferences in the plaintiff's favor. Madara, 916 F.2d at 1514.

Defendants are subject to jurisdiction pursuant to subsection (b) of the Florida long-arm

statute because they committed a tort in Florida. The evidence is clear that some of O'Quinn's

defamatory statements were first uttered and published to numerous individuals in Florida, and

all of O'Quinn's defamatory statements were published in Florida via national broadcast.

---

[4] It is not at all clear how Defendants contend that the case filed by them as supplemental authority would apply to this inquiry. See Keston v. FirstCollect, Inc., No. 07-60933-CIV, 2007 WL4225593 (S.D. Fla. Oct. 31, 2007). In that case involving allegations of improper debt-collection activities, the defendants had not conducted any debt collection in Florida. The only connection with Florida was that the plaintiff's attorney lived there, and the defendants corresponded with her on one occasion – all other activities, including the purported tortuous activity, took place in Maryland. That case is simply inapplicable here.

(O'Quinn Depo. at 82-83, 102, 125-26.) Defendants admit those facts; however, they invent a theory unsupported by any authority whatsoever that the tort of slander does not occur in Florida if a slanderous statement uttered in Florida is republished elsewhere. (Mot. to Dismiss at 6.)

Defendants' contention ignores the well-settled principle that "[u]nder Florida law, the tort of defamation is committed in the place where it is published." Casita v. Maplewood Equity Partners, 960 So. 2d 854, 857 (Fla. 3d DCA 2007). Thus, "[a] telephonic, electronic, or written communication is deemed 'published' in Florida, subjecting the publisher to long-arm jurisdiction under section 48.193(1)(b) of the Florida Statutes if the communication was made into this State by a person outside the State, even if that person has no other contacts with the state." Id. The Eleventh Circuit found that the long-arm statute was satisfied where the plaintiff was a California resident and the allegedly libelous statements were made in New York and received via telephone in California because "the tort in this case occurred in Florida. . . ." Madara, 916 F.2d at 1515 ("The tort of libel is generally held to occur wherever the offending material is circulated. Florida courts subscribe to this rule."). See also Wendt v. Horowitz, 822 So. 2d 1252, 1260 (Fla. 2002) ("'[C]omitting a tortious act' in Florida under section 48.193(1)(b) can occur through the non-resident defendant's telephonic, electronic, or written communications into Florida. . . ."). An action for defamation arises in Florida if the statements are published in Florida, regardless of whether injury was suffered in Florida or whether the statements were published first in Florida. See, e.g., Stepanian v. Addis, 782 F.2d 902, 903 (11th Cir. 1986) (rejecting the defendant's claim that the tort occurred only in Washington, D.C., where the interview was given, because "where a person informs a news reporter, the tort of slander and libel can occur where the allegedly false material is circulated. The material here was published in Florida and plaintiff asserts a Florida cause of action against defendant for that publication.").

Any publication of the statements in Florida constitutes a tort committed in Florida, and certainly first publication of statements in Florida constitutes a tort committed in Florida.

Stern has alleged in the Amended Complaint – and Defendants have admitted – that O'Quinn's defamatory statements about Stern were published in Florida in two different ways. First, O'Quinn was physically present in Florida when he uttered certain of the defamatory statements to the effect that Stern murdered Ms. Smith. (Am. Compl. at ¶¶ 89, 106; O'Quinn Depo. at 82-83, 102-03.) Thus, those statements were published immediately in Florida to everyone who heard O'Quinn make the statements, including the interviewers, Rita Cosby and Greta Van Susteren, both of whom were in Florida conducting the interviews in person. (O'Quinn Depo. at 83, 125-26.) O'Quinn also testified that both of the interviews were conducted somewhere on the courthouse grounds, and that approximately ten (10) people were in the area during his interview with Van Susteren. (O'Quinn Depo. at 82-83, 102.) Second, all of the defamatory statements made by O'Quinn were aired by Fox News, MSNBC and CNN on national television shows that were broadcast in Florida. (Am. Compl. at ¶¶ 88, 91, 105, 108, 125, 127, 141, 143, 164, 166, 177, 179, 191, 193, 205, 206; O'Quinn Depo at 170-72.)

Because O'Quinn's defamatory statements about Stern were published in Florida, Defendants are subject to jurisdiction pursuant to subsection (b) of the Florida long-arm statute.

## B.   EXERCISING JURISDICTION OVER DEFENDANTS COMPLIES WITH CONSTITUTIONAL DUE PROCESS.

When a court finds jurisdiction under the long-arm statute, it must then "ascertain whether or not sufficient 'minimum contacts' exist to satisfy the Due Process Clause of the Fourteenth Amendment so that 'maintenance of the suit does not offend traditional notions of

fair play and substantial justice.'" <u>Cable/Home Comm. Corp. v. Network Prods., Inc.</u>, 902 F.2d 829, 855 (11th Cir. 1990) (quoting <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945)).[5]

### 1.    Defendants Have Established Minimum Contacts With Florida.

Defendants' contacts with Florida far exceed the "minimum contacts" required to satisfy Constitutional due process. A defendant's contacts with the forum state must satisfy three criteria: (1) they "must be related to the plaintiff's cause of action or have given rise to it;" (2) they must involve "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum;" and (3) they "must be such that the defendant should reasonably anticipate being haled into court there." <u>McGow v. McCurry</u>, 412 F.3d 1207, 1214 (11th Cir. 2005). This Court has held that "even an 'isolated and sporadic' contact can satisfy the minimum contacts requirement." <u>Elite Aluminum Corp. v. Trout</u>, 451 F. Supp. 2d 1311, 1316 (S.D. Fla. 2006). Additionally, "territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there. . . ." <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 476 (1985).

In a defamation case, the minimum contacts requirement is satisfied where the defendant's statements are "purposefully directed" at the forum state such that the defendant could expect to be haled into court there. <u>See, e.g.</u>, <u>Keeton v. Hustler Magazine, Inc.</u>, 465 U.S. 770, 773-74 (1984) (holding that the defendant's "regular circulation of magazines in the forum State is sufficient to support an assertion of jurisdiction in a libel action based on the contents of the magazine"); <u>Calder v. Jones</u>, 465 U.S. 783, 789 (1984) (finding minimum contacts with California because defendants' "intentional, and allegedly tortious, actions were expressly aimed at California" where defamatory statements focused on California, were published in

---

[5] This second prong of the personal jurisdiction analysis alleviates Defendants' concerns that where defamatory statements are broadcast nationally, defendants in such cases could be subjected to suit in all fifty states. (<u>See</u> Motion at 7.) In such situations, the tort occurs in every state, but Constitutional due process may limit the states in which suit may be brought against the defendants.

California, and damaged the plaintiff in California); Straw v. Chase Revel, Inc., 813 F.2d 356, 359 (11th Cir. 1987) (sales of magazines constituted minimum contacts with forum); Rebozo v. Washington Post Co., 515 F.2d 1208, 1214-16 (5th Cir. 1975) (finding the test of International Shoe "amply satisfied" and newspaper "constitutionally susceptible to the jurisdiction of Florida" where newspaper sent reporters into and circulated their news coverage in Florida; subjecting foreign newspaper to suit in Florida was "fair in the circumstances"; and "Florida [was] clearly the most convenient forum in terms of the economical utilization of judicial resources"); Faigin v. Kelly, 919 F. Supp. 526 (D.N.H. 1996) (holding that minimum contacts existed because defendants' book containing defamatory statements was published nationally, including in forum state). Cf. Madara, 916 F.2d at 1518 (holding that the defendant did not have minimum contacts with Florida because he did not either personally publish the statements in Florida or engage in activities in Florida related to the alleged libelous statements).

The fact that O'Quinn is not a "publisher" or "producer" of the television broadcasts on which his defamatory statements were broadcast does not preclude jurisdiction over him in Florida. In this case, unlike cases cited by Defendants, O'Quinn was physically present in Florida when he made the defamatory statements and was conducting activities in Florida related to those statements. Thus, this case does not present the situation presented in Madara or Hoeschst Celanese Corp. v. Nylon Engineering, Inc., 896 F. Supp. 1190 (M.D. Fla. 1995), where the *only* basis for jurisdiction was that allegedly defamatory statements were published in Florida. In both of those cases, the statements were made *outside* of Florida, and the defendants had conducted no activities in Florida that were related to the allegedly defamatory statements.

It is also immaterial to this inquiry that Stern is not a resident of Florida. As recognized by the United States Supreme Court, the "plaintiff's residence in the forum State is not a

separate requirement, and lack of residence will not defeat jurisdiction established on the basis of defendant's contacts." Keeton, 465 U.S. at 779.

A review of Defendants' contacts with Florida make it clear that those contacts – all of which are related to Stern's claims in this case – satisfy the minimum contacts requirement.

### a. Defendants' activities in Florida are related to the cause of action.

Defendants' activities in Florida are related to Stern's claims. The O'Quinn Law Firm was itself paying for several employees and agents to be in Florida for legal proceedings in which its client, Arthur, was challenging Stern for custody of Ms. Smith's body. While O'Quinn was present in Florida for those proceedings, he acted as Arthur's "media spokesman." (O'Quinn Depo. at 30, 56, 95.) During that time, O'Quinn gave many media interviews in Florida during which he attacked Stern and directly accused him of murdering Ms. Smith. Defendants' agents were also conducting an investigation in Florida into the cause of Ms. Smith's death, and they were attempting to have Stern prosecuted in Florida for Ms. Smith's death. (O'Quinn Depo. at 60, 66-67; Wood Dec. at ¶¶ 10-12.) Thus, Defendants' contacts in Florida "are related to" and "have given rise to" Stern's claims.

### b. Defendants purposefully availed themselves of the privileges of Florida.

O'Quinn and McCabe were admitted *pro hac vice* in Florida on behalf of their client, Arthur, so that they could "purposefully avail" themselves of the benefits of Florida laws regarding custody of Ms. Smith's body. O'Quinn admits that being admitted *pro hac vice* in another state means that an attorney is, to some extent, "submitting yourself to the jurisdiction and regulation of that state's judicial system." (O'Quinn Depo. at 102.) Moreover, this is not a typical case where a lawyer merely represents a client – this representation was *pro bono*, and the O'Quinn Law Firm paid not only its own expenses but also the expenses of Arthur and her

family and friends. Defendants even engaged and paid a Florida lawyer to represent Arthur in her Florida appeal of the probate order. (O'Quinn Depo. at 21, 25, 30, 48, 54-56, 72-73, 95, 141, 154-55, 168-69.)

Defendants' activities in Florida went beyond mere appearances in court hearings – O'Quinn acted as a media spokesman in Florida, fielding over fifty (50) requests for interviews, and actually giving at least five (5) television interviews while in Florida and perhaps one (1) print interview. Defendants even paid two (2) investigators to travel to Florida on several occasions to conduct an investigation at Defendants' expense into Ms. Smith's death – the very topic of the defamatory statements made by O'Quinn about Stern. Defendants actively attempted to use their purported investigation to convince Florida authorities to investigate Stern with the ultimate goal of having Stern prosecuted in Florida. (See Wood Dec. at ¶¶ 11-12 and Exhibits D & E.) Defendants plainly have availed themselves of "the privilege of conducting activities" in Florida.

c.    **Defendants could reasonably anticipate being haled into court in Florida.**

Defendants could "reasonably anticipate being haled into court" in Florida given the fact that O'Quinn's slanderous statements were "purposefully directed" at Florida. Notwithstanding Defendants' weak attempt to claim O'Quinn did not purposefully direct his statements at Florida, O'Quinn uttered slanderous statements while he was in Florida representing Arthur in legal proceedings being conducted in Florida to determine the custody of Ms. Smith's body and while he was acting as Arthur's media spokesman in Florida. O'Quinn's statements were focused on Florida – he accused Stern of having murdered Ms. Smith in Florida. As part of those accusations, O'Quinn even called into question the validity of the autopsy and investigative report issued by the Chief Medical Examiner for Broward County, Florida. (Am. Compl. at

¶ 195.) At the time O'Quinn uttered the slanderous statements, he knew they would be broadcast in Florida. (See O'Quinn Depo. at 171-72.)

Moreover, although Stern is not a Florida resident, the effects of the defamatory statements were targeted at Stern in the State of Florida after Stern filed the petition to determine custody of Ms. Smith's body. (See O'Quinn Depo. at 46-47.) Because Ms. Smith died in Florida and her body was being held by Florida authorities, Stern had to file his custody petition in Florida. Thus, O'Quinn's slanderous statements were directed at a Florida litigant and were designed to harm the reputation of a Florida litigant and impact the Florida litigation. Indeed, O'Quinn's statements, along with other actions taken by employees of the O'Quinn Law Firm, were admittedly designed to encourage Florida officials to "initiat[e] an independent criminal investigation into the death of Anna Nicole Smith," which the O'Quinn Law Firm hoped would result in Stern being prosecuted for Ms. Smith's death, which occurred in Florida. (See Wood Dec. at ¶¶ 11-12 and Exhibits D & E.) O'Quinn's statements were directed toward Florida and designed to injure Stern in Florida.

O'Quinn reasonably should have expected that he could be haled into court in Florida for statements which were uttered and broadcast in Florida, which were directed at the circumstances surrounding Ms. Smith's death in Florida, and which arose out of O'Quinn's work in Florida as a media spokesman. O'Quinn's contacts with Florida were deliberate and cannot be characterized as "random, fortuitous, or attenuated." These purposeful contacts, which are directly related to this lawsuit, satisfy the "minimum contacts" required for personal jurisdiction.

## 2. Exercising Jurisdiction Over Defendants Does Not Offend Traditional Notions Of Fair Play And Substantial Justice.

After the Court determines that the minimum contacts requirement has been satisfied, Defendants can defeat jurisdiction only if they can present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable" because it would not

comport with "fair play and substantial justice." Burger King, 471 U.S. at 477-78. Factors that may be considered include: (1) the burden on the Defendants; (2) Florida's interest in adjudicating the dispute; (3) Plaintiff's interest in obtaining effective and convenient relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interests of the several states in furthering substantive social policies. Id. None of those factors present a "compelling case" to defeat jurisdiction in this case.[6]

Defendants would be under a minimal burden in defending this action in the Southern District of Florida. Defendants have retained competent counsel located in Florida, and they have openly conducted the practice of law in Florida in representing Arthur in Florida courts. Defendants have the financial resources to litigate in Florida, and O'Quinn has admitted that he can afford to pay for litigation in Florida. (O'Quinn Depo. at 180.) See Rebozo, 515 F.2d at 1216 (holding that it was fair and reasonable for Washington, D.C. publisher to litigate in Florida when it was clear the publisher was "quite solvent").

Additionally, any state has an interest in adjudicating a case involving allegedly slanderous statements published in that state. See, e.g., Keeton, 465 U.S. at 776-77 (finding that New Hampshire had a strong interest in protecting non-residents from libel circulated in New Hampshire and in preventing its citizens from being deceived by such libel). In this case, Florida's interest in adjudicating this action extends far beyond the typical interest a state has in defamation published there. Florida is where Ms. Smith died, it is where her death was investigated by legitimate law enforcement and separately by Defendants' investigators, it is where Defendants and their agents attempted to influence the Florida investigation into Ms. Smith's death, it is where the custody hearing over Ms. Smith's body was held, it is where

---

[6] O'Quinn contends that Stern would not be harmed if this Court does not exercise jurisdiction over him because Stern could file his action in O'Quinn's home state of Texas. (Motion at 12.) However, "[t]he victim of a libel, like the victim of any other tort, may choose to bring suit in any forum with which the defendant has certain minimum contacts. . . ." Keeton, 465 U.S. at 780 (internal quotation omitted).

Defendants physically made defamatory statements about Stern, and it was the location most affected by the media frenzy following Ms. Smith's death. Police officers in Florida conducted the investigation following Ms. Smith's death, and the Broward County Medical Examiner determined the cause of death. (Am. Compl. at ¶¶ 41-42.) O'Quinn's defamatory statements challenge the findings of local Florida law enforcement and the Broward County Medical Examiner, and his statements therefore greatly affect Florida and its residents. (See Am. Compl. at ¶ 195.) Florida has a substantial interest in adjudicating the present dispute.

There are no compelling factors that would overcome the involvement of this case with the State of Florida. This Court has personal jurisdiction over Defendants.

## II.    VENUE IS PROPER IN THIS COURT.

Venue is proper in this Court because the case is located in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. . . ." 28 U.S.C. § 1391(a)(2).[7] Venue in a defamation action is proper pursuant to § 1391(a)(2) where the defamatory statement is published. See, e.g., Cummings v. Western Trial Lawyers Ass'n, 133 F. Supp. 2d 1144, 1150 (D. Ariz. 2001) ("[A] substantial part of the events giving rise to Plaintiff's defamation claim against [defendant] clearly occurred within Arizona. [Defendant] directed approximately four letters into Arizona which at least partially caused Plaintiff's defamation injury."); Wachtel v. Storm, 796 F. Supp. 114, 116 (S.D.N.Y. 1992) ("Defendant acknowledges that he mailed the letter to [the plaintiff's] offices in this District and that the letter was published here. Because these events are crucial to plaintiff's cause of action for defamation, venue in the Southern District of New York is proper under § 1391(a)(2).") (citations omitted).

---

[7] The 1990 Amendment to § 1391(a)(2) eliminated the more stringent requirement that venue was proper only in the district where "the claim arose." Thus, Congress' intent is clear that venue in a given case may be proper in more than one district. See Bates v. C&S Adjusters, Inc., 980 F.2d 865, 867 (2d Cir. 1992).

In this case, a substantial part of the events giving rise to the claim occurred in this District, and Stern has sufficiently alleged facts establishing venue. O'Quinn uttered a number of slanderous statements during interviews given in Ft. Lauderdale, which is in this District. (Compl. at ¶¶ 31, 37.) All of the circumstances surrounding the defamatory statements occurred in this District: (1) Anna Nicole Smith died in this District (Compl. ¶ 16); (2) O'Quinn was in this District when he appeared before Florida courts in connection with the custody dispute over the body of Anna Nicole Smith (Compl. ¶ 26-27); (3) at the time the defamatory statements were made in this District, Stern was involved in legal proceedings in this District involving O'Quinn's client (Compl. ¶¶ 29-30); (4) the law enforcement authorities who investigated the death of Ms. Smith are in this District (Compl. ¶ 24); and (5) the Broward County Medical Examiner office which examined Ms. Smith's body and ruled that Ms. Smith's death was accidental is in this District (Compl. ¶ 22-23).

These facts are sufficient to support venue in this Court. While other jurisdictions may have some relationship to this case, it is essentially "a Florida case."

## III.   THIS CASE SHOULD NOT BE TRANSFERRED PURSUANT TO *FORUM NON CONVENIENS.*

The question presented by Defendants' request for transfer pursuant to the doctrine of *forum non conveniens* is whether Stern's choice of forum creates problems of convenience for Defendants and their witnesses of such a substantial nature that transfer is appropriate in the interests of justice. Pilkington v. United Airlines, Inc., 855 F. Supp. 1248, 1250 (M.D. Fla. 1994). When venue is otherwise proper, a district court may transfer a case pursuant to 28 U.S.C. § 1404(a) only "for the convenience of the parties and witnesses, and in the interest of justice." Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 260 (11th Cir. 1996). Defendants have not satisfied their burden of demonstrating actual inconvenience for Defendants or any witnesses.

### A.   Defendants Have Not Satisfied Their Burden.

Defendants have not satisfied their burden of demonstrating that this case should be transferred to another court. A defendant "has the burden of making a strong case for transfer and if the transfer would merely shift inconvenience from one party to the other, or if the balance of all factors is but slightly in favor of the movant, plaintiff's choice of forum should not be disturbed and transfer should be denied." Colondy v. Iverson, Yoakum, Papiano & Hatch, 1994 WL 150835 at * 2 (M.D. Fla. 1994) (citing Grey v. Continental Marketing Assoc. Inc., 315 F. Supp. 826, 831 (N.D.Ga. 1970)); see also In re Ricoh Corp., 870 F.2d 570, 573 (11th Cir. 1989) (burden is on movant); Excelsior Designs, Inc. v. Sheres, 291 F. Supp.2d 181, 185 (E.D.N.Y. 2003) (defendant must make "clear and convincing showing" for transfer).

Defendants have not introduced sufficient evidence to support transfer of this case. Although Defendants have listed various witnesses who live outside of Florida, Defendants have provided no facts or details regarding any alleged inconvenience these parties will suffer by having to appear in Florida. Defendants have made only vague assertions regarding the purported testimony of the alleged witnesses. Further, Defendants have made no showing as to how they would be inconvenienced by litigating this case in this District. Finally, Defendants have failed to identify any evidence that is located in Texas or any fact which arose in Texas.

The mere fact that Defendants have provided no factual support regarding any of these factors in and of itself requires that Defendants' motion to transfer be denied. See, e.g., J.I. Kislak Mortg. Corp. v. Connecticut Bank & Trust Co., 604 F. Supp. 346, 348 (S.D. Fla. 1985) (denying motion to transfer where defendant made conclusory assertions regarding the inconvenience of witnesses and thus did not establish by clear showing that other forum was more convenient). Accord Strategene v. Parson, Behle & Latimer, 315 F. Supp. 2d 765, 771 (D. Md. 2004) (affidavits are needed from witnesses and parties that explain the inconvenience and

hardship they would suffer if the case were heard in the current venue; mere assertions of inconvenience or hardship are insufficient); Z-Tel Comms., Inc. v. SBS Comms., Inc., 331 F. Supp. 2d 567, 571 (E.D. Tex. 2004) (affidavits regarding witnesses required).[8]

**B.    All Factors Support Venue In This District.**

Stern has demonstrated that venue is proper in this Court.

**1.    The Convenience Of The Parties Favors This District.**

Normally, a plaintiff's choice of forum is given "considerable deference." In re Ricoh, 870 F.2d at 573. Contrary to Defendants' suggestion, this deference does not disappear when the plaintiff does not reside in the chosen forum; instead, it simply applies with "less force," and the choice of forum is assumed to be "less reasonable." Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 127 S. Ct. 1184, 1191 (2007). See also In re ML-Lee Acquisition Fund II, L.P., 816 F. Supp. 973, 976 (D. Del. 1993) ("While transfer of a case will generally be regarded as less inconvenient to a plaintiff if the plaintiff has not chosen its home turf or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer."). Selection of this District was entirely "reasonable" given its contacts with this case.

Moreover, as discussed *supra*, although Stern is not a Florida resident, he was a Florida litigant when O'Quinn launched his accusatory attacks from Florida. Stern was required to file the petition in Florida seeking custody of Ms. Smith's body. O'Quinn's accusations were intended to damage Stern in Florida, where Stern was attempting to obtain custody of Ms.

---

[8] Defendants cannot cure these evidentiary faults with their reply brief. See Griffin Indus., Inc. v. Couch, No. 1:05-CV-0684-WSD, 2006 WL 783354 at * 2, n.1 (N.D. Ga. 2006) (dismissing motion to transfer for failure to support motion with relevant evidence; rejecting effort by defendants to supplement record in reply brief); Matera v. Native Eyewear, Inc., 355 F. Supp. 2d 680, 682 (E.D.N.Y. 2005) (submitting required affidavits in reply brief not sufficient; motion to transfer denied).

Smith's body. O'Quinn's accusations were further intended to have Stern prosecuted in Florida for Ms. Smith's death, which occurred in Florida. Thus, while Stern's choice of Florida as a forum does not receive the deference afforded the home forum, it should be granted more deference than the choice of forum of a non-resident or non-domiciliary of Florida. See Bixy, Inc. v. KBI Holdings, LLC, 2007 WL 3407623, at *2-3 (N.D. Ga. 2007) (chosen venue could be plaintiff's "home district" to the extent that facts giving rise to lawsuit arose in that district).

Further, Defendants have utterly failed to demonstrate how they would be inconvenienced if this litigation continues in Florida. In diversity actions, it is not uncommon for defendants to defend themselves in a foreign state. E.g., Hughes v. Wheeler, 364 F.3d 920, 924-25 (8th Cir. 2004 ) (holding that denial of motion to transfer venue was proper because "[t]here is no doubt some inconvenience in litigating a case far from home, but the mere fact that the case is heard in a foreign state cannot be an adequate reason for a change of venue in a diversity action, since by hypothesis in such an action one of the parties will almost always have to litigate in a foreign state"). Defendants also claims inconvenience on the part of their lawyers, but "the fact that counsel may be inconvenienced is irrelevant to whether the motion for transfer should be granted." Prather v. Raymon Constr. Co., 570 F. Supp. 278, 284 (N.D. Ga. 1983).

Indeed, Defendants have demonstrated that it is not at all inconvenient for them to litigate in Florida. O'Quinn and other agents from the O'Quinn Law Firm spent weeks in Florida in February of 2007 litigating the custody hearings while O'Quinn served as Arthur's media spokesman. Agents of the O'Quinn Law Firm continued to spend time in Florida during March, April, and May of 2007 investigating Ms. Smith's death. (Law Firm Depo. at 27, 59-60.) Obviously litigating in Florida was not difficult, because Defendants are not even being paid for their representation of Arthur in Florida. They traveled to Florida and represented Arthur in the custody hearing *pro bono*, not only paying their own expenses but even going so far as to pay

Arthur's expenses in Florida, and incurring approximately $400,000 in out-of-pocket expenses in doing so. (O'Quinn Depo. at 13-15, 48-52; Law Firm Depo at 13-18.)  O'Quinn has access to his own airplane, so travel to Florida is not difficult. (O'Quinn Depo. at 17.) Obviously, if it is convenient for O'Quinn and other agents of the O'Quinn Law Firm to travel to Florida at their own expense to falsely accuse Stern of murder, it is at least equally convenient for Defendants to travel to Florida to attempt to defend those slanderous attacks.

### 2.      The Convenience Of Key Witnesses Favors This District.

The convenience of the witnesses is of major importance when considering transfer, and the focus of the court should be on convenience for "key" witnesses. McNair v. Monsanto Co., 279 F. Supp. 2d 1290, 1311 (M.D. Ga. 2003). There is a distinction between party witnesses – who are presumed to be more willing to testify in a different forum – and non-party witnesses – for whom no such presumption can be made. Gundle Lining Constr. Corp. v. Fireman's Fund Ins. Co., 844 F. Supp. 1163, 1166 (S.D. Tex. 1994). Because live testimony is preferred over other means of presenting evidence, the convenience of non-party witnesses weighs most heavily on the court in deciding whether to transfer venue. State Street Capital Corp. v. Dente, 855 F. Supp. 192, 198 (S.D. Tex. 1994) ("[I]t is the convenience of non-party witnesses, rather than that of party witnesses, that is the more important factor and is accorded greater weight in a transfer of venue analysis."). Further, Defendants bear the burden of identifying, through an affidavit, the key non-party witnesses who will be inconvenienced by a trial in this District, and for whom Texas is a more convenient forum. See, e.g., Stratagene, 315 F. Supp.2d at 771; Pilates, Inc. v. Pilates Inst. Inc., 891 F. Supp. 175, 183 (S.D.N.Y. 1995); Kislak, 604 F. Supp. at 348.

Defendants have presented nothing more than a laundry list of purported witnesses, many without addresses, and all without detail as to convenience. Indeed, at least two (2) of the witnesses on Defendants' list reside in Florida. In sharp contrast, Stern has identified numerous

key non-party witnesses, many by name, who are located in this District. (Wood Dec. at ¶ 5.) This list includes: Florida eyewitnesses to events surrounding the death of Ms. Smith, the Broward County Medical Examiner's Office, Florida law enforcement authorities, Florida EMS personnel, Florida news reporters and media personnel, employees of the Hard Rock Hotel and any fact witnesses interviewed during the medical and law enforcement investigations. (Wood Dec. at ¶ 5.) These witnesses will provide crucial information relevant to the critical inquiry regarding the circumstances of the death of Ms. Smith, which goes directly to O'Quinn's liability in this defamation action. (Wood Dec. at ¶¶ 7-8.) Indeed, the most important witnesses are clearly Florida officials, who cannot be expected to travel to another state to testify. See Matt v. Baxter Healthcare Corp., 74 F. Supp. 2d 467, 470 (E.D. Pa. 1999) (liability witnesses accorded more weight than other types of witnesses when deciding transfer issue).

### 3.   The Interests Of Justice Favor This District.

Finally, the interests of justice overwhelmingly favor venue in this District. Among the factors considered under the "interests of justice" analysis are "access to evidence, availability of witnesses, the cost of obtaining witnesses, the possibility of a jury view [of relevant premises], and all other practical problems that make trial of a case easy, expeditious and inexpensive." Moore v. McKibbon Bros., Inc., 41 F. Supp. 2d 1350, 1357 (N.D. Ga. 1998). See also Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09 (1947) ("Factors of public interest also have a place in applying the doctrine. . . There is a local interest in having localized controversies decided at home."). All of these factors favor venue in this Court.

This slander action arises out of statements uttered in Florida about a Florida death with the intent to influence Florida residents, a Florida litigant and Florida judicial proceedings. Florida and its residents therefore have a local interest in having this Court decide this case. Because most of the facts giving rise to this case occurred in Florida, and the medical and law

enforcement investigatory evidence relating to Ms. Smith's death is located in Florida, the trial will be facilitated by remaining in this District near such evidence. See Intergraph Corp. v. Stottler, Stagg & Associates, Inc., 595 F. Supp. 976, 979 (N.D. Ala. 1984). Additionally, as noted *supra*, a considerable number of witnesses live in Florida, and the ability to use compulsory process to obtain live testimony of key witnesses, as well as the cost and convenience of producing those witnesses at trial, is a distinct advantage of a trial in this District. Southeastern Equip. Co. v. Union Camp Corp., 498 F. Supp. 164, 166 (S.D. Ga. 1980). Moreover, Florida law will apply to Stern's claims. This Court is better equipped than a Texas court to further Florida's interest in this case given this Court's familiarity with Florida law. See State Street, 855 F. Supp. at 198 (Texas was better choice than Florida court to apply Texas law).

This is a "Florida case." The only reason Texas is even involved is because O'Quinn and his client live there. Indeed, had the present action been brought in any other judicial district, a § 1404(a) analysis would militate strongly towards Florida as being a more convenient overall forum for the resolution of the present dispute.[9]

## CONCLUSION

Based on the foregoing, Stern respectfully submits that Defendants' Motion To Dismiss and Alternatively, To Transfer must be DENIED.

Respectfully submitted this 15th day of January, 2008.

/s/ L. Lin Wood
L. Lin Wood
(Georgia Bar No. 774588) (Pro hac vice)
llwood@pogolaw.com
Nicole Jennings Wade
(Georgia Bar No. 390922) (Pro hac vice)
nwade@pogolaw.com

---

[9] If the Court were inclined to transfer this case, however, it is clear that California would be a more appropriate forum than Texas – numerous witnesses identified by Defendants reside in California, Ms. Smith resided in California prior to moving to the Bahamas, and Stern is a California resident. Thus, unlike Texas, California at least has some arguable connection to this case.

Eric P. Schroeder
(Georgia Bar No. 629880) (Pro hac vice)
eschroeder@pogolaw.com
Katherine V. Hernacki
(Georgia Bar No.: 727027) (Pro hac vice)
Luke A. Lantta
(Georgia Bar No. 141407) (Pro hac vice)
llantta@pogolaw.com

**POWELL GOLDSTEIN LLP**
One Atlantic Center
Fourteenth Floor
1201 West Peachtree Street, N.W.
Atlanta, Georgia  30309
Telephone:     (404) 572-6600
Facsimile:     (404) 572-6999

M. Krista Barth
(Florida Bar No. 0461229)
krista@emsattorneys.com

**ERIC M. SAUERBERG, P.A.**
Suite 102
200 Village Square
Palm Beach Gardens, Florida  33410
Telephone:     (561) 776-0330
Facsimile:     (561) 776-0302

Attorneys for Plaintiff
Howard K. Stern

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **Plaintiff Howard K. Stern's Memorandum**

**of Law in Opposition to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction,**

**Forum Non Conveniens, and Improper Venue** was served upon the following by overnight

delivery, addressed as follows:

> Robert M. Klein, Esq.
> kleinr@stephenslynn.com
> Roberta G. Mandel, Esq.
> Cayla B. Tenenbaum, Esq.
> Law Offices of Stephens Lynn La Cava
>   Hoffman & Puya, P.A.
> Two Datran Center – Penthouse II
> 9130 South Dadeland Boulevard
> Miami, FL 33156
>
> Neil McCabe, Esq.
> The O'Quinn Law Firm
> 440 Louisiana, Suite 2300
> Houston, Texas  77002

This 15th day of January, 2008.

> /s/ M. Krista Barth
> M. Krista Barth
> (Florida Bar No. 0461229)
> krista@emsattorneys.com

1239729