**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. : 07-60534-CIV-DIMITROULEAS**
**MAGISTRATE JUDGE: ROSENBAUM**

HOWARD K. STERN,

       Plaintiff,

vs.

JOHN M. O'QUINN and
JOHN M. O'QUINN & ASSOCIATES PLLC
d/b/a The O'Quinn Law Firm

       Defendants.

_____/

**PLAINTIFF HOWARD K. STERN'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

Plaintiff Howard K. Stern ("Stern") hereby respectfully submits this Memorandum of Law in Opposition to Defendants John M. O'Quinn ("O'Quinn") and John M. O'Quinn & Associates PLLC d/b/a The O'Quinn Law Firm's (the "O'Quinn Law Firm") (collectively, "Defendants") Motion To Dismiss For Failure To State A Claim (the "Motion").

**PRELIMINARY STATEMENT**

Defendants have made incredibly inflammatory and baseless accusations against Stern with respect to the deaths of Stern's former client and companion, Anna Nicole Smith, and her son, Daniel. O'Quinn, an attorney and officer of the court, gave nationally televised interviews during which he made various false accusations against Stern, including the following:

- "[W]e're supposed to believe this was all accidental. . . . So Stern can walk away from a murder."

- "You better believe it," that he agrees with his client that Stern murdered Ms. Smith.

- "Stern . . . decided he needed rid of Daniel."

- Stern is "the man who all arrows are pointing to as having killed [Arthur's] daughter and her grandson."

These statements, as well as the other accusations that form the basis for this action, are all completely without any factual support, and O'Quinn knew that at the time he made them. There is absolutely no evidence that Stern had any involvement in the tragic deaths of Ms. Smith or her son, Daniel – Stern has never been charged or accused by authorities of having been criminally involved in either of those deaths. To the contrary, Ms. Smith's death was declared accidental after a complete investigation by Florida authorities. Moreover, O'Quinn knew when he made these accusations that Stern was not a beneficiary under Ms. Smith's will and that there was absolutely no financial benefit to Stern from either Ms. Smith's death or Daniel's death.

It is clear that these accusations were made by O'Quinn solely in an effort to discredit Stern and harm his reputation. O'Quinn's client, Virgie Arthur ("Arthur"), who is Ms. Smith's biological mother, was fighting Stern for custody of Ms. Smith's body and trying to obtain custody of Ms. Smith's daughter, Dannielynn, at the time these accusations were made.

O'Quinn asks this Court to sanction his slanderous statements as a matter of law merely because they were made in an attempt to gain a competitive advantage for his client. O'Quinn's statements are not protected by the litigation privilege, because they were not made in the course of any judicial proceedings and were not necessary or relevant to any pending legal actions. A lawyer is not entitled to intentionally slander his client's opponent in the national media just because it would be beneficial for his client to discredit that opponent. Defendants' motion must be denied because this Court cannot allow litigants or counsel to abuse the system of justice by using it as a shield from liability for false accusations of murder made in media interviews.

## STATEMENT OF FACTS

**A.     THE DEATHS OF ANNA NICOLE SMITH AND DANIEL**

Ms. Smith was a world-renowned actress and model. Stern was her long-time companion and attorney. (First Amended Complaint ("Am. Compl.") at ¶¶ 21-22.) Stern is also the duly appointed executor of Ms. Smith's estate pursuant to her will.

On September 7, 2006, while she was living in the Bahamas, Ms. Smith gave birth to her second child, a daughter named Dannielynn. Ms. Smith's twenty-year-old son, Daniel, came to the Bahamas to visit his mother and his new sister shortly after she was born. Daniel died unexpectedly in his mother's hospital room on September 10, 2006, from an apparent cardiac dysrhythmia after taking a combination of methadone, Zoloft and Lexapro. (Am. Compl. at ¶¶ 28-29.) Stern did not murder Daniel or give him any drugs, no criminal charges have been filed against Stern in connection with Daniel's death, and there is no evidence that Stern had any involvement in Daniel's death. (Am. Compl. at ¶¶ 30-32.) An inquest into the cause of Daniel's death is currently proceeding in the Bahamas.

On February 8, 2007, Ms. Smith was found unconscious in her room at the Seminole Hard Rock Hotel & Casino in Hollywood, Florida. (Am. Compl. at ¶ 37.) Florida Emergency Medical Services providers unsuccessfully attempted to revive Ms. Smith, and she was later pronounced dead in a Broward County hospital. Her death received international media coverage and triggered an extensive investigation by Florida law enforcement authorities and the Broward County coroner into the cause of her death. The Broward County Chief Medical Examiner Joshua A. Perper consulted with a number of experts in Florida in connection with the autopsy.

The official autopsy report was released on March 26, 2007, and concluded that Ms. Smith died "of acute combined drug intoxication" and that "[a]bscesses of buttocks, and viral

enteritis were contributory causes of death." (Am. Compl. at ¶ 41.) Her death was ruled to be an "ACCIDENT." In a March 26, 2007, press conference held in Fort Lauderdale, Florida, Seminole Chief of Police Charles Tiger stated: "We are convinced, based on extensive review of the evidence, that this case is an accidental overdose with no other criminal element present." (Am. Compl. at ¶ 42.) Stern did not murder Ms. Smith, no criminal charges have been filed against him in connection with her death, and there is no evidence that he had any involvement in her death. (Am. Compl. at ¶¶ 38-42.)

**B.    DEFENDANTS' REPRESENTATION OF ARTHUR**

Shortly after Ms. Smith's death, Stern filed a petition in Broward County Circuit Court to carry out Ms. Smith's intent to be buried in the Bahamas beside her son. Arthur opposed Stern's petition for custody, and the O'Quinn Law Firm represented Ms. Arthur in that litigation. A hearing was held from February 16 through February 22, 2007. Arthur lost her request for custody of Ms. Smith's body, and the O'Quinn Law Firm assisted Arthur in her unsuccessful appeal. (Am. Compl. at ¶¶ 51-53.)

In addition to providing legal representation to Arthur in the custody hearing and subsequent appeal, the O'Quinn Law Firm has assisted Arthur in attempting to initiate a criminal investigation into the death of Ms. Smith. One of the O'Quinn Law Firm's investigators, Don Clark ("Clark"), has engaged in various communications with the Broward County Medical Examiner's Office and the Florida State Attorney's office, encouraging them to open a criminal investigation. (See Declaration of L. Lin Wood dated January 14, 2008 ("Wood Dec."), being filed separately with the Court, at ¶¶ 10-11 and Exhibits C & D.) Florida authorities have refused to open such an investigation. (See Wood Dec. at ¶ 12 and Exhibit E.)

4

## C.   O'QUINN'S ACCUSATIONS OF MURDER AGAINST STERN

Throughout his representation of Arthur, O'Quinn has acted as her media spokesperson and has given many nationally-televised interviews, including interviews with MSNBC, Fox News Channel and CNN. During these interviews, O'Quinn made numerous direct accusations that Stern murdered Ms. Smith and her son, Daniel, for financial gain:

(1)   February 19, 2007 interview during *Rita Cosby Specials Unit* on MSNBC (Am. Compl. at ¶ 93 (emphasis added)):

> O'QUINN:  Why would anyone ask to see the will like Stern did, unless the person was dead who wrote the will or the person who wrote the will was about to die?

> COSBY:  What are you suggesting?

> O'QUINN:  I suggest you draw your own conclusions. **He asked to read the will 4 days before Anna Nicole died in his presence. ... Why did he need to read that will unless he knew she was going to die**?
>
> ***

> O'QUINN:  . . . What must have been going through Mr. Stern's mind that he wanted to read that will 4 days before Anna Nicole died?  Draw your own conclusions.  Use your own common sense.

(2)   February 21, 2007, interview during *On The Record With Greta Van Susteren* on Fox News (Am. Compl. at ¶¶ 110 (emphasis added)):

> O'QUINN:  [Virgie Arthur] believes Howard K. Stern murdered her daughter.

> VAN SUSTEREN:  Murdered?

> O'QUINN:  Yes.

> VAN SUSTEREN:  Strong word.

> O'QUINN:  That's what she said.  She said that in court, He killed her.

> VAN SUSTEREN:  What's the basis for that, for the — for being there, sort of complicit that Anna Nicole took drugs or providing her drugs?  I mean, what's her theory?

O'QUINN: **He handled all the drugs.** We've talked to the maid who kept the place. She gave us a list of the drugs. That's where I got the list. **And he wanted to keep total control over her by keeping her doped up. He had total control over her.** It was all a technique, a Machiavellian, sinister technique.

***

O'QUINN: . . . Everybody has a judgment by now about what they've heard.

VAN SUSTEREN: **And you agree with that judgment, murder?**

O'QUINN: **You better believe it.** Why does a man ask for a will four days before a person dies?

***

VAN SUSTEREN: There's a lot of suspicion about their presence in the Bahamas. I agree. That's still not murder, though.

O'QUINN: And motive. **He had opportunity. He was alone with her for three days. He had motive. And there's evidence that he handled her drugs.**

(3)  March 1, 2007 interview during the *Nancy Grace Show* on CNN Headline News (Am. Compl. at ¶ 129 (emphasis added)):

O'QUINN: I've been told by sources that should know the truth that **there were seven life insurance policies on Anna Nicole's life**, and the beneficiary was her son, who died under suspicious circumstances, and **the alternative beneficiary is Stern.**

***

O'QUINN: I'm told they were paid up and in full force, and **the primary beneficiary was her son, who died under very suspicious circumstances.**

***

O'QUINN: . . . **This is all about the money.**

(4)  March 15, 2007 interview during *On The Record With Greta Van Susteren* on Fox News (Am. Compl. at ¶ 145 (emphasis added)):

O'QUINN: ... Stern's motives, Stern's agenda is to keep control of the money.

***

6

O'QUINN:  Stern was a user.  He used Anna Nicole.  He wasn't there for any other reason.  Remember, Anna Nicole took a massive amount of drugs while she was pregnant with Anna — with Dannielynn. . . . And **Stern is the one that got the drugs**. He got — they had so many drugs, they got them from more than one doctor. And **he took them around in a duffel bag — he being Stern — and fed them to Anna Nicole while she was pregnant. . . .**

***

O'QUINN:  …  **[Arthur] now has a granddaughter who's still in the hands of the man who all arrows (ph) are pointing to as having killed her daughter and her grandson**, and she's worried sick about what's going to happen to her granddaughter.

VAN SUSTEREN: . . . You know, there's been nothing to suggest — not — **there's been no even allegation that he killed the grandson or the daughter**. But I heard what you said. All right...

O'QUINN:  **There are allegations.**

VAN SUSTEREN:  All right. Well, OK. Well, they're your allegations.

(5)  <u>March 20, 2007 interview during the *Nancy Grace Show* on CNN Headline News</u> (Am. Compl. at ¶ 168 (emphasis added)):

GRACE:  John, what do you think of the biological dad of Anna Nicole Smith coming out and making allegations about homicide?

O'QUINN:  . . .  Most people I talk to on the inside think say they think that there is probably is – **Stern probably had something to do with it.** . . . Greed sometimes just takes people over.

***

O'QUINN:  . . . Stern is trying to control all evidence, because **he knows he faces prosecution for many crimes.**

(6)  <u>March 26, 2007 interview during the *Nancy Grace Show* on CNN Headline News</u> (Am. Compl. at ¶ 181 (emphasis added)):

O'QUINN:  Oh, but we're supposed to believe this was all accidental. . . . **So Stern can walk away from a murder.**

This was not accidental. That duffle bag is not an accident. It was brought there on purpose. Extra drugs beyond what the hospital was giving was not an accident. It was done on purpose. And let somebody

7

lay blue in a bed and not try to get any medical attention for them is not an accident.

(7) <u>March 27, 2007 interview during the *Nancy Grace Show* on CNN Headline News</u> (Am. Compl. at ¶ 195 (emphasis added)):

> O'QUINN: ...  **Howard Stern was there when both of them got deadly sick and died.**
>
> ***
>
> O'QUINN:  . . . The fact that he concluded, Perper concluded that it was a drug overdose, I don't quarrel with that, and I don't quarrel with his talents to figure that out. But **he basically based his story on what happened based on what Howard Stern told him. That's like asking the murderer to tell us how this person died. You don't necessarily get the truth.**
>
> GRACE: Well, again, before we call Stern a murderer...
>
> O'QUINN: OK, OK. **He's acting like he's the one. . . . .**

(8) <u>March 27, 2007 Interview during *On The Record With Greta Van Susteren* on Fox News</u> (Am. Compl. at ¶ 208 (emphasis added)):

> VAN SUSTEREN: ... What kind of information could [Arthur] add to this?
>
> O'QUINN: The information she could add is that her daughter was perfectly – she was a fine girl until she got in with Stern. . . . **Stern sought to manipulate Anna Nicole because really what he wanted was her money.**
>
> VAN SUSTEREN: **How would that be relevant to Daniel's death?**
>
> O'QUINN: **Motive.** Daniel was – had already figured things out. He was trying to get an investigator to – hire an investigator to investigate Stern and he went to his mother to get the money and **Stern learned of that and he decided he needed rid of Daniel.**

All of these accusations were made by O'Quinn and authorized by the O'Quinn Law Firm.

## ARGUMENT AND CITATION OF AUTHORITIES

**I.      THE COMPLAINT STATES AN ACTIONABLE CLAIM FOR SLANDER.**

Stern has stated a claim against O'Quinn for slander by pleading with specificity that O'Quinn's statements were false and defamatory and were uttered with actual malice.[1] O'Quinn's slanderous statements are not protected or privileged as a matter of law.

### A.      STERN HAS ADEQUATELY PLED A CLAIM FOR DEFAMATION.

Stern has stated a claim against Defendants for slander.

#### 1.      The Allegations In The Complaint Must Be Considered As True.

The allegations of the complaint must be accepted as true on a Rule 12(b)(6) motion to dismiss. Cruz v. Beto, 405 U.S. 319, 322 (1972). The court must give the plaintiff the benefit of every reasonable inference that can be drawn from the "well-pleaded" allegations of the complaint. See Retail Clerks Int'l Ass'n v. Schermerhorn, 373 U.S. 746, 753 n.6 (1963).

A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations of the complaint." Id. at 1969. As the Supreme Court has made clear:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'"

Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007) (decided two weeks after Twombly) (citations omitted). Thus, a court may grant a motion to dismiss only when "on the basis of a dispositive

---

[1] A determination of actual malice, like falsity, is inherently a factual issue that is not properly addressed in a 12(b)(6) motion to dismiss. Nevertheless, Stern has alleged actual malice in the Amended Complaint for each statement. Similarly, punitive damages require proof of actual malice and therefore are not properly addressed in a Rule 12(b)(6) motion to dismiss.

issue of law, no construction of the factual allegations will support the cause of action."

Marshall Cty. Bd. Of Educ. v. Marshall Cty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993).

### 2.    Stern Was Not Required To Attach Transcripts To The Complaint.

There is no requirement that Stern attach complete, authenticated transcripts of the broadcasts during which O'Quinn uttered slanderous statements about Stern. See, e.g., Fed. R. Civ. P. 10(c); 5A FED. PRAC. & PROC. CIV. 3d § 1327 (2007) ("[T]here is no requirement that the pleader attach a copy of the writing on which his claim for relief or defense is based."). On a Rule 12(b)(6) motion, the allegations of the complaint must be taken as true, and the court must determine the context based on the facts alleged in the Complaint. See Fed R. Civ. P. 12(b)(6). Any question about the context or accuracy of the alleged statements is a fact issue for summary judgment and not an issue for a motion to dismiss. Horsley v. Feldt, 304 F.3d 1125, 1135, 1137 (11th Cir. 2002) (questions regarding accuracy of transcript attached to answer were issues for summary judgment, not a Rule 12(b)(6) motion).[2]

The allegations set forth in the Amended Complaint are clearly sufficient for this Court to consider the context of O'Quinn's statements.[3] Florida courts have "expressly held that a defamatory statement does not need to be accounted for 'verbatim' to state a cause of action for slander" – even at trial. Lipsig v. Ramlawi, 760 So. 2d 170, 184 (Fla. 3d DCA 2000). This is particularly true when the defamation occurred during a television broadcast:

> The general rule in Florida is that allegedly defamatory words should be set out in the complaint. . . . That . . . does not necessarily require that the statements be set out verbatim. This is particularly true where the statements may not easily be

---

[2] Providing transcripts only aids the Court in its determination of defamatory meaning, and considering them "creates no unfairness to any party." Condit v. Dunne, 317 F. Supp. 2d 344, 357 (S.D.N.Y. 2004).

[3] Indeed, O'Quinn admitted during his jurisdictional deposition that at least with respect to the February 19 interview with Greta Van Susteren, he "believe[s]" that the partial transcript posted by Fox News "was, in fact, accurate" regarding his statements in the interview. (O'Quinn Depo. at 94.)

retained because they were made orally in either conversation or by radio or television broadcast. … Accordingly, we hold that <u>when the cause of action for defamation is based on oral statements, it is sufficient that the plaintiff set out the substance of the spoken words</u> with sufficient particularity to enable the court to determine whether the publication was defamatory.

<u>Edward L. Nezelek, Inc. v. Sunbeam Television Corp.</u>, 413 So. 2d 51, 55 (Fla. 3d DCA 1982) (emphasis added). There is no basis upon which O'Quinn can assert that he is not on notice from the Amended Complaint of the substance of slanderous statements he is alleged to have made.

## B.   O'QUINN'S STATEMENTS ARE NOT PROTECTED BY THE LITIGATION PRIVILEGE.

O'Quinn's accusations in the media that Stern murdered Ms. Smith and Daniel are not protected by the litigation privilege. The common law litigation privilege in Florida protects only statements that are: (1) "made in the course of judicial procedure," <u>and</u> (2) "relevant to the subject of inquiry." <u>Fridovich v. Fridovich</u>, 598 So. 2d 65, 66 (Fla. 1992) (citing <u>Myers v. Hodges</u>, 44 So. 357, 361 (1907)). Neither of those two necessary factors is met in this case.

### 1.   Statements To The Media Are Not Made "In The Course Of Judicial Procedure."

The litigation privilege extends only to "any act occurring during the course of a judicial proceeding . . . so long as the act has some relation to the proceeding." <u>Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.</u>, 639 So. 2d 606, 608 (Fla. 1994).

Defendants contend that the litigation privilege protects "nearly all conduct that occurs during a proceeding, so long as it has some relation to that proceeding." (Motion at 2.) However, the litigation privilege is not intended to cover press statements, and there are no cases extending the Florida litigation privilege to statements made to the media.

To the contrary, the two courts that have addressed this issue under Florida law have held that statements to the press are not communications occurring "during the course of a judicial

11

proceeding" which qualify for the privilege. Scholz v. RDV Sports, Inc., 710 So. 2d 618, 627 (Fla. 5[th] DCA 1998) (holding that statements to the media about a pending lawsuit were not protected by the litigation privilege because "the [defendant]'s statements were not made during the course of litigation, were not statements made to the court or opposing counsel, and were not included as testimony. Instead, the statements were made to the media in response to [the plaintiff]'s allegations that he had been fired because of racial discrimination."); Fuente Cigar, Ltd. v. Opus One, 985 F. Supp. 1448, 1457 (M.D. Fla. 1997) (holding that statements made to a magazine about a pending lawsuit were not protected by the litigation privilege because "the statements made to [the trade publication], statements made at the very onset of litigation and upon [the defendant]'s own initiative, did not occur in the due course of judicial procedure and, thus, are not entitled to any qualified privilege"). Both of these cases, which involve media statements made during the course of pending litigation about that litigation, make it clear that Florida's litigation privilege does not protect Defendants in this case.

The purpose of the absolute protection afforded by the litigation privilege is to prevent "the chilling effect on free testimony and access to the courts. . . ." Wright v. Yurko, 446 So. 2d 1162, 1164 (Fla. 5th DCA 1984). See also Fridovich, 598 So.2d at 68 (purpose of the privilege is "to encourage free and unhindered communication to assist the authorities in detecting and prosecuting perpetrators of criminal activity"). This purpose would not be furthered by extending the privilege to statements made to the media about an opposing party. Indeed, it would frustrate public policy to cut off a remedy to those who have had their reputations damaged by false statements about them. Id. at 69 ("There is no benefit to society or the administration of justice in protecting those who make intentionally false and malicious defamatory statements. . . .").

Although Florida law applies in this case, it is instructive that a multitude of courts which have addressed the applicability of the litigation privilege to statements to the media – including the United States Supreme Court – have determined that the litigation privilege does not protect statements made by attorneys to the media, even where those statements are directly related to pending litigation.[4] Treatises have reached the same conclusion.[5] It is widely recognized that statements to the media are not statements made "in the due course" of a judicial proceeding.

**2.     O'Quinn's Statements Were Not "Relevant To The Subject Of Inquiry."**

Even if O'Quinn's statements could be considered part of a judicial proceeding, they were not "relevant to the subject of inquiry." It is settled law in Florida that:

> in order that defamatory words . . . may be absolutely privileged, they must be connected with, or relevant or material to, the cause in hand or subject of inquiry. . . . We think the ends of justice will be effectually accomplished by not extending the privilege so far as to make it an absolute exemption from liability for defamatory words wholly and entirely outside of, and having no connection with, the matter of inquiry. For why should a person be absolutely privileged to defame another in the course of a judicial proceeding by making slanderous statements wholly outside of the inquiry before the court?

---

[4] See, e.g., Buckley v. Fitzsimmons, 509 U.S. 259, 277-78 (1993) ("Comments to the media have no functional tie to the judicial process just because they are made by a prosecutor. . . . The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions."); Asay v. Hallmark Cards, Inc., 594 F.2d 692, 697 (8th Cir. 1979) ("Publication to the news media is not ordinarily sufficiently related to a judicial proceeding to constitute a privileged occasion."); Encompass Ins. Co. v. Giampa, No. 05-11693-RCL, 2007 WL 3359703 at *5 (D. Mass. Sept. 27, 2007) ("Communications made to newspapers and during press conferences have been almost universally found to be excluded from the protection of absolute privilege.") (citation omitted); Classen Immunotherapies, Inc. v. King Pharms., Inc., 403 F. Supp. 2d 451, 460 (D. Md. 2005) (holding that statements made in press release are "extrajudicial publications" and are not made "in the course of a judicial proceeding" for purposes of the privilege); Pratt v. Nelson, 164 P.3d 366, 380 (Utah 2007) ("Extending the judicial proceeding privilege to statements made or distributed during a press conference would ill-serve the public policy underlying the privilege.").

[5] See, e.g., RESTATEMENT (SECOND) TORTS § 586 at reporter's note ("The absolute privilege does not extend to a press conference."); Sack on Defamation § 8.2.1 ("Statements to the press by a lawyer are not ordinarily privileged.").

Myers v. Hodges, 44 So. 357, 361 (1907) (emphasis added). See also Monroe v. Citimortgage, Inc., No. 8:07-cv-0066-SCB-TGW, 2007 WL 2071284, at *3 (M.D. Fla. July 19, 2007) (statements must be "legally necessary" and related to the lawsuit at issue for the litigation privilege to apply); Trent v. Mortgage Elec. Registration Sys., Inc., No. 3:06-cv-374-J-32HTS, 2007 WL 2120262, * 3 (M.D. Fla. July 20, 2007) (privilege did not apply to statements in pre-suit notices when "the law does not require that these notices be sent"); Clough Mktg. Servs., Inc. v. Main Line Corp., No. 1:07-CV-0173-RLV, 2007 WL 1430404, at * 6 (N.D. Ga. May 10, 2007) (holding that Florida law is "clear that simply 'relating to' the judicial proceeding is not enough. The allegedly tortious conduct must have been taken to prosecute or defend the lawsuit" in order to be protected by the litigation privilege). The accusations that O'Quinn made against Stern were not made in the course of any civil or criminal litigation against Stern regarding Ms. Smith's death – there was never any such litigation, because the authorities concluded that Ms. Smith's death was an accident. (Am. Compl. at ¶¶ 41-42.)

Defendants contend that O'Quinn's statements accusing Stern of murder were "related to the litigation in question" because O'Quinn made the statements in an attempt to gain a competitive advantage for his client, Arthur. That argument turns the analysis on its head. Defendants have admitted that the only issues that were the subject of pending litigation when the statements were made were: (1) custody of Ms. Smith's body, which involved a legal question as to who was the next of kin, and (2) custody of Ms. Smith's daughter, Dannielynn. (See O'Quinn Depo. at 41.) Certainly Stern recognizes that an attorney is entitled – and sometimes required – to advocate for his or her client in the court of public opinion.

But attorneys do not have *carte blanche* to slander opposing litigants. By stepping outside of the courtroom and making accusations against Stern on subjects that were not being

14

adjudicated by any court anywhere, O'Quinn moved from being subject to Rule 11 sanctions to being subject to civil penalties for his improper conduct. See, e.g., Encompass, 2007 WL 3359703, at *5 (rejecting the application of the litigation privilege to a press release issued by the plaintiff after filing a complaint alleging claims for fraud, civil conspiracy, and RICO violations: "In the instant case, the plaintiff not only repeated allegations made in the complaint to the press, but also added statements about its investigation, the costs of insurance fraud to consumers and the insurance industry, and [plaintiff's] commitment to fighting fraud and prosecuting criminals. Such statements go beyond the scope of the protection afforded by the absolute litigation privilege."). The cause of Ms. Smith's death was not at issue in any legal proceedings, and the cause of Daniel's death certainly was not at issue in any legal proceedings. O'Quinn's statements on those topics therefore fall outside any possible protection from the litigation privilege.

O'Quinn was nothing more than a "counsel who avails himself of his situation to gratify private malice by uttering slanderous expressions and making libelous statements, which have no relation to, or connection with, the cause in hand or the subject-matter of inquiry." Myers, 44 So. at 362. O'Quinn's statements are not protected by the litigation privilege, and his motion to dismiss on this basis should be denied.

C.     O'QUINN'S STATEMENTS ARE FALSE AND DEFAMATORY.

Stern has alleged that O'Quinn's statements are both false and defamatory, and those allegations are sufficient to survive a motion to dismiss. To state a claim for defamation under Florida law, the plaintiff must allege a "false and unprivileged publication" which is defamatory and "tends to harm the reputation of [the plaintiff]." LRX, Inc. v. Horizon Assocs. Joint Venture, 842 So. 2d 881, 885 (Fla. 4th DCA 2003). It is irrelevant whether the defendant is merely expressing or repeating the opinions of others, because the law is clear that a republisher of a

defamatory statement is just as liable for repeating the defamatory accusation as the original publisher of the statement. Layne v. Tribune Co., 146 So. 234, 237 (Fla. 1933) (holding that "a person must be held liable for the publication of a libel or defamatory words in regard to another, even though he is but repeating what he has heard"). See also Condit v. Dunne, 317 F. Supp. 2d 344, 363 (S.D.N.Y. 2004) ("[A] speaker who republishes the accusations of others is not immune from a defamation action.").

### 1.    O'Quinn's Statements Are Not Protected Opinion.

Defendants contend that O'Quinn's statements are protected opinion. Speech does not constitute protected opinion if it conveys or implies false statements of fact which are defamatory. See, e.g., Milkovich v. Lorain Journal Co., 497 U.S. 1, 18 (1990) (holding that there is no "wholesale defamation exemption for anything that might be labeled 'opinion'"); Stembridge v. Mintz, 652 So. 2d 444, 446 (Fla. 3d DCA 1995) (same, citing RESTATEMENT (SECOND) OF TORTS § 566); Johnson v. Clark, 484 F. Supp. 2d 1242, 1249-50 (M.D. Fla. 2007) (statements which "strongly implied" lawyer was negligent in handling estate matters were not protected opinion). The test in determining whether a statement is protected opinion is whether "the statements are capable of being proved false," in which case "they are not protected." Florida Med. Ctr., Inc. v. New York Post Co., 568 So. 2d 454, 458 (Fla. 4th DCA 1990). See also Barnes v. Horan, 841 So. 2d 472, 477 (Fla. 3d DCA 2002) (statements were not protected opinion when they could be "verified by receiving sworn testimony" as to their truthfulness).

A statement might be protected as opinion if all of the facts upon which the opinion is based are disclosed; however, "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." Milkovich, 497 U.S. at 18-19.

See also Lipsig, 760 So. 2d at 184 (statement is not protected "pure opinion" if speaker does not state the facts on which he bases his opinion or if the facts underlying the opinion are false or inaccurately presented).

### 2.      O'Quinn's Statements Are Not Rhetorical Hyperbole.

Defendants also assert that O'Quinn's statements constitute rhetorical hyperbole. "Rhetorical hyperbole" is a form of speech that is occasionally protected because the statements are a "vigorous epithet" or used "in a loose, figurative sense" such that the statements cannot "reasonably [be] interpreted as stating actual facts" about a person. Greenbelt Coop. Publ'g Ass'n v. Bresler, 398 U.S. 6, 13-14 (1970); Horsley v. Rivera, 292 F.3d 695, 701-02 (11th Cir. 2002). There is, however, no First Amendment protection if "a publication reasonably asserts a factual charge which is defamatory, even in a humorous or satirical vein." Ford v. Rowland, 562 So. 2d 731, 735 (Fla. 5th DCA 1990).

O'Quinn's statements accusing Stern of murder are not comparable to the rhetorical hyperbole in Horsley. The plaintiff in that case sued Geraldo Rivera for making statements that the plaintiff was "an accomplice to homicide" during a lively and spirited exchange between the two on Rivera's television talk show. Horsley, 292 F.3d at 699-700. The interview focused on plaintiff's pro-life website and the fact that after a doctor who performed abortions was killed, the plaintiff added that doctor's information to his website with a red X over the entry. The plaintiff and Geraldo had an exchange during which Geraldo challenged the purpose and merit of the plaintiff's website. Id. at 702. Geraldo was not seriously contending that the plaintiff was an "accomplice to homicide" or that he had any literal connection with the murder. Instead, he focused on whether the plaintiff was "morally responsible" for the doctor's death by encouraging people to target doctors who performed abortions. Id.

17

This case does not involve talk show banter with Geraldo Rivera. To the contrary, this case involves accusations of murder made by a well-known and credible lawyer who was involved in the controversies arising from Ms. Smith's death and who was speaking on legal news shows, ostensibly about topics with respect to which he had inside factual and legal knowledge. O'Quinn was plainly attempting to convey statements of fact to the viewers.

### 3.    O'Quinn's Statements Are Defamatory.

Defendants also assert with respect to a number of O'Quinn's statements that they are not defamatory. Defamatory meaning may be supplied by the implications of the language used, such as by considering the statements "in their totality." Madsen v. Buie, 454 So. 2d 727, 729 (Fla. 1st DCA 1984) (statements criticizing psychologists' treatment as communist "brainwashing" were "in their totality" defamatory and not protected opinion). Statements may also be defamatory by the juxtaposition of truthful statements, Boyles v. Mid-Florida Television Corp., 431 So. 2d 627, 634 (Fla. 5th DCA 1983), aff'd, 467 So. 2d 282 (Fla. 1985), or by omitting favorable facts which could refute the defamatory sting. See LRX, 842 So. 2d at 886-87. Defamatory meaning can be drawn from the implications of the language used even if all the statements are literally true. See, e.g., LRX, 842 So. 2d at 886-87; Johnson v. Clark, 484 F. Supp. 2d 1242, 1249-50 (M.D. Fla. 2007) (statements which "strongly implied" lawyer was negligent in handling estate matters were actionable); Abrams v. Gen. Ins. Co., 460 So. 2d 572, 573 (Fla. 3d DCA 1984) (letter denying insurance coverage could be read to defame plaintiff). Defamatory meaning is a question of first instance for the court, but "if an allegedly defamatory publication is reasonably susceptible of two meanings, one of which is defamatory and one of which is not, it is for the trier of fact to determine the meaning understood by the average reader." Ford, 562 So.

2d at 734. O'Quinn's statements either directly or impliedly accused Stern of involvement in the crime of murder, and those statements are plainly defamatory.

### 4. Discussion Of Individual Statements.

Stern will address each of the statements set forth in the Amended Complaint with respect to the elements of defamation that must be alleged to survive a motion to dismiss.[6] For each and every one of these statements, Stern has included separate allegations in the Amended Complain that the statement is false, is defamatory, and was uttered with actual malice.

#### (a)   Slanderous Interview 1 (Am. Compl. ¶¶ 88-104)

During this February 19, 2007, interview with Rita Cosby, O'Quinn claimed that Stern had requested a copy of Ms. Smith's will four (4) days prior to her death, and O'Quinn asked "[w]hy did he need to read that will unless he knew she was going to die?" (Am. Compl. ¶ 93.)

Defendants' only assertion with respect to this statement is that it is protected by the litigation privilege. Defendants do not dispute that this is a statement of fact, not opinion, in that O'Quinn is reporting that Stern requested a copy of Ms. Smith's will four (4) days prior to her death. Moreover, Defendants do not dispute that the statement was absolutely false, as unquestionably demonstrated by counsel for Stern during the Florida custody proceeding. (Am. Compl. ¶¶102-103.) O'Quinn plainly accused Stern of murder in this statement by contending that Stern knew of Ms. Smith's impending death and had a financial motive to cause her death.

#### (b)   Slanderous Interview 2 (Am. Compl. ¶¶ 105-124)

In this interview with Greta Van Susteren on February 21, 2007, O'Quinn repeated his client's belief that Stern murdered Ms. Smith, and he then confirmed that he shared that belief –

---

[6] Stern will not address with respect to each individual statement the contended application of the litigation privilege or the purported requirement that Stern attach transcripts, because those issues have been sufficiently discussed *supra*, and the arguments do not differ from statement to statement.

"you better believe it." (Am. Compl. ¶ 110 at pg. 22.) O'Quinn repeated his inaccurate accusation that Stern requested Ms. Smith's will prior to her death, claiming that Stern "had motive" and "had opportunity" to cause Ms. Smith's death. (Am. Compl. ¶ 110 at pg. 23.) He also contended that Stern controlled Ms. Smith "by keeping her doped up" and that O'Quinn had "talked to the maid who kept the place," and the maid "gave us a list of the drugs." (Am. Compl. ¶ 110 at pgs. 21-22.)

Defendants contend that these statements constitute opinion. As an initial matter, the accusations are not opinion because "the statements are capable of being proved false." See Florida Med. Center, 568 So. 2d at 459. Even if the accusations could be considered to be opinion, however, O'Quinn provided inaccurate and incomplete facts to support that opinion, and "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." Milkovich, 497 U.S. at 19.

O'Quinn attempted to justify his accusation by stating that Arthur "sat in the courtroom, like we all have. She has her own judgment about what she's heard. Everybody has a judgment by now about what they've heard." (Am. Compl. ¶ 110 at pg. 22.) O'Quinn thus asserted that facts that had been learned during the hearing – but which were not known to the viewer – supported his accusation that Stern murdered Ms. Smith. O'Quinn also repeated the inaccurate assertion that Stern had requested a copy of her will prior to Ms. Smith's death. Additionally, O'Quinn provided a purported witness to support his contention – when asked the basis for the accusation of murder, O'Quinn stated that he "talked to the maid," Thus, O'Quinn was plainly attempting to support, with evidence, his factual accusation that Stern murdered Ms. Smith.

(c)    **Slanderous Interview 3** (Am. Compl. ¶¶ 125-140)

During this March 1, 2007, interview with Nancy Grace, O'Quinn asserted that "there were seven life insurance policies on Anna Nicole's life, and the beneficiary was her son, who died under suspicious circumstances, and the alternative beneficiary is Stern." (Am. Compl. ¶ 129.) Thus, O'Quinn contended that "[t]his is all about the money." (Id.)

These statements convey false statements of fact – there were no life insurance policies whatsoever. (Am. Compl. ¶ 133.) The contention that there were life insurance policies was plainly used to support O'Quinn's theory that Stern murdered Ms. Smith and Daniel for money. It is irrelevant that O'Quinn prefaced his remark about the life insurance policies by the phrase "I've been told by sources that should know the truth." Repeating a slanderous statements subjects one to a claim for defamation.  See, e.g., Layne, 146 So. at 237 (holding that "a person must be held liable for the publication of a libel or defamatory words in regard to another, even though he is but repeating what he has heard").

Stern has also alleged that these statements are defamatory. (See Am. Compl. ¶ 134-37.) Although false statements that someone has life insurance policies might not be defamatory in a vacuum, these statements are plainly defamatory because they were provided by O'Quinn as a purported motive for Stern to murder Ms. Smith and Daniel.

(d)    **Slanderous Interview 4** (Am. Compl. ¶¶ 141-163)

This second interview with Greta Van Susteren took place on March 15, 2007. During this interview, O'Quinn contended that Stern was unfit to care for Dannielynn. He also asserted that "Stern is the one that got the drugs. . . . and fed them to Anna Nicole while she was pregnant." (Am. Compl. ¶ 145.) He further contended that Dannielynn, who was still in Stern's custody at the time, was "in the hands of the man who all arrows are pointing to as having killed

her daughter and her grandson. . . ." (<u>Id.</u>)

Defendants argue these statements are not actionable because they are not false. Stern has alleged repeatedly in his Amended Complaint that these accusations are false and that he has never been charged as a suspect in connection with either death. (<u>See, e.g.,</u> Am. Compl. ¶¶ 30-32, 39-40, 146-148.) Indeed, despite Defendants' wishful thinking that the cause of Ms. Smith's death is an open issue, Stern has alleged that the Florida authorities have quite clearly and unequivocally ruled Ms. Smith's death an "ACCIDENT." (Am. Compl. ¶¶ 41-42.)

On a motion to dismiss, this Court must consider all allegations of the Amended Complaint to be true and must construe all allegations in favor of Stern. Stern has pled that this statement is false and defamatory. <u>See, e.g.,</u> <u>Nautica Int'l, Inc. v. Intermarine USA</u>, 5 F. Supp. 2d 1333, 1344 (S.D. Fla. 1998) ("[T]aking the allegations contained in the Complaint as true, plaintiff has sufficiently pled the elements of defamation – a published false statement, communicated to a third party, causing damages – in order to withstand a motion to dismiss.").

(e)    **Slanderous Interview 5** (Am. Compl. ¶¶ 164-176)

During O'Quinn's second interview with Nancy Grace on March 20, 2007, he alleged that "[m]ost people I talk to on the inside think say they think that there probably is – Stern probably had something to do with it." (Am. Compl. ¶ 168.) He further stated that "Stern is trying to control all evidence, because he knows he faces prosecution for many crimes." (<u>Id.</u>)

Defendants' contention that O'Quinn was responding to suspicions voiced by other on the show is irrelevant. O'Quinn is liable for his own statements regardless of what other may or may not have said. O'Quinn asserted during this interview that he had "inside" information – facts unknown to the viewers – that supported his position that Stern was criminally involved in

the deaths of Ms. Smith and Daniel. That constitutes actionable statements of fact. Stern has alleged that those statements are false and defamatory. (See Am. Compl. ¶¶ 169-70, 171-173.)

  **(f)**  **Slanderous Interview 6** (Am. Compl. ¶¶ 177-190)

  On March 26, 2007, O'Quinn gave a third interview on Nancy Grace, during which he responded to the conclusion by the Florida authorities that Ms. Smith's death was accidental. O'Quinn disagreed with that conclusion and asserted "[t]his was not accidental . . . It was done on purpose." (Am. Compl. ¶ 181.) O'Quinn derided the conclusion of the Broward County Medical Examiner that Ms. Smith's death was accidental: "Oh, but we're supposed to believe this was all accidental. Remember, all accidental? So Stern can walk away from a murder." (Id.)

  Defendants again argue that O'Quinn was responding to suspicions voiced by others. However, O'Quinn was actively disagreeing with the conclusion reached by Dr. Perper, arguing that the characterization of Ms. Smith's death as an accident would permit Stern to "walk away from murder." That is a direct accusation of murder, based upon O'Quinn's contention that Stern gave Ms. Smith "extra drugs beyond what the hospital was giving" and that he "let [Ms. Smith] lay blue in a bed and not try to get any medical attention." (Id.) Stern has alleged that these factual allegations are false and defamatory. (Am. Compl. ¶¶ 182-86.)

  **(g)**  **Slanderous Interview 7** (Am. Compl. ¶¶ 191-204)

  During a fourth interview with Nancy Grace on March 27, 2007, O'Quinn continued to disagree with Dr. Perper's conclusion that Ms. Smith's death was an accident. He complained that Dr. Perper "basically based his story on what happened based on what Howard Stern told him. That's like asking the murderer to tell us how this person died." (Am. Compl. ¶ 195.) When Nancy Grace questioned O'Quinn's characterization of Stern as "a murderer," O'Quinn said that "[h]e's acting like he's the one." (Id.)

Defendants do not address O'Quinn's accusation of murder in this statement. It is irrelevant that other speakers might have been questioning Stern's actions. Stern has alleged that this accusation of murder by O'Quinn was false and defamatory. (Am. Compl. ¶¶ 196-200.)

(h)   **Slanderous Interview 8** (Am. Compl. ¶¶ 205-217)

On March 27, 2007, also gave a second interview to Greta Van Susteren. During that interview, O'Quinn asserted that Stern had "motive" to murder Daniel, because "Daniel was – had already figured things out. . . . Stern learned of that and he decided he needed rid of Daniel." (Am. Compl. ¶ 208.)

Defendants do not address this statement other than to complain that there is no transcript attached. Defendants are on notice of what O'Quinn is alleged to have said and can certainly respond to the allegations. This statement constitutes another direct accusation by O'Quinn that Stern murdered Daniel, and Stern has alleged that this statement is false and defamatory. (Am. Compl. ¶¶ 209-214.)

Stern has plainly alleged that all of the statements set forth in his Amended Complaint are false and defamatory and that they were published with actual malice. This Court must consider all allegations in the Amended Complaint as true, and it is clear that Stern's allegations state a claim against Defendants for slander.

## II.   THE COMPLAINT STATES AN ACTIONABLE CLAIM FOR FALSE LIGHT INVASION OF PRIVACY.

The tort of false light invasion of privacy differs from defamation in that it: 1) may be based on a statement that is not defamatory; and 2) seeks to protect, and provides for damages based on, emotional harm. Gannett Co. v. Anderson, 947 So. 2d 1, 4 (Fla. 1st DCA 2006). A defendant is liable for false light of invasion of privacy when he "gives publicity to a matter … that places [the plaintiff] before the public in a false light" if the matter is "highly offensive to a

reasonable person" and "the actor had knowledge or acted in reckless disregard as to the falsity

of the publicized matter and the false light in which the other would be placed." <u>Rapp v. Jews for

Jesus, Inc.</u>, 944 So. 2d 460, 467 (Fla. 4th DCA 2006), <u>rev. granted</u>, 963 So.2d 702 (Fla. 2007).[7]

     Stern's claims for false light invasion of privacy are not precluded by his defamation

claims. The false light claims here do not duplicate the defamation claims in that they are based

on those statements, if any, that the Court or jury may find do not rise to the level of defamation

– i.e., that the statement did not in fact injure Stern's reputation – but which statements are

highly offensive to the reasonable person and caused emotional harm to Stern. <u>See generally

Gannett</u>, 944 So. 2d at 4. Stern is entitled to redress for the emotional harm caused by O'Quinn's

reckless statements in addition to the harm to his reputation. Because it may not be determined

until trial whether the statements identified in the Amended Complaint were defamatory and

caused damage to Stern's reputation, see <u>Ford,</u> 562 So. 2d at 735, the false light claims cannot be

dismissed at this stage of the litigation. <u>See, e.g.,</u> <u>Rapp</u>, 944 So. 2d at 467-68 (dismissing

defamation claims but allowing false light claim to survive motion to dismiss).

## CONCLUSION

     Based on the foregoing, Stern respectfully submits that O'Quinn's Motion To Dismiss for

Failure to State a Claim must be DENIED.

     Respectfully submitted this 15th day of January, 2008.

<u>/s/ L. Lin Wood</u>
L. Lin Wood

---

[7] Defendants inaccurately contend that a false light invasion of privacy claim "is currently precluded under Florida law" merely because the issue was certified to the Florida Supreme Court in <u>Rapp</u>. (<u>See</u> Motion at 8.) To the contrary, the court in <u>Rapp</u> recognized that the Florida Supreme Court has recognized such an action, and therefore reversed the lower court's dismissal of that claim. 944 So. 2d at 468-69. Thus, such a claim is viable unless the Florida Supreme Court were to hold otherwise. <u>See, e.g.,</u> <u>Straub v. Lehtinen, Vargas & Riedi, P.A.</u>, No. 4D07-972, 2007 WL 4409483 at *2 (Fla. 4th DCA Dec. 19, 2007) (noting <u>Rapp</u> but nevertheless holding that the complaint in that case "sufficiently alleged the elements of a cause of action for false light invasion of privacy under Florida law").

(Georgia Bar No. 774588) (Pro hac vice)
llwood@pogolaw.com
Nicole Jennings Wade
(Georgia Bar No. 390922) (Pro hac vice)
nwade@pogolaw.com
Eric P. Schroeder
(Georgia Bar No. 629880) (Pro hac vice)
eschroeder@pogolaw.com
Katherine V. Hernacki
(Georgia Bar No.: 727027) (Pro hac vice)
Luke A. Lantta
(Georgia Bar No. 141407) (Pro hac vice)
llantta@pogolaw.com

**POWELL GOLDSTEIN LLP**
One Atlantic Center
Fourteenth Floor
1201 West Peachtree Street, N.W.
Atlanta, Georgia  30309
Telephone:     (404) 572-6600
Facsimile:     (404) 572-6999

M. Krista Barth
(Florida Bar No. 0461229)
krista@emsattorneys.com

**ERIC M. SAUERBERG, P.A.**
Suite 102
200 Village Square
Palm Beach Gardens, Florida  33410
Telephone:     (561) 776-0330
Facsimile:     (561) 776-0302

Attorneys for Plaintiff
Howard K. Stern

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **Plaintiff Howard K. Stern's Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Failure to State a Claim** was served upon the following by overnight delivery, addressed as follows:

> Robert M. Klein, Esq.
> kleinr@stephenslynn.com
> Roberta G. Mandel, Esq.
> Cayla B. Tenenbaum, Esq.
> Law Offices of Stephens Lynn La Cava
>    Hoffman & Puya, P.A.
> Two Datran Center – Penthouse II
> 9130 South Dadeland Boulevard
> Miami, FL 33156
>
> Neil McCabe, Esq.
> The O'Quinn Law Firm
> 440 Louisiana, Suite 2300
> Houston, Texas  77002

This 15th day of January, 2008.

> /s/ M. Krista Barth
> M. Krista Barth
> (Florida Bar No. 0461229)
> krista@emsattorneys.com

1246856