UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-60534-CIV-DIMITROULEAS

HOWARD K. STERN,

                                                 Magistrate Judge Rosenbaum

    Plaintiff,

vs.

JOHN M. O'QUINN and
JOHN M. O'QUINN & ASSOCIATES
PLLC d/b/a The O'Quinn Law Firm,

    Defendants.
_____/

### ORDER DENYING DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

THIS CAUSE is before the Court upon Defendants John O'Quinn and John M. O'Quinn & Associates PLLC d/b/a The O'Quinn Law Firm's Motion to Dismiss for Failure to State a Claim [DE 79]. The Court has carefully considered the Motion, Plaintiff Howard K. Stern's Response [DE 91], Defendants' Reply [DE 104], the underlying First Amended Complaint [DE 64] the arguments of counsel made before the undersigned at the hearing held on June 25, 2008, and is otherwise fully advised in the premises.

### I. BACKGROUND

Plaintiff filed the initial Complaint in this action for slander and false light invasion of privacy on April 13, 2007 [DE 1]. Plaintiff then filed the Amended Complaint, which is the operative complaint in this action, on November 9, 2007 [DE 64]. The Amended Complaint alleges that the Defendant John M. O'Quinn ("O'Quinn"), while representing John M. Quinn & Associates ("the O'Quinn Law Firm"), made false and defamatory public statements conveying that the Plaintiff, Howard K. Stern murdered Vickie Lynn Marshall, better known as Anna

Nicole Smith ("Ms. Smith"), and her son, Daniel Smith, for his own financial gain, and kidnapped Ms. Smith's daughter, Dannielynn, with the intent to ransom her to Larry Birkhead. Defendants allegedly made these statements during interviews for the national television media. Plaintiff points to eight (8) total interviews in which he believes that Defendant O'Quinn made false and defamatory statements.  The interviews at issue were given to Rita Crosby, Greta Van Susteren and Nancy Grace, and they were broadcast nation-wide.

Plaintiff Howard K. Stern ("Stern") is an attorney admitted to practice in the state of California. Defendant John M. O'Quinn ("O'Quinn") is also an attorney admitted to practice in the state of Texas.  Defendant the O'Quinn Law Firm is a Texas limited liability company organized as a law firm with its main office in Texas.  O'Quinn is the Managing Partner of the O'Quinn Law Firm.

On February 8, 2007 Ms. Smith was found unresponsive at the Seminole Hard Rock Hotel & Casino in Hollywood, Florida.  She was pronounced dead later that afternoon.  The death of Ms. Smith induced a media frenzy with around-the-clock media coverage regarding the medical and law enforcement investigation of Ms. Smith's death.  After Ms. Smith's death, Stern, as the nominated executor under Ms. Smith's Last Will and Testament, filed a petition seeking custody of Ms. Smith's body.  Prior to Ms. Smith's death, Stern was Ms. Smith's longtime personal attorney, friend and companion.  Stern's petition for custody was opposed by Virgie Arthur ("Arthur"), Ms. Smith's biological mother.

Defendants represented Arthur, before, during and after court proceedings held here in Broward County Florida in February of 2007.  These proceedings surrounded the legal custody of Ms. Smith's body and the paternity and parental custody of Ms. Smith's daughter Dannielynn.

Shortly after being hired by Arthur, O'Quinn traveled to Florida to assist with the litigation over custody of Ms. Smith's body and to handle media relations for Arthur.

During the course of his representation of Arthur, Defendant O'Quinn began making appearances on nationally-broadcast television shows representing himself to be Arthur's attorney. According to the allegations of the Amended Complaint, O'Quinn was acting as an employee and representative of the O'Quinn Law Firm when he made these media appearances on behalf of Arthur. In the Amended Complaint, Plaintiff alleges that these media interviews contained false and defamatory statements that constitute slander per se. The gist of these statements according to the Amended Complaint is that "Stern is a despicable person worthy of public scorn and contempt, falsely stating that he engaged in a number of crimes and other violent, unsavory and disreputable acts, including, but not limited to, criminal involvement in the death of Daniel Smith; criminal involvement in the death of Ms. Smith; and kidnapping Dannielynn for ransom."

The allegedly slanderous statements made by Defendant O'Quinn during various nationally-broadcast television interviews are as follows:

> 1) On February 19, 2007, O'Quinn gave an interview on *Rita Crosby Specials Unit*, where the Plaintiff alleges the following defamatory statements were uttered:
>
>> **O'QUINN:** Why would anyone ask to see the will like Stern did, unless the person was dead who wrote the will or the person who wrote the will was about to die?
>>
>> **COSBY:** What are you suggesting?
>>
>> **O'QUINN:** I suggest you draw your own conclusions. He asked to read the will 4 days before Anna Nicole died in his presence. . . Why did he need to read that will unless he knew she was going to die?
>>
>> * * *
>>
>> **O'QUINN:** . . . What must have been going through Mr. Stern's mind that he

wanted to read that will 4 days before Anna Nicole died?  Draw your own conclusions.   Use your own common sense.

2) On February 21, 2007, O'Quinn gave an interview on *On the Record with Greta Van Susteren*, where the Plaintiff alleges the following defamatory statements were uttered:

> **O'QUINN:** [Virgie Arthur] believes Howard K. Stern murdered her daughter.
>
> **VAN SUSTEREN:** Murdered?
>
> **O'QUINN:** Yes.
>
> **VAN SUSTEREN:** Strong word.
>
> **O'QUINN:** That's what she said.  She said that in court, He killed her.
>
> **VAN SUSTEREN:** What's the basis for that, for the - for being there, sort of complicit that Anna Nicloe took drugs or providing her drugs? I mean, what's her theory?
>
> **O'QUINN:** He handled all the drugs.  We've talked to the maid who kept the place.  She gave us a list of the drugs.  That's where I got the list.  And he wanted to keep total control over her by keeping her doped up.  He had total control over her.  It was all a technique, a Machiavellian, sinister technique.
>
> \* \* \*
>
> **O'QUINN:** She sat in the courtroom, like we all have.  She has her own judgment about what she's heard.  Everybody has a judgment by now about what they've heard.
>
> **VAN SUSTEREN:** And you agree with that judgment, murder?
>
> **O'QUINN:** You better believe it.  Why does a man ask for a will four days before a person dies?
>
> \* \* \*
>
> **VAN SUSTEREN:** There's a lot of suspicion about their presence in the Bahamas.  I agree.  That's still not murder, though.
>
> **O'QUINN:** And motive.  He had opportunity.  He was alone with her for three days.  He had motive.  And there's evidence that he handled her drugs.

3) On March 1, 2007, O'Quinn gave an interview on the *Nancy Grace Show*  where the Plaintiff alleges the following defamatory statements were uttered:

> **O'QUINN:** I've been told by sources that should know the truth that there were seven life insurance policies on Anna Nicole's life, and the beneficiary was her son, who died under suspicious circumstances, and the alternative beneficiary is Stern.
>
> \* \* \*

>**O'QUINN:** I'm told they were paid up and in full force, and the primary beneficiary was her son, who died under very suspicious circumstances.
>
>\* \* \*
>
>**O'QUINN:** . . . This is all about money.

4) On March 15, 2007, O'Quinn gave an second interview with *On the Record with Greta Van Susteren* where the Plaintiff alleges the following defamatory statements were uttered:

>**O'QUINN:** . . .Stern' motives, Stern's agenda is to keep control of the money.
>
>\* \* \*
>
>**O'QUINN:** Stern was a user. He used Anna Nicole. He wasn't there for any other reason. Remember, Anna Nicole took a massive amount of drugs while she was pregnant with Anna - with Dannielynn . . . . And Stern is the one that got the drugs. He got - they had so many drugs, they got them from more than one doctor. And he took them around in a duffel bag - he being Stern - and fed them to Anna Nicole while she was pregnant . . .
>
>\* \* \*
>
>**O'QUINN:** . . . [Arthur] now has a granddaughter who's still in the hands of a man who all arrows (ph) are pointing to as having killed her daughter and her grandson, and she's worried sick about what's going to happen to her granddaughter.
>
>**VAN SUSTEREN:** . . .You know, there's been nothing to suggest - not - there's been no even allegations that he's killed the grandson or the daughter. But I heard what you said. All right . . .
>
>**O'QUINN:** There are allegations
>
>**VAN SUSTEREN:** All right. Well, OK. Well they're your allegations.

5) On March 20, 2007, O'Quinn gave a second interview on the *Nancy Grace Show* where the Plaintiff alleges the following defamatory statements were uttered:

>**GRACE:** John, what do you think of the biological dad of Anna Nicole Smith coming out and making allegations about homicide?
>
>**O'QUINN:** . . . Most people I talk to on the inside think say they think that there is probably is - Stern probably had something to do with it . . . . Greed sometimes just takes people over.
>
>\* \* \*
>
>**O'QUINN:** . . . . Stern is trying to control all evidence, because he knows he faces prosecution for many crimes.

6) On March 26, 2007, O'Quinn gave a third interview on the *Nancy Grace Show* where the Plaintiff alleges the following defamatory statements were uttered:

> **O'QUINN:** Oh, but we're supposed to believe this was all accidental. . . . So Stern can walk away from a murder.
>
> This was not accidental. That duffel bag is not an accident. It was brought there on purpose. Extra drugs beyond what the hospital was giving was not an accident. It was done on purpose. And let somebody lay blue in bed and not try to get any medical attention for them is not an accident.

7) On March 27, 2007, O'Quinn gave another interview on the *Nancy Grace Show* where the Plaintiff alleges the following defamatory statements were uttered:

> **O'QUINN:** . . . Howard Stern was there when both of them got deadly sick and died.
>
> * * *
>
> **O'QUINN:** . . . The fact that he concluded, Perper concluded that it was a drug overdose, I don't quarrel with that, and I don't quarrel with his talents to figure that out. But he basically based his story on what happened based on what Howard Stern told him. That's like asking the murder to tell us how this person died. You don't necessarily get the truth.
>
> **GRACE:** Well, again, before we call Stern a murderer. . .
>
> **O'QUINN:** OK, OK, He's acting like he's the one. . .

8) On March 27, 2007, O'Quinn gave another interview on *On the Record with Greta Van Susteren* where the Plaintiff alleges the following defamatory statements were uttered:

> **VAN SUSTEREN:** . . . What kind of information could [Arthur] add to this?
>
> **O'QUINN:** The information she could add is that her daughter was perfectly - she was a fine girl until she got in with Stern. . . Stern sought to manipulate Anna Nicole because really what he wanted was her money.
>
> **VAN SUSTEREN:** How would that be relevant to Daniel's death?
>
> **O'QUINN:** Motive. Daniel was - had already figured things out. He was trying to get an investigator to - hire an investigator to investigate Stern and he went to his mother to get the money and Stern learned of that and he decided he needed rid of Daniel.

Accordingly, Plaintiff alleges that during the course of his representation of Arthur, on at least eight (8) occasions, Defendant O'Quinn, as a representative of the O'Quinn law firm, appeared in nationally televised interviews and uttered slanderous statements about him.

6

Plaintiff seeks to recover from the Defendants due to the damage he suffered to his reputation.

## II. DISCUSSION

In their Motion to Dismiss, Defendants argue that the entire Amended Complaint should be dismissed.  Defendants argue that the Plaintiff fails to state a claim because: (1) Florida's litigation privilege bars all of Plaintiff's defamation claims; (2) O'Quinn's statements were non-defamatory as a matter of law, because they were pure opinion and/or rhetorical hyperbole; (3) Plaintiff has failed to sufficiently allege actual malice; (4) the Florida Supreme Court has never formally endorsed the validity of a cause of action for false light invasion of privacy; (5) joint and several liability is precluded by the invalidity of the Plaintiff's slander and false light claims; and finally (6) Plaintiff's claim for punitive damages fails because the Plaintiff cannot show actual malice.  The Court will address each argument in turn.

### a. Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should be granted if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007) (abrogating Conley v. Gibson, 355 U.S. 41 (1957)).  The allegations of the claim must be taken as true and must be read to include any theory on which the plaintiff may recover.  See Linder v. Portocarrero, 963 F.2d 332, 336 (11th Cir. 1992) (citing Robertson v. Johnston, 376 F.2d 43 (5th Cir. 1967)).

### b. Plaintiff's Defamation Claims

The Court will begin by addressing the Defendants' three grounds for attacking the Plaintiff's defamation claims:

*1. Plaintiff's Claims are Not Barred by Florida's Litigation Privilege*

Defendants first argue that the Plaintiff's claims are barred by Florida's litigation privilege. They argue that despite the fact that the statements were made outside of the courtroom, they are nonetheless part of the prosecution or defense of the lawsuit and are therefore absolutely privileged, regardless of how defamatory they might otherwise be. Defendants argue that in this day and age, the media serves as an important battle ground in any litigation. According to the Defendants, the battle over public opinion can be nearly as important as the battle in the courtroom itself. Defendants further point to statements made by Stern in the Amended Complaint suggesting that the Plaintiff also views Defendant's statements to the press as part of the overall legal battle. For example, Plaintiff states: "O'Quinn's strategy was to injure Stern's reputation in the public arena so that Defendants and Arthur could gain a competitive advantage in the court proceedings and media frenzy surrounding Ms. Smith's death, paternity and custody of Ms. Smith's daughter, and/or control of the estate of Ms. Smith." The Plaintiff, on the other hand, argues that these statements were made outside the courtroom and were therefore not made in "the course of a judicial proceeding." Additionally, Stern contends the statements were unrelated to the litigation because none of the statements were legally necessary in the prosecution of any claim or defense at issue. The Court agrees with the Plaintiff that Florida's litigation privilege does not extend so far as the Defendants suggest.

In Florida, all statements made in "the course of judicial proceedings" are absolutely privileged, and no cause of action for damages can lie, regardless of how false or malicious the statements may be, so long as they are "relevant to the subject of inquiry." See Fridovich v. Fridovich, 598 So. 2d 65, 66 (Fla. 1992). The Florida Supreme Court explained the scope and

rationale behind the litigation privilege in Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell v. U.S. Fire Ins. Co.:

> In balancing policy considerations, we find that absolute immunity must be afforded to any act occurring during the course of a judicial proceeding, regardless of whether the act involves a defamatory statement or other tortious behavior such as the alleged misconduct at issue, so long as the act has some relation to the proceeding. The rationale behind the immunity afforded to defamatory statements is equally applicable to other misconduct occurring during the course of a judicial proceeding. Just as participants in the litigation must be free to engage in unhindered communication, so too must those participants be free to use their best judgment in prosecuting or defending a lawsuit without fear of having to defend their actions in a subsequent civil action for misconduct.

639 So. 2d 606, 608 (Fla. 1994). In the Florida Supreme Court's most recent pronouncement on the issue, it reiterates that the focus is on whether the statements were made in furtherance of a party's prosecution or defense of the action. See Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole, 950 So. 2d 380, 384 (Fla. 2007) ("participants must be free to use their best judgment in prosecuting or defending a lawsuit.").

The Court agrees with the Plaintiff that this reasoning, to encourage "unhindered communication" during the course of judicial proceedings does not extend to statements made outside of the courtroom to the media. In-court misbehavior can be regulated by the Court's inherent power and civil contempt power. Levin, 639 So. 2d at 608-09. It would be unreasonable to expect or allow Courts to regulate all statements made by litigants, attorneys and witnesses to the press. Accordingly, to extend the privilege to such statements would effectively cut off any form of remedy to those who have had their reputations damaged by false and defamatory statements. See Fridovich, 598 So. 2d at 69 ("There is no benefit to society or the administration of justice in protecting those who make intentionally false and malicious defamatory statements.").

9

The two Florida courts to address this issue came to the same conclusion. See Scholz v. RDV Sports, Inc., 710 So. 2d 618, 627 (Fla. 5th DCA 1998) ("the Magic's statements were not made during the course of litigation, were not statements made to the court or opposing counsel, and were not included as testimony. Instead, the statements were made to the media in response to Scholz' allegations that he had been fired because of racial discrimination."); Fuente Cigar, Ltd. v. Opus One, 985 F. Supp. 1448, 1457 (M.D. Fla. 1997) ("It is manifest that the statements made to *Cigar Insider*, statements made at the very onset of litigation and upon Opus One's own initiative, did not occur in the due course of judicial procedure and, thus, are not entitled to any qualified privilege.").[1] In fact, the Defendant identifies, and the Court has not found, any case where a Florida court has extended the litigation privilege to statements made to the media. This Court will not be the first to do so.

What is more, even if the Court were to hold that the statements occurred during the course of a "judicial proceeding," the Plaintiff's cause of action still would not be barred by Florida's litigation privilege because the Defendant's statements are not "relevant to the subject of inquiry." Under Florida law, "in order that defamatory words, published by the parties,

---

[1] It is worth noting that the vast majority of courts outside of Florida have likewise declined to extend their litigation privileges to statements made to the media. See e.g. Buckley v. Fitzsimmons, 509 U.S. 259, 277-78 (1993) ("Comments to the media have no functional tie to the judicial process just because they are made by the prosecutor. At the press conference, Fitzsimmons did not act in 'his role as advocate for the State.' The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the State's case in court, or actions preparatory for these functions. Statements to the press may be an integral part of a prosecutors job, and they may serve a vital public function. But in these respects a prosecutor is in no different position than other executive officials who deal with the press, and, as noted, qualified immunity is the norm for them."); Encompass Ins. Co. of Mass. v. Giampa, 522 F. Supp. 2d 300, 309 (D. Mass. 2007) ("'Communications made to newspapers and during press conferences have been almost universally held to be excluded from the protection of absolute privilege.'" (quoting Med. Informatics Eng'g, Inc. v. Orthopaedics Ne, P.C., 458 F. Supp. 2d 716, 724 (N.D. Ind. 2006))); Classen Immunotherapies, Inc. v. King Pharms., Inc., 403 F. Supp. 2d 451, 460 (D. Md. 2005) (holding that statements made in press release are "extrajudicial publications" and are not made "in the course of a judicial proceeding" for purposes of the privilege).

counsel or witnesses in the due course of judicial procedure may be absolutely privileged they must be connected with, or relevant or material to the cause in hand or subject of inquiry." Myers v. Hodges, 53 Fla. 197, 209 (1907). The litigation at issue, when O'Quinn's statements were made, concerned custody of Ms. Smith's body, as well as the paternity and custody of her daughter Dannielynn. Under Florida law, in order for the Florida litigation privilege to apply, the statements must be legally necessary for the prosecution or defense of a lawsuit. See Monroe v. Citimortgage, Inc, 2007 WL 2071284 *3 (M.D. Fla. July 19, 2007) (holding that payoff letters that were not "legally necessary" to the lawsuit were not related to the lawsuit at issue and therefore the privilege did not apply); Trent v. Mortgate Elec. Registration Sys., Inc., 2007 WL 2120262 *3 (M.D. Fla. July 20, 2007) ("After detailed review of the Echevarria decision and the unsettled state of Florida law on this issue, this Court is unprepared to extend the litigation privilege to pre-suit communications especially where, as here, the parties agree that the law does not require that these notices be sent."); Clough Mktg. Servs. v. Main Line Corp., 2007 WL 1430404 *6 (N.D. Ga. May 10, 2007) ("The Florida Supreme Court's reasoning in Levin and Echivarria, and the holdings themselves, make clear that simply 'relating to' the judicial proceeding is not enough. The allegedly tortious conduct must have been taken to prosecute or defendant the lawsuit, and that did not occur in this case."). In this case, the out-of-court statements made by O'Quinn to the press, alleging that the Plaintiff was somehow involved in the death of Ms. Smith could under no interpretation be deemed to be legally necessary to the in-court litigation surrounding custody of Ms. Smith's body or the paternity or custody of her child. Accordingly, the Defendants' Motion to Dismiss based on Florida's litigation privilege must be denied.

*2. The Court Cannot Hold, at this point in the Proceedings, that O'Quinn's Statements were Non-Defamatory as a Matter of Law*

Alternatively, Defendants argue that even if Florida's litigation privilege does not act to bar the Plaintiff's defamation claims they are non-defamatory as a matter of law. Defendants argue that O'Quinn's statements are protected as either pure opinion or rhetorical hyperbole and that a reasonable person could not possibly have imputed a defamatory meaning to the Defendant's statements.[2]

"'To recover for libel or slander under Florida law, a plaintiff must demonstrate that: 1.) the defendant published a false statement; 2.) about the plaintiff; 3.) to a third party; and 4.) that [plaintiff] suffered damages as a result of the publication.'" Fortson v. Colangelo, 434 F. Supp. 2d 1369, 1378 (S.D. Fla. 2006) (quoting Thompson v. Orage Lake Country Club, Inc., 224 F. Supp. 2d 1368, 1376 (M.D. Fla. 2002)). However, the United States Supreme Court has held that "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual" cannot support a cause of action. Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990). The test in determining whether a statement is protected opinion is whether "the

---

[2] As a preliminary matter, the Defendant argues that the Court must consider the statements made within the entirety of their context. See Colodny v. Iverson, Yoakum, Papiano & Hatch, 936 F. Supp. 917, 923 (M.D. Fla. 1996). This statement of the law is undoubtedly correct. However, the Plaintiff has not attached entire transcripts of the interviews and has only provided the particular excerpts that he alleges are defamatory. Stern was not required to attach complete transcripts of the interviews to the Complaint and the Court must consider the statements as alleged in the Complaint as true. Any issues regarding the accuracy of the statements or their context are issues more appropriate for summary judgment. See Horsley v. Feldt, 304 F.3d 1125, 1135 (11th Cir. 2002) (holding that questions regarding the accuracy of transcripts attached to the Defendant's answer were issues more appropriate for summary judgment). Accordingly, the Defendants' burden at this stage in the litigation is to show that the Plaintiff's allegations fail to state a claim that is plausible on its face. See Twombly, 127 S. Ct. at 1974. Accordingly, the Court will review the Defendant's statements as they are alleged in the Complaint. If the Defendants, at a later stage in the litigation, wish to argue that, taken in context, upon review of the entire transcripts and as viewed in their original context, O'Quinn's statements were non-defamatory as a matter of law, the Court will be receptive to that argument. At this point, however, it is inappropriate, as the Plaintiff's allegations are sufficient to comply with Rule 8(a) of the Federal Rules of Civil Procedure.

statements are capable of being proved false." Fla. Med. Ctr., Inc. v. New York Post Co., 568 So. 2d 454, 458 (Fla. 4th DCA 1990). Although pure opinions are protected, mixed expressions of opinion are not. Fuente Cigar, 985 F. Supp. 1448, 1457 (M.D. Fla. 1997). "Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the article or assumed to exist by the parties to the communication." Id. (internal citations and quotations omitted).

The Court finds that in this case, the statements by the Defendant were at least mixed expressions of opinion, if not pure facts. The Plaintiff alleges that the Defendant repeatedly made false and defamatory statements implying that the Plaintiff murdered Ms. Smith and her son. He also alleges that O'Quinn further supported these false statements by making misstatements of the underlying facts. For example, according to the Plaintiff, on several occasions the Defendant alleged that Stern had requested a copy of the Plaintiff's will four (4) days prior to her death. Further, Plaintiff alleges that O'Quinn stated that Stern was an alternative beneficiary to Ms. Smith's life insurance policies. According to the Plaintiff, both of these statements are false. In the course of making these statements, O'Quinn suggested that he was in possession of non-public information that had informed his so-called "opinions." He did this by making reference to what people who were present in the courtroom had learned, stating that he had spoken with the maid at the hotel and implying that he had conducted his own personal investigation. If a speaker states the facts upon which his opinion is based "if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." Milkovich, 497 U.S. at 19. Accordingly, the Court cannot hold at this early stage in this litigation that O'Quinn's statements are constitutionally

13

protected expressions of opinion.

The Court also rejects the Defendants' allegations that O'Quinn's statements constituted little more than "rhetorical hyperbole." Speech that is protected as "rhetorical hyperbole" must consist of "the sort of loose, figurative language that no reasonable person would believe presented facts." Horsley v. Feldt, 304 F.3d 1125, 1132-33 (11th Cir. 2002)."Where rhetorical hyperbole is employed, the language itself 'negate[s] the impression that the writer was seriously maintaining that [the plaintiff] committed the [particular act forming the basis of the alleged defamation]." Fortson, 434 F. Supp. 2d at 1379. In ultimately making this determination the Court must consider the statements in their totality. Smith v. Cuban Am. Nat'l Found., 731 So. 2d 702, 705 (Fla. 3d DCA 1999). The Defendant argues that the Court must consider the fact that these statements took place on shows that are essentially "tabloid television." However, at this early stage in the litigation, construing all facts and all reasonable inferences in the light most favorable to the Plaintiff, the Court finds that O'Quinn's false statements of fact could "convey to a reasonable [person] the impression that it describes actual facts about the plaintiff or the activities in which he participated." Fortson, 434 F. Supp. 2d at 1379. Accordingly, the Court must also deny the Defendants' motion to dismiss on these grounds. These issues are more appropriate for determination on a motion for summary judgment or at trial after the parties have had the opportunity to conduct discovery and more fully supplement the record.

*3. Plaintiff has Sufficiently Alleged Actual Malice*

Finally, Defendants argue that Stern is a limited public figure, and as such, his defamation suit is subject to First Amendment limitations. New York Times Co. v. Sullivan, 376 U.S. 254, 279-280 (1964). As a limited public figure, Stern must show that O'Quinn made his statements

with "actual malice," which means "with knowledge that it was false or with reckless disregard of whether it was false or not." Colodny v. Iverson, Yoakum, Papiano & Hatch, 936 F. Supp. 917, 922 (M.D. Fla. 1996).  Defendants argue that Stern can prove no set of facts showing that O'Quinn acted with "actual malice" in making the allegedly defamatory statements.  In his Response, the Plaintiff does not argue that he is not required to prove actual malice, rather he argues that the determination of actual malice is a factual one that is inappropriate on a motion to dismiss.  The Court agrees; the cases that the Defendants cite that have held that a plaintiff has failed to meet his or her burden on the issue of actual malice are cases decided on summary judgment motions, not on motions to dismiss.  See e.g. Shaw v. R.J. Reynolds Tobacco Co., 818 F. Supp. 1539 ( M.D. Fla. 1993) aff'd, 15 F. 3d 1097 (11th Cir. 1994).  Accordingly, the Court agrees with the Plaintiff that the general allegations that the Defendants acted with actual malice with respect to each of the alleged defamatory statements is sufficient to conform with the notice pleading standards of Rule 8(a) of the Federal Rules of Civil Procedure.  The Defendants arguments in this respect are more appropriate for disposition on a motion for summary judgment.  Accordingly, the Defendants' Motion to Dismiss the Plaintiff's defamation claims on this grounds must also be denied.

### c. Plaintiff's False Light Invasion of Privacy Claims

Defendant argues that Plaintiff's false light invasion of privacy claim must be dismissed for failure to state a claim because the state of Florida no longer recognizes a cause of action for false light invasion of privacy.  Defendant argues that the Supreme Court of Florida has never directly endorsed the validity of a cause of action for invasion of privacy on the false light theory. Gannett Co., Inc. v. Anderson, 947 So. 2d 1, 6 (Fla. 1st DCA 2006).  However, the Court agrees

with the reasoning of the Fourth District Court of Appeals that the Supreme Court of Florida has tacitly recognized the existence of the tort, and that until the Supreme Court holds that Florida no longer recognizes the tort of false light invasion of privacy, this Court will continue to recognize it.  See Rapp v. Jews for Jesus, Inc., 944 So. 2d 460, 468 (Fla. 4th DCA 2006) (finding that the Florida Supreme Court cases "Ginsberg and Agency for Health Care, as well as cases from this court, have given false light invasion of privacy a toehold in Florida law.").  Accordingly, the Defendants' Motion to Dismiss the Plaintiff's false light invasion of privacy claim must be denied.

### d. Plaintiff's Joint and Several Liability Claim and Claim for Punitive Damages

Defendant argues that the Plaintiff's claim for joint and several liability cannot stand where his claims for slander and false light invasion fail.  Ovadia v. Bloom, 756 So. 2d 137, 140 (Fla. 3d DCA 2000).  However, because the Court has found that the Plaintiff has sufficiently stated a claim with respect to all claims, the Plaintiff's claim for joint and several liability cannot be dismissed on these grounds.  Likewise, Defendants argue that the Plaintiff can show no set of facts that O'Quinn acted with actual malice in making the allegedly defamatory statements, and therefore, his punitive damages claim must be dismissed.  See Gertz v. Welch, 418 U.S. 323, 349 (1974).  However, as discussed more fully above, because the Court finds that the Plaintiff has adequately alleged actual malice at this point in the proceedings, the Defendants' Motion to Dismiss on this grounds must be denied.

### III. CONCLUSION

Accordingly, for the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants John O'Quinn and John M. O'Quinn & Associates PLLC d/b/a The

O'Quinn Law Firm's Motion to Dismiss for Failure to State a Claim [DE 79] is hereby

**DENIED**.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 7th day of August, 2008.

*[signature]*
WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:

Counsel of record