# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-60534-CIV-DIMITROULEAS/ROSENBAUM

HOWARD K. STERN,

      Plaintiff,

vs.

JOHN M. O'QUINN and
JOHN M. O'QUINN & ASSOCIATES PLLC,
d/b/a The O'Quinn Law Firm,

      Defendants.

_____/

## <u>OMNIBUS ORDER</u>

This matter comes before the Court on Defendants' Motion from Protective Order [D.E. 111],  Plaintiff's Motion to Compel Defendants' Compliance With Local Rule 26.1 [D.E. 126], Plaintiff's Motion to Determine the Sufficiency of Defendant John M. O'Quinn's Responses to Plaintiff's First Request for Admissions [D.E. 128], Plaintiff's Motion to Compel Responses to Interrogatories From Defendant John M. O'Quinn [D.E. 130], Plaintiff's Motion to Compel Production of Documents Responsive to Plaintiff's First Request for Production of Documents From Defendant John M. O'Quinn & Associates PLLC, d/b/a The O'Quinn Law Firm [D.E. 131], and Plaintiff's Motion to Compel Production of Documents Responsive to Plaintiff's First Request for Production of Documents From Defendant John M. O'Quinn.  [D.E. 132].  The Court has fully reviewed the Motions, Responses, Replies, and the case file in this matter.  The Court also heard oral argument from counsel for the parties at a hearing conducted on August 13, 2008.  This Order memorializes the rulings made from the bench on some of the motions presented and further sets

forth the Court's rulings on those motions taken under advisement.

## I. *BACKGROUND*

Plaintiff Howard K. Stern ("Plaintiff" or "Stern") filed the initial Complaint in this matter on April 13, 2007, alleging claims for slander and false light invasion of privacy. [D.E. 1]. On November 9, 2007, Plaintiff filed his First Amended Complaint also alleging slander and false light invasion of privacy, but adding Defendant John M. O'Quinn & Associates PLLC, d/b/a The O'Quinn Law Firm (the "Firm"), as a party. [D.E. 64]. The First Amended Complaint alleges that individual Defendant John M. O'Quinn ("O'Quinn"), as a representative and authorized agent for the Firm, made false and defamatory public statements conveying that Plaintiff murdered Vickie Lynn Marshall, better known as Anna Nicole Smith ("Ms. Smith") and her son Daniel Smith for Plaintiff's own financial gain. The First Amended Complaint also alleges that Defendant O'Quinn publicly stated that Plaintiff kidnapped Ms. Smith's young daughter Dannielynn, with the intent to ransom her to Larry Birkhead ("Birkhead"). Plaintiff contends that O'Quinn made the statements during eight interviews on national television, including interviews given to Greta Van Susteren, Nancy Grace, and Rita Cosby.

The facts that form the basis of the First Amended Complaint stem from litigation that ensued after the death of Ms. Smith in Hollywood, Florida. Therefore, a recitation of background facts relating to that litigation is necessary for a full understanding of the issues now before the Court.

Plaintiff is an attorney licensed to practice law and was Ms. Smith's longtime personal attorney and companion before her death. D.E. 64, ¶¶ 2-3. On February 8, 2007, Ms. Smith died suddenly during a trip to Florida with Plaintiff. *Id.* ¶ 36. More particularly, Ms. Smith was found unresponsive at the Seminole Hard Rock Hotel & Casino in Hollywood, Florida, and pronounced

dead later that afternoon.  *Id.* at ¶ 37.  Ms. Smith's death received extensive media coverage regarding the medical and law enforcement investigation of her death.  *Id.* at ¶ 43.

Following Ms. Smith's death, Plaintiff, as the nominated executor of Ms. Smith's Last Will and Testament, filed a petition seeking custody of Ms. Smith's body so that he could have her buried in the Bahamas next to her son Daniel.  *Id.* at ¶ 44.  Virgie Arthur ("Arthur"), Ms. Smith's biological mother, who wanted Ms. Smith to be buried in Texas, opposed Plaintiff's petition.  *Id.* at ¶ 46. Plaintiff's petition, along with issues surrounding the paternity and custody of Ms. Smith's infant daughter Dannielynn became the subject of nationally broadcast court proceedings in Broward County, Florida (the "Broward County proceedings").  *Id.* at ¶ 45.

Defendants represented Arthur during these court proceedings and continue to represent Arthur in other proceedings stemming from those initiated in Broward County.  In the course of such representation, O'Quinn traveled to Florida to assist with the litigation.  *Id.* at ¶¶ 47-48.  According to Plaintiff, Defendants hired an investigator, Don Clark ("Clark"), to assist them in their representation of Arthur in the Broward County proceedings.  *Id.* at ¶ 49.  Clark allegedly conducted an investigation into Ms. Smith's and Daniel Smith's deaths at the Firm's expense.  *Id.* at ¶ 50. According to Plaintiff, Defendants' investigation continued through April of 2008.  *See* D.E. 133.

During his representation of Arthur in the Broward County proceedings, O'Quinn made appearances on television shows and in the print media.  *Id.* at ¶ 54.  According to Plaintiff, in making these appearances, O'Quinn was acting as an employee and representative of the Firm, within the scope of his representation of Arthur on behalf of the Firm.  *Id.* at ¶¶ 58-60.  Plaintiff contends that the media interviews contained false and defamatory statements that constitute slander *per se.  Id.* at ¶ 82.  Additionally, Plaintiff alleges that O'Quinn made the statements to injure Plaintiff's reputation so that Defendants and Arthur could gain a competitive advantage in the

Broward County proceedings and surrounding media frenzy.  *Id.* at ¶¶ 61, 69.  Plaintiff further asserts that the Firm authorized O'Quinn to make the public statements to the media.  *Id.* at ¶ 60.

In sum, Plaintiff argues that the statements alleged to have been made by O'Quinn conveyed the message that "Stern is a despicable person worthy of public scorn and contempt, falsely stating that he engaged in a number of crimes and other violent, unsavory, and disreputable acts, including, but not limited to, criminal involvement in the death of Daniel Smith; criminal involvement in the death of Ms. Smith; and kidnapping Dannielynn for ransom." *Id.* at ¶ 80.  As noted above, according to Plaintiff, the statements were made during various interviews.   The interviews occurred on February 19, 2007 (*Rita Cosby Specials Unit*), February 21, 2007 (*On the Record With Greta Van Susteren*), March 1, 2007 (*Nancy Grace Show*), March 15, 2007 *(On the Record With Greta van Susteren*), March 20, 2007 *(Nancy Grace Show)*, March 26, 2007 (*Nancy Grace Show*), and March 27, 2007 (*Nancy Grace Show*), March 27, 2007 (*On the Record with Greta Van Susteren*). Accordingly, Plaintiff contends that during the course of his representation of Arthur in the Broward County proceedings, and as authorized by the Firm, O'Quinn, on at least eight occasions, appeared on nationally televised interviews and slandered Stern.  As a result, Plaintiff filed the initial Complaint in this matter on April 13, 2007.

A few months later, on September 4, 2007, Rita Cosby ("Cosby") and Hachette Book Group, USA, Inc. ("Hachette"), published a book entitled *BLONDE AMBITION: The Untold Story Behind Anna Nicole Smith's Death* ("*Blonde Ambition*").  *Id.* at ¶ 70.  According to Plaintiff, *Blonde Ambition* falsely accuses Stern of a number of "salacious and criminal acts." *Id.* at ¶ 71.  In the First Amended Complaint, Plaintiff alleges that an investigator working as an agent or employee of Defendants served as the source of false accusations contained in *Blonde Ambition*. *Id.* at ¶ 72. Plaintiff further contends that the investigator allegedly engaged in this behavior in furtherance of

-4-

Defendants' goal to injure Plaintiff's reputation. *Id.* at ¶ 73.

Thus, on October 9, 2007, Plaintiff filed a libel lawsuit against Cosby and Hachette, which is currently pending in the United States District Court for the Southern District of New York, *Howark K. Stern v. Rita Cosby, et al.*, Case No. 07-Civ-8536 ("*Blonde Ambition* Litigation"). D.E. 64 at ¶ 74; D.E. 121 at 6. Through the *Blonde Ambition* Litigation, Plaintiff discovered that Defendants' investigator Clark, as well as another investigator assisting Clark, Wilma Vicedomine ("Vicedomine"), served as the source for many of the statements contained in *Blonde Ambition*. D.E. 121 at 6.

Indeed, in the *Blonde Ambition* Litigation, Cosby and Hachette list Vicedomine in their Initial Disclosures as an individual likely to have discoverable information. Specifically, the Initial Disclosures state that Vicedomine has information regarding the "truth of statements in *Blonde Ambition*, facts refuting Mr. Stern's allegations of fault, [and] Mr. Stern's conduct and reputation." *See* Exhibits G & H to D.E. 121. Likewise, the Initial Disclosures identify Clark as having similar information. *Id.* Plaintiff asserts that while the investigation was ongoing, Clark and Vicedomine revealed information from their investigation to third parties such as Cosby. D.E. 133 at 3. Additionally, Plaintiff contends that Clark attemped to persuade the Federal Bureau of Investigation ("FBI") and Florida Attorney General to re-open the investigation into Ms. Smith's death. *See* D.E. 133.

Also during this same time frame, according to Plaintiff, Vicedomine posted her investigative progress on the Internet. *Id.* In this respect, Plaintiff asserts that Vicedomine, under various pseudonyms, shared intimate details of the Clark/Vicedomine investigation in Internet chat rooms. D.E. 121 at 10. Specifically, Plaintiff asserts that Vicedomine posted thousands of messages in an online chat room dedicated to discussion of Ms. Smith's death. In these alleged postings,

Vicedomine allegedly discussed aspects of Defendants' investigation, including strategy, efforts to have Plaintiff prosecuted, and conversations that she had with Arthur. *Id.* Further, Plaintiff alleges that Vicedomine directed chat room members to post specific statements regarding Plaintiff on the website TMZ.com. *Id.* at 11.

On the same day that Plaintiff filed his lawsuit against Cosby and Hachette, October 9, 2007, Arthur filed a lawsuit in Texas against Plaintiff and others in which she alleged that Plaintiff conspired with Ms. Smith and other third-party media entities to defame her. D.E. 64 at ¶ 75. The lawsuit, *Virgie Arthur v. Howard K. Stern*, Case No. 07-Civ-03742 ("Texas Lawsuit"), is currently pending in the United States District Court for the Southern District of Texas. Plaintiff claims that Arthur filed the Texas Lawsuit in retaliation for the instant lawsuit. *Id.* at ¶ 77. Defendants continue to represent Arthur in the Texas Lawsuit.

## II. *PROCEDURAL HISTORY*

As noted above, Plaintiff filed his First Amended Complaint on November 9, 2007, alleging slander and false light invasion of privacy against O'Quinn and the Firm. [D.E. 64]. In response to the First Amended Complaint, Defendants filed a Motion to Dismiss For Failure to State a Claim ("Motion to Dismiss"). [D.E. 79].[1] In their Motion to Dismiss, Defendants asserted that Florida's litigation privilege bars Plaintiff's defamation claim. [D.E. 79]. Additionally, Defendants argued that O'Quinn's statements were non-defamatory, as a matter of law, and were protected as either pure opinion or rhetorical hyperbole. *Id.* at 4. More specifically, Defendants argued that "there is not a single instance of any particular 'fact' that is related by O'Quinn." *Id.* at 5-6. In this regard,

---

[1]Defendants also filed a Motion to Dismiss for Lack of Jurisdiction [D.E. 80], which was denied by the Court. However, an in-depth discussion of the D.E. 80 is not necessary for a determination of the matters now before the Court.

Defendants submitted that O'Quinn's statements could be interpreted only as constituting his own opinion and the opinion of his client Arthur since no reasonable viewer could have thought that O'Quinn's comments were statements of fact. *Id.* Further, Defendants asserted that the statements should be taken in context, upon review of the entire transcripts and as viewed in their original context. *Id.*

In their Motion to Dismiss, Defendants also argued that as a limited public figure, Plaintiff must show that O'Quinn made his statements with actual malice. In other words, Defendants contended that Plaintiff must demonstrate that the statements were made "with knowledge that [they] were false or with reckless disregard of whether [they were] false or not." *Id.* at 6 (citing *Colodny v. Iverson, Yoakum, Papiano & Hatch*, 936 F. Supp. 917 (M.D. Fla. 1996)). Ultimately, Defendants posed that Plaintiff "can prove no set of facts in support of his First Amended Complaint that O'Quinn deliberately or recklessly uttered the challenged statements, believing his statements to be false." *Id.* at 7. Defendants emphasized that an ongoing debate exists about the Smiths's deaths, and "there is continued speculation and no conclusive suspect(s) and/or no conclusive cause of death." *Id.*

On August 8, 2008, the Court entered an Order Denying Defendants' Motion to Dismiss for Failure to State a Claim. [D.E. 156]. The Court disagreed with Defendants' assertion that Florida's litigation privilege bars Plaintiff's claims and declined to extend the privilege to statements made to the media. *Id.* at 10. The Court further determined that the litigation privilege did not apply because O'Quinn's alleged statements were not legally necessary for the prosecution or defense of the lawsuit surrounding custody of Ms. Smith's body or the paternity or custody of her child. *Id*. at 11. Additionally, the Court denied the Motion to Dismiss, since it declined to find that O'Quinn's statements were non-defamatory as a matter of law. *Id.* at 12. In this regard, the Court expressed

that the statements by O'Quinn were "at least mixed expressions of opinion, if not pure facts." *Id.* at 13. In making this determination, the Court specifically noted that during the course of his statements, O'Quinn suggested that he was in possession of non-public information that supported his statements. *Id.* Additionally, the Court found that O'Quinn implied that he had conducted his own personal investigation. *Id.*

While the Motion to Dismiss was pending, Plaintiff propounded discovery, much of which constitutes the subject of the motions now before the Court for consideration. More particularly, Plaintiff served non-party Wilma Vicedomine with a subpoena *duces tecum*. The subpoena issued to Vicedomine encapsulates many of the focal issues before the Court for consideration. A review of the subpoena reveals that it seeks documents in Vicedomine's possession individually and as an agent of the Firm, O'Quinn, or investigator Clark, concerning her investigation of, and any communications regarding, Plaintiff, Ms. Smith, Daniel Smith, Larry Birkhead, Virgie Arthur, and the paternity of Dannielynn. *See* Composite Exhibit A to D.E. 111.

In response to this subpoena, Defendants filed a Motion for Protective Order [D.E. 111] stating that Vicedomine has assisted the Firm in developing information which is relevant to the various proceedings that the Firm is handling on behalf of its client Arthur. Consequently, Defendants argue that any information developed by Vicedomine for use by the Firm or any communications that she maintained with the Firm are protected by the attorney-client privilege and the work-product doctrine. [D.E. 111 at 5]. Hence, Defendants urge that Plaintiff must be precluded from taking Vicedomine's deposition and obtaining the requested information.

Additional discovery requests propounded by Plaintiff seek information and documentation that Defendants similarly contend are protected by either the attorney-client privilege or work-product doctrine. Generally speaking, these discovery requests seek documents, materials, and

information reviewed by O'Quinn, which support the statements attributed to O'Quinn in the First Amended Complaint.   Likewise, the discovery requests seek documents concerning the Firm's efforts to investigate whether O'Quinn's statements about the Plaintiff were true or false.   The requests necessarily include documents obtained by investigator Clark and those working for him, such as Vicedomine, in conducting the investigation into the Smiths' deaths and the paternity of Dannielynn.  As with the Vicedomine deposition, Defendants responded to the discovery requests by asserting that much of the information sought was protected from disclosure by the attorney-client privilege and work-product doctrine.

Plaintiff has filed a number of Motions to Compel [D.E. 130, 131, 132] with respect to these discovery requests.   Additionally, Plaintiff complains that Defendants failed to provide privilege logs that comply with Local Rule 26.1.G.3.c and, therefore, they seek to compel compliance with this rule.  *See* D.E. 126.  Finally, Plaintiff filed a Motion to Determine the Sufficiency of Defendant O'Quinn's Responses to Plaintiff's First Request for Admissions.  *See* D.E. 128.

All of these motions have been briefed fully and were the subject of a hearing held on August 13, 2008.  Accordingly, these matters are ripe for disposition and shall be addressed below.

## III.  *DISCUSSION*

The Court's consideration of Plaintiff's various motions seeking to compel discovery begins with a review of the scope of permissible discovery under Rule 26(b), Fed. R. Civ. P.  That rule provides, in relevant part, that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . .   Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  R. 26(b)(1), Fed. R. Civ. P.  The Advisory Committee Notes to Rule 26 indicate that "[t]he purpose of discovery is to allow a broad search for facts, the names of witnesses,

or any other matters which may aid a party in the preparation or presentation of his case."  Adv. Com. Notes, 1946 Amendment, R. 26, Fed. R. Civ. P. (citations omitted).  Indeed, the Advisory Committee Notes approvingly cite language from a case stating that "the Rules . . . permit 'fishing for evidence as they should.'"  *Id.* (citation omitted); *see also Hickman v. Taylor*, 329 U.S. 495, 507 (1947) ("No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case.").

The courts have long recognized the wide scope of discovery allowed under the Federal Rules of Civil Procedure.  As the Eleventh Circuit's predecessor court noted,

> The discovery provisions of the Federal Rules of Civil Procedure allow the parties to develop fully and crystalize concise factual issues for trial. Properly used, they prevent prejudicial surprises and conserve precious judicial energies.  The United States Supreme Court has said that they are to be broadly and liberally construed.

*Burns v. Thiokol Chem. Corp.*, 483 F.2d 300, 304 (5th Cir. 1973)[2] (citing *Hickman v. Taylor*, 329 U.S. 495, 507 (1947); *Schlagenhauf v. Holder*, 379 U.S. 104, 114-115 (1964)).

Of course, the scope of permissible discovery is not unbounded.  Requested discovery must be relevant, and it must not impose an undue burden or be unreasonably cumulative, under the standards described in Rule 26(b)(2)(C).  Finally, even if the discovery sought satisfies all of these requirements, an opposing party may not be compelled to respond to it where the opposing party invokes and demonstrates the applicability of an appropriate privilege or protection, except under certain conditions.  The Court need not address these additional considerations, however, if Plaintiff cannot first demonstrate the relevance of the information sought, as relevance serves as the gate through which all discovery requests must pass.  Accordingly, the Court turns its attention first to

---

[2]Pursuant to *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

Plaintiff's assertions of relevance.  Only if Plaintiff can satisfy a showing of relevance under Rule 26(b) must the Court consider Defendants' claims of privilege and protection, as well as Defendants' objections to the discovery Plaintiff seeks.

**A.**   **Relevance**

Essentially, Plaintiff seeks (1) all documents, materials, and information reviewed by Defendant O'Quinn and directed by Defendant O'Quinn to be created or obtained ("O'Quinn Materials"); and (2) all documents, materials, and information obtained by Don Clark and those working with or for him in conducting the investigation into Plaintiff, the deaths of the Smiths, and the paternity of Dannielynn allegedly ordered by Defendants on behalf of their client Virgie Arthur[3] ("Investigation Materials").  In support of his requests, Plaintiff argues that the O'Quinn Materials fall within the scope of relevancy under Rule 26, Fed. R. Civ. P., because the First Amended Complaint charges O'Quinn with knowingly and recklessly making false and defamatory public statements regarding Plaintiff.  Thus, Plaintiff urges, what O'Quinn actually knew at the times that he made the alleged statements will provide evidence relating to O'Quinn's state of mind during those times.  Similarly, how O'Quinn chose to direct the investigation bears on Plaintiff's allegations that Defendants "ignored contradictory evidence," D.E. 64, ¶¶101, 121, 139, 162, 175, 189, 203, and 216, and "purposely avoided learning the truth[.]" D.E. 64, ¶¶231, 232; *see also* ¶¶102, 122, 140,

---

[3]The discovery requests themselves, as well as the items subpoenaed from Vicedomine, actually seek broader categories of documents.  At the hearing, however, Plaintiff made clear that he is seeking to compel production and responses only with respect to the O'Quinn Materials and the Investigation Materials.  Plaintiff specifically disclaimed seeking communications between Defendants and their agents, on the one hand, and their client Arthur or Defendants' attorneys in the pending case, on the other.  Plaintiff similarly stated that he does not seek Defendants' nor their counsel's attorney files, except to the extent that a particular portion of Defendants' attorney files developed in representing Arthur constitutes a part of the O'Quinn Materials or the Investigation Materials.

163, 176, 190, 204, and 217.  Plaintiff further argues that Defendants, through their discovery responses and briefs, have already demonstrated their intention to rely as a defense upon O'Quinn's knowledge at the time of the statements at issue, based on information he received at least in significant part from the Law Firm's investigation.  Defendants do not dispute the relevance of the O'Quinn Materials through the time that O'Quinn allegedly made the last public statement attributed to him in the First Amended Complaint.  Nor could they.  It is axiomatic that evidence relating to an alleged defamer's knowledge and thought process at the time of the statements at issue bears on the issue of actual malice.  *See Herbert v. Lando*, 441 U.S. 153, 160-65 (1979).

Beyond that time frame, however, Defendants argue that the O'Quinn Materials can shed no further light on O'Quinn's state of mind at the time that he made the alleged statements since any O'Quinn Materials reviewed by O'Quinn after the last alleged defamatory statement could not be considered a part of O'Quinn's knowledge at the time he allegedly made the statements.  In response, Plaintiff asserts that any efforts by O'Quinn after making the alleged statements to investigate further the truth of the subject matter upon which O'Quinn had already opined reflects on O'Quinn's state of mind.  According to Plaintiff, additional investigation by O'Quinn amounts essentially to a concession by O'Quinn that he had doubts about the truth of the statements attributed to him or he otherwise did not know the truth of the statements he allegedly made at the times he allegedly made them, thus tending to suggest that O'Quinn may have acted with actual malice in making the statements.

The Court agrees with Plaintiff that the O'Quinn Materials for the time period following O'Quinn's last alleged public statement at issue fall within the broad scope of relevancy as provided by Rule 26, Fed. R. Civ. P., although the Court concludes that the relevance of such information is minimal.  The Supreme Court has indicated that a plaintiff may demonstrate actual malice by, among

other methods, presenting "subsequent statements of the defendant, . . . facts tending to show a reckless disregard of the plaintiff's rights, . . . or [evidence] that defendant had failed to make a proper investigation before publication of the statement in question." *See Herbert v. Lando*, 441 U.S. at 164 n.12 (quoting with approval 50 Am.Jur.2d, Libel and Slander §455 (1970)). Consequently, evidence concerning O'Quinn's post-statement efforts directing further investigation into the subject matter of his previously-made alleged statements could reflect in some way on O'Quinn's state of mind at the time the statements were made. *See Herbert v. Lando*, 73 F.R.D. 387, 396-97 (S.D.N.Y. 1977), *rev'd on other grounds*, 568 F.2d 974 (2d Cir. 1977), *rev'd on other grounds*, 441 U.S. 153 (1979). Nevertheless, because such evidence could also relate simply to Defendants' efforts to prepare their defense in the pending case, and further, because other evidence such as the manner in which O'Quinn directed the investigations through the time of the alleged statements and what O'Quinn actually knew at the time of the statements attributed to him are far more probative on the issue of O'Quinn's state of mind, the Court finds the post-statement investigative efforts to be of minimal relevance.

As for the Investigation Materials, Plaintiff asserts that these are relevant to the claims before the Court because Plaintiff will effectively have to demonstrate the falsity of the statements attributed to O'Quinn in the First Amended Complaint in order to prevail on his claims, and the Investigation Materials can fairly be expected to provide relevant information pertaining to the facts surrounding the deaths of the Smiths and the paternity of Dannielynn, and, thus, to the truth or falsity of the alleged statements. Defendants do not challenge Plaintiff's assertion in this particular regard. The Court similarly agrees that evidence shedding light on the truth or falsity of the alleged statements is relevant to the claims before the Court in this case.

Additionally, since, as noted above, the First Amended Complaint avers that Defendants

"ignored contradictory evidence" and "purposely avoided learning the truth," Plaintiff contends that the entirety of the investigation O'Quinn ordered regarding the deaths of the Smiths and the paternity of Dannielynn – not just what O'Quinn states he actually reviewed – is relevant. According to Plaintiff, if O'Quinn's own investigation uncovered evidence contradictory to O'Quinn's alleged statements, such a fact would bear on Defendants' alleged recklessness, as well as perhaps on O'Quinn's state of mind, at the time he allegedly uttered the statements at issue.

Defendants disagree, arguing that it was reasonable for O'Quinn to rely upon his investigator Don Clark to provide O'Quinn with the most significant information collected from the investigation, as Clark served for approximately thirty years as an agent of the Federal Bureau of Investigation ("FBI"), ultimately heading the FBI's Houston office. Because, in Defendants' view, O'Quinn's reliance on Clark was reasonable, Defendants contend that only information passed along by Clark to O'Quinn has any relevance to the action before the Court.

The problem with Defendants' position is twofold. First, in order to deny the relevance of the Investigation Materials on this suggested basis, the Court must at this relatively early stage of the litigation make a finding that O'Quinn's reliance on Clark was reasonable and effectively relieved O'Quinn from any responsibility to review Investigation Materials other than those that Clark chose to give him. This the Court cannot do. While it may, in fact, ultimately turn out to be the case that O'Quinn's reliance on Clark was reasonable, such a determination would be inappropriate at this point in the litigation. Indeed, discovery exists to allow the parties to explore fully the claims and defenses in the case. In this case, no real doubt can exist that the Investigation Materials in their entirety would be relevant, at least through the point in time when O'Quinn made the last statement attributed to him, should O'Quinn fail in his position that his reliance on Clark was reasonable. Moreover, discovery of the Investigation Materials could bear on the reasonableness of O'Quinn's

-14-

stated reliance on Clark.

Second, even if Defendants' contention that O'Quinn's reliance on Clark was reasonable ultimately succeeds, Plaintiff will still likely be entitled to cross-examine O'Quinn regarding what he reviewed and what he did not examine, particularly in view of the contention that O'Quinn and the Law Firm directed the investigation that Clark undertook. Thus, the entirety of the Investigation Materials through the time of the last attributed statement is certainly at least relevant to the pending case on this independent basis.[4]

As for the relevance of the post-statement Investigation Materials, Plaintiff again relies upon his argument discussed above with respect to the O'Quinn Materials, that the way in which the investigation was directed and conducted after O'Quinn allegedly made all of the statements identified in the First Amended Complaint provides some insight into O'Quinn's state of mind at the time that he allegedly made the statements at issue. Defendants invoke the same response as they did to the relevance of the O'Quinn materials on this basis.

---

[4]During the hearing on these Motions, Plaintiff asserted that as it relates to Defendant Law Firm, the First Amended Complaint bases liability on two separate legal theories: *respondeat superior* and liability against Defendant Law Firm in its own right, regardless of the liability of Defendant O'Quinn. Thus, if the Court declined to find the Investigation Materials to be relevant because of O'Quinn's defense that his reliance on Clark was reasonable, Plaintiff urged the Court to find the materials relevant, nonetheless, to the Law Firm's state of mind at the time that O'Quinn allegedly made the statements attributed to him. In other words, Plaintiff argued, because Clark acted as an agent of the Law Firm while conducting the investigation, anything Clark learned through the investigation must be attributed to the Law Firm's knowledge, regardless of whether O'Quinn actually reviewed or otherwise knew of the information. Defendants challenged Plaintiff's contention that the First Amended Complaint asserts liability against the Law Firm in any way other than vicariously. Moreover, Defendants contended that, as a matter of law, the Law Firm could not be liable in its own right for defamation in the absence of a finding that O'Quinn was liable. The Court need not determine whether the First Amended Complaint seeks liability against the Law Firm in its own right or whether, as a matter of law, such a claim would even be viable, as the Court's finding of relevance above moots the issue for purposes of the Motions presently under consideration.

The Court discerns no reason for treating the post-statement Investigation Materials any differently than the post-statement O'Quinn Materials. Accordingly, the Court finds the post-statement Investigation Materials to be of at least minimal relevance under Rule 26 for the same reasons as the Court determined the post-statement O'Quinn Materials to satisfy the relevancy standard.

**B.    Privilege**

**1.    Work-Product Protection**

The findings of relevance, however, do not end the Court's inquiry or dictate compulsion of Plaintiff's discovery requests. Rather, Defendants argue that even if the requested discovery materials are relevant, the Court must deny discovery of them because allowing discovery would intrude upon Defendants and their client's work-product protection. In this regard, Defendants assert that when Clark and Vicedomine engaged in their investigative activities, they did so as agents of Defendants, in furtherance of Defendants' representation of their client Virgie Arthur in "numerous proceedings arising out of the death of her daughter, Anna Nicole Smith[,] . . . [and in] representing Ms. Arthur in a defamation action which has been filed against the Plaintiff, Howard K. Stern, in the United States District Court for the Southern District of Texas." D.E. 111, pp. 4-5. In addition to risking disclosure of work-product information from these other matters, Defendants assert that discovery of such materials and information "threaten[s] the disclosure of information that is being developed for the actual defense of the claim that the Plaintiff, Howard K. Stern, has filed against O'Quinn to the extent that there are common elements of fact that are relevant to both The Firm's representation of Virgie Arthur and The Firm's defense of the claims that have been filed against O'Quinn and The Firm in the case at hand." *Id.* at p. 5.

The work-product protection traces its recognition in American courts to *Hickman v. Taylor*,

329 U.S. 495 (1947).  In *Hickman*, the Supreme Court explained the rationale for the protection:

> Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients.  In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference.  That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways – aptly though roughly termed by the Circuit Court of Appeals in this case (153 F.2d 212, 223) as the 'Work product of the lawyer.'  Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten.  An attorney's thoughts, heretofore inviolate, would not be his own.  Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial.  The effect on the legal profession would be demoralizing.  And the interests of the clients and the cause of justice would be poorly served.

329 U.S. at 510-11.

Rule 26(b)(3), Fed. R. Civ. P., codifies the work-product doctrine originally recognized by the United States Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947), as it pertains to "documents and tangible things" sought in discovery.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1421 (11th Cir. 1994); *see also* Advisory Committee Notes to 1970 Adoption of Rule 26(b)(3), Fed. R. Civ. P. (discussing the Rule's adoption of the *Hickman* work-product doctrine principles).  That rule provides, in relevant part,

> Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney,

> consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.  In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation. . . .

By the terms of Rule 26(b)(3), the Rule applies only to "documents and tangible things" and only at the discovery stage.  Therefore, where a party invokes work-product protection as it involves non-tangible things, such as testimony, or it relates to a different stage of the litigation than discovery, courts must look to *Hickman v. Taylor*.  Regardless of the item or information sought or the stage of the litigation at which it is requested, however, federal law governs application of the work-product protection, even in diversity cases.  *See United Coal Companies v. Powell Const. Co.*, 839 F.2d 958, 966 (3d Cir. 1988); *see also Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 658-59 (S.D. Ind. 1991) (citing *Hickman v. Taylor, supra*; *Pete Rinaldi's Fast Foods, Inc. v. Great Amer. Ins. Cos.*, 123 F.R.D. 198, 201 (M.D.N.C. 1988); Fed. R. Evid. 501); *Abbott Labs. v. Alpha Therapeutic Corp.*, 200 F.R.D. 401, 405 (N.D. Ill. 2001).

Moreover, the fact that materials might be generated by an agent of the attorney, and not the attorney himself, does not divest of that status what would otherwise be considered protected by the work-product doctrine:

> At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

*U.S. v. Nobles,* 422 U.S. 225, 238-39 (1975).  Thus, the mere fact that some, or even all, of the O'Quinn and Investigation Materials may have been prepared by Clark or Vicedomine does not mean that such Materials do not enjoy the protections of the work-product doctrine, provided that the Materials otherwise qualify for work-product protection.

### a.    Anticipation of Litigation

The burden to demonstrate the applicability of the work-product doctrine falls on the shoulders of the party claiming the protection.  *U.S. v. Moore*, 485 F.2d 1165, 1166 (5th Cir. 1973); *Place St. Michel, Inc. v. Travelers Prop. Cas. Co. of America*, 2007 WL 1059561, *3 (S.D. Fla. Apr. 4, 2007) (citing *Guidry v. Jen Marine LLC*, 2003 WL 22038377, *3 (E.D. La. Aug. 25, 2003); *Auto Owners Ins. Co. v. Totaltape, Inc.*, 135 F.R.D. 199, 201 (M.D. Fla. 1990).  Here, while Plaintiff notes Defendants' burden to show that the materials at issue were prepared in anticipation of litigation or for trial and further observes that "'[t]he mere conclusory assertion that material sought is covered by . . . work product privilege is not sufficient to render such material undiscoverable,'" *see* D.E. 133 at p. 9 (citing *Place St. Michel*, 2007 WL 1059561, *3), Plaintiff does nothing more to challenge Defendants' assertions that the materials and information for which Defendants invoke work-product protection were created in anticipation of litigation or for trial.

Furthermore, the First Amended Complaint, by its allegations, effectively concedes that information and materials developed during the course of the investigations into the Smiths' deaths and the paternity of Dannielynn were created in anticipation of litigation or for trial.  *See* D.E. 64. In this regard, paragraphs 44 through 61 discuss the custody hearings over Anna Nicole Smith's body and the origins of Defendants' representation of Virgie Arthur.  *Id.*  In particular, paragraphs 44, 46, 47, 48, 49, and 50 allege as follows:

44.    After Ms. Smith's death, Stern, as the nominated executor under Ms. Smith's Last

Will and Testament, filed a petition seeking custody of Ms. Smith's body so that he could carry out Ms. Smith's intent to be buried in the Bahamas next to her son, Daniel.

46.   **Stern's petition was opposed by Arthur**, who wanted Ms. Smith to be buried in Texas.

47.   **Arthur was represented in the Florida custody hearings over Ms. Smith's body by Defendants**.

48.   Shortly after being hired by Arthur, O'Quinn traveled to Florida to assist with the litigation regarding custody of Ms. Smith's body and to handle the media for Arthur. Accompanying O'Quinn in Florida was Neal McCabe, an attorney with the O'Quinn Law Firm.

49.   **Defendants hired at least one investigator, Don Clark ("Clark"), to assist them in their representation of Arthur**.

50.   **Clark traveled to Florida at Defendants' request and at the Law Firm's expense and conducted an investigation into Ms. Smith's and Daniel Smith's deaths** while he was in Florida.

51.   **Defendants represented Arthur in the hearings held from February 16 through February 22, 2007, in Broward County Circuit Court regarding custody of the body of Ms. Smith**.  At the conclusion of these hearings, Judge Larry Seidlin awarded legal custody of Ms. Smith's body to Richard Milstein, the Guardian Ad Litem for Dannielynn.

*Id.* (emphasis added); *see also* D.E. 64, ¶¶62-69 (allegations concerning Defendants' representation of Arthur in relation to custody hearings regarding Dannielynn, including averment that "O'Quinn intentionally slandered Stern in a calculated effort to gain a competitive advantage for Defendants and Arthur, in any dispute Arthur may have with Stern over the custody of Ms. Smith's body, parental custody of Dannielynn and/or control of the estate of Ms. Smith.").  Thus, the allegations contained in the First Amended Complaint assert that, from the beginning of Defendants' business relationship with Arthur, Defendants served as Arthur's lawyers for the purpose of representing her in the custody proceedings.  They further aver that Defendants hired Clark for the express purpose of assisting Defendants in representing Arthur.  Finally, the First Amended Complaint alleges that

-20-

Clark is the one who conducted the investigations, the materials and information of which constitute the subject of the discovery requests.  Under these circumstances, the Court finds that both the O'Quinn Materials and the Investigation Materials were generated by or on behalf of counsel in anticipation of litigation.

**b.**     **Waiver**

Because the work-product doctrine extends to the O'Quinn Materials and the Investigation Materials, the Court must next consider whether Defendants did anything to waive that protection. Plaintiff argues that Defendants waived any protection that the work-product doctrine may have provided in two independent ways: (1) by indicating their intention to rely upon the investigation in defending the case ("implied waiver"), and (2) by making disclosures of information otherwise subject to the work-product protection ("disclosure waiver").

***Implied Waiver***

As it relates to his implied waiver argument, Plaintiff argues that Defendants have already expressly indicated in their Motion to Dismiss for Failure to State a Claim, as well as in their discovery responses and their briefs relating to the various discovery motions currently before the Court, their intention to rely upon the investigation performed by Clark and Vicedomine as a significant part of their defense.[5]   In this regard, Defendants point to O'Quinn's answers to interrogatories, which, after explaining that O'Quinn cannot reveal all of the specific facts that inform his belief that Stern is criminally responsible for the death of Anna Nicole Smith because doing so would reveal work-product-protected information, explicitly state, "[W]e have had

---

[5]Defendants have not yet filed an Answer in the case before the Court.  Because the discovery cut-off is quickly approaching, however, the Court looks to Defendants' arguments asserted in its briefs and other filings to determine Defendants' defenses.

-21-

investigators working on this case since March of 2007.  One of those investigators is Don Clark .

. . . ," and "Other than media interviews, any information that I had received [supporting O'Quinn's

March 26, 2007, statement on CNN Headline News's *Nancy Grace* show that Stern "let somebody

lay blue in a bed and [did] not try to get any medical attention" and the death was "not [an]

accident"] would have come directly from our own in-house investigator, Don Clark."  D.E. 133 at

10 (quoting D.E. 130-3 at 8, 23).  Thus, Plaintiff urges, having put the investigation, as well as

O'Quinn's knowledge, at issue in this case, Defendants cannot now avoid discovery about these very

areas.

In response, during the hearing, Defendants effectively conceded that they had placed at issue

what O'Quinn relied upon in making the statements attributed to him.  More specifically, Defendants

acknowledged that they had done so by taking the position that O'Quinn had made the statements

in good faith, based on what they described as O'Quinn's reasonable reliance on information

provided to O'Quinn by Clark.  Defendants, however, insisted that they had not waived the work-

product protection with respect to anything beyond that.  *See also* D.E. 150 at 6; D.E. 142 at 12.

Accordingly, Defendants argue, discovery must be limited to only the specific materials reviewed

by O'Quinn.  *See id.*

Before addressing the parties' arguments, the Court first considers the theory of implied

waiver.  Under this doctrine, a party waives work-product or privilege protection when (1) assertion

of the protection results from some affirmative act by the party invoking the protection; (2) through

this affirmative act, the asserting party puts the protected information at issue by making it relevant

to the case; and (3) application of the protection would deny the opposing party access to information

vital to its defense. *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 184 F.R.D. 49, 55 (S.D.N.Y.

1999) (citing *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975); *U.S. v. Bilzerian*, 926 F.2d

1285, 1292 (2d Cir. 1991); *In re Kidder Peabody Securities Litigation*, 168 F.R.D. 459, 488-89

(S.D.N.Y. 1996); *Tribune Co. v. Purcigliotti*, 1997 WL 10924, *6 (S.D.N.Y. Jan. 10, 1997)).

To illustrate the manner in which the implied wavier doctrine operates, the Court turns to

*Volpe v. US Airways, Inc.*, 184 F.R.D. 672 (M.D. Fla. 1998).  In *Volpe*, the plaintiff sued the

defendant, alleging employment discrimination based on sexual harassment.  As a defense to the

plaintiff's claims, the defendant asserted an affirmative defense that demonstrated that the defendant

intended to rely upon an internal investigation it had conducted into the plaintiff's complaints, as

well as subsequent remedial action, to avoid liability.  Although the defendant had produced the final

report of its internal investigation to the plaintiff, the court held that by relying upon the investigation

as a defense, the defendant had put the investigation at issue and had waived any privilege or

protection of the documents comprising the complete investigation file, including the investigator's

notes and other materials.  184 F.R.D. at 673.  Explaining the reasoning behind this conclusion, the

court noted, "[I]f defendant intends to rely on the investigation as a defense, plaintiff is entitled to

test the *bona fides* of the investigation."  *Id.*

Implicit in the holding of this case is the idea that it is simply not fair to allow a party to

wield the work-product protection as a sword to cut out the heart of an opposing party's case while

simultaneously brandishing it as a shield from disclosure of any Achilles heels.  *See Kallas v.*

*Carnival Corp.*, 2008 WL 2222152, *5 n.1 (S.D. Fla. May 27, 2008) (citing *Pitney Bowes, Inc. v.*

*Mestre*, 86 F.R.D. 444 (S.D. Fla. 1980); *Hollinger Int'l, Inc. v. Hollinger, Inc.*, 230 F.R.D. 508, 516

(N.D. Ill. 2005); *Granite Partners L.P. v. Bear Stearns & Co.*, 184 F.R.D. 49, 55 (S.D.N.Y. 1999));

*cf. GAB Business Servs., Inc. v. Syndicate 627,* 809 F.2d 755, 762 (11th Cir. 1987) (discussing the

concept in the context of the attorney-client privilege); *Baratta v. Homeland Housewares, LLC*, 242

F.R.D. 641, 643 (S.D. Fla. 2007) (same); *Peterson v. Wallace Computer Servs.,Inc.*, 984 F. Supp.

-23-

821 (D. Vt. 1997) (same).

The Court finds an implied waiver with respect to both the O'Quinn Materials and the Investigation Materials in the instant case, at least up until the time of the last statement attributed to O'Quinn by the First Amended Complaint (*i.e.,* March 27, 2007). First, the facts satisfy the three requirements of the implied waiver test set forth earlier in this discussion. Although Defendants have not yet filed an answer in the pending matter, they have, nonetheless, engaged in affirmative acts putting at issue the O'Quinn Materials and the Investigation Materials through the time of the last alleged statement. More specifically, as described previously, Defendants have indicated in their discovery responses their intention to rely upon information obtained through the Clark investigation in making their defense. Indeed, at the hearing, even Defendants agreed that Plaintiff is entitled to anything upon which O'Quinn relied in making the statements attributed to him in the First Amended Complaint. The Court further notes that in the absence of disclosure of the work-product protected materials, Plaintiff has no means to combat or otherwise test the veracity of Defendants' defenses that O'Quinn acted in good faith and did not entertain serious doubts as to the veracity of the matters allegedly stated or purposefully avoid learning the truth. That is because Defendants base this defense, in significant part, on Defendants' investigation, and knowledge concerning these matters falls uniquely within the province of Defendants.

Second, in addition to meeting the implied waiver test, the pending matter is not materially distinguishable from *Volpe*. Like in *Volpe*, Defendants in the instant matter intend to rely upon the investigation in their defense. As the *Volpe* Court concluded, a plaintiff must be permitted access to all investigation materials for the purpose of testing the genuineness of such an investigation. The Court finds this rationale to apply with equal force here, particularly in light of the fact that Defendants themselves employed Clark to investigate for the purpose of assisting Defendants in their

representation of Arthur in the underlying litigation. Because Defendants assert that O'Quinn relied in good faith upon information garnered by this investigation when he made the statements at issue, Defendants have waived work-product protection with respect to the O'Quinn Materials and the Investigation Materials produced through the time that the last statement attributed to O'Quinn was allegedly made.

Nor, as Defendants suggest, does *Rhone-Poulenc Rorer, Inc. v. Home Indemnity Co.*, 32 F.3d 851 (3d Cir. 1994) ("*Rhone-Poulenc*"), dictate a contrary conclusion. In *Rhone-Poulenc*, Rhone-Poulenc Rorer, Inc. ("Rorer"), Rorer entered into an agreement to purchase Revlon, Inc.'s ethical pharmaceutical businesses, including, among others, Armour Pharmaceutical Company. One of Armour's products was Factorate, a blood-clotting product processed by Armour and sold principally for use by hemophiliacs. Shortly after Rorer acquired Armour, Armour was named in the first of a series of lawsuits filed by people who claimed that Factorate had infected them with HIV. Rorer had purchased a general liability insurance policy from The Home Indemnity Company ("Home") prior to acquiring Armour and looked to it for coverage, which Home, in turn, denied. As a result, Rorer and Armour brought suit against Home, alleging that Home had wrongfully failed and refused to honor its obligations to defend and indemnify Rorer and Armour.

Home answered the complaint, asserting a number of affirmative defenses, as well as a counter-claim for a declaration that it did not owe a duty to indemnify or defend the plaintiffs for the claims in the complaint. Among Home's affirmative defenses, Home stated that the claims in the complaint were excluded from coverage because they did not result from an "occurrence," as defined by the insurance policy. An "occurrence" was defined, in relevant part, as "an accident . . . which results in . . . damage neither expected nor intended from the standpoint of the insureds." Home argued that Rorer or Armour knew of the potential transmission of HIV at the time the insurance was

purchased, so transmission incidents could not constitute "occurrences."

Based on its affirmative defenses, Home sought from Rorer and Armour all evaluations or assessments of their potential liability for AIDS-related claims arising from Armour's blood products, including those in their possession and those in the possession of their attorneys and agents. Although the Third Circuit found that Home was entitled to "the knowledge [regarding the transmission of HIV through Factorate] the insureds possessed at the time they obtained coverage," it concluded that Home could not breach the attorney-client privilege[6] to reach the advice counsel had provided to Rorer with regard to the legal significance of the facts and documents gathered by Rorer and Armour about potential AIDS-related claims prior to buying the insurance contract at issue in that case.

In arriving at this determination, the Third Circuit observed that "[t]here is authority for the proposition that a party can waive the attorney client privilege by asserting claims or defenses that put his or her attorney's advice in issue in the litigation." 32 F.3d at 863. As the Third Circuit noted,

> In these cases, the client has made the decision and taken the affirmative step in the litigation to place the advice of the attorney in issue. Courts have found that by placing the advice in issue, the client has opened to examination facts relating to that advice. Advice is not in issue merely because it is relevant, and does not necessarily become in issue merely because the attorney's advice might affect the client's state of mind in a relevant manner. The advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication.

*Id.* (citing *North River Ins. Co. v. Philadelphia Reinsurance Corp.*, 797 F. Supp. 363, 370 (D.N.J. 1992); *Pittston Co. v. Allianz Ins. Co.*, 143 F.R.D. 66, 71 (D.N.J. 1992)). In other words, the Third

---

[6]Although *Rhone-Poulenc* involves the attorney-client privilege, Defendants argue, and the Court agrees, that the reasoning of *Rhone-Poulenc* is similarly applicable to the work-product doctrine.

Circuit agreed that a party can effect, as in the case of *Rhone-Poulenc*, an implied attorney-client privilege waiver by taking affirmative steps to rely upon the otherwise privileged material to prove a claim or defense.  Under the particular facts of *Rhone-Poulenc*, however, the Third Circuit found that Rorer and Armour engaged in no such affirmative act placing at issue the legal advice of their attorneys.  Thus, while the facts, which are never privileged, involving Rorer and Armour's knowledge of Factorate's alleged ability to transmit HIV were discoverable because they were relevant to Rorer and Armour's claim that the Factorate lawsuits were covered under the insurance policy as "occurrences," the advice of Rorer and Armour's counsel was not discoverable because Rorer and Armour had performed no affirmative act to make the advice of their attorneys otherwise at issue.  Indeed, the Third Circuit noted that counsel's advice could reveal nothing on the matter Rorer and Armour had placed at issue – that is, whether or not Rorer and Armour knew that Factorate could transmit HIV before they entered into the insurance policy.

Therefore, in no way did the Third Circuit condemn the implied waiver doctrine.  To the contrary, the Third Circuit expressly endorsed it, commenting, "Finding a waiver of the attorney client privilege when the client puts the attorney's advice in issue is consistent with the essential elements of the privilege."  Instead, the *Rhone-Poulenc* Court took issue only with courts that it described as having "extended" what is effectively the implied waiver doctrine to cases where, according to the Third Circuit, the courts found a waiver merely because "the information sought [was] relevant and should in fairness be disclosed."  32 F.3d at 864.  As the Third Circuit noted, "Relevance is not the standard for determining whether or not evidence should be protected from disclosure as privileged, and that remains the case even if one might conclude the facts to be disclosed are vital, highly probative, directly relevant or even go to the heart of an issue."  In other words, the Third Circuit was troubled by what it perceived as these courts' willingness to breach the

privilege simply because protected information was deeply relevant, and their corresponding failures to insist upon and recognize an affirmative step by the party whose privilege was being abrogated to place at issue the information protected by the privilege, before finding the privilege waived.

That is simply not the case here. Unlike Rorer and Armour, as the Court has previously discussed, Defendants in the pending matter have engaged in affirmative acts placing at issue both O'Quinn's knowledge and the investigation through the last statement alleged in the First Amended Complaint to be uttered by O'Quinn. While Defendants suggest that their actions in these regards have, at most, placed only O'Quinn's knowledge at issue, for purposes of the discovery requests under consideration, the Court finds this to represent a distinction without a difference in this case. Defendants in the instant case are the very ones who engaged Clark for the purpose of performing an investigation, and they did so in order to assist Defendants in their representation of Arthur. As such, the Clark investigation is, effectively, Defendants' own work product, and there is no layer between Defendants and the investigation. In other words, Clark is a part of the Law Firm's Arthur litigation team. As a result, Defendants cannot isolate themselves from the entirety of the investigation Clark performed, as though Clark were independently running his own separate, personal, private investigation, while Defendants simultaneously rely on select portions of that very same investigation that they themselves ordered for the specific purpose of assisting in the underlying litigation. Having effectively conceded that they have placed at issue whatever O'Quinn relied upon from the Clark investigation when O'Quinn made the contested statements, Defendants have necessarily also placed at issue whatever the investigation undertaken by Defendants' Arthur litigation team uncovered as of the time of the last attributed statements.

Similarly, *U.S. v. Nobles*, 422 U.S. 225 (1975), cannot save Defendants from application of the implied waiver doctrine, either. In fact, *Nobles* suggests the very result at which the Court

arrives.  In *Nobles*, the defendant called his investigator to the stand to impeach the credibility of prosecution witnesses, based on the investigator's interviews of those prosecution witnesses.  The Court ordered the defense to produce to the prosecution a copy of those portions of the investigator's report pertaining to his interviews of the witnesses he sought to impeach.  Among other claims, the defendant invoked the work-product doctrine, seeking to protect the report from disclosure.  The Supreme Court held that the defendant had waived the work-product protection, however, by electing to present the investigator as a witness.  In this regard, the Supreme Court noted, "Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination."  *Id.* at 239-40 (citation omitted).

Defendants first argue that *Nobles* and its progeny suggest that no waiver can occur unless Defendants present testimony that discloses work product.  Nothing in *Nobles* or later cases, however, requires such a conclusion.  Rather, *Nobles* provides an example of a case where the party's affirmative act putting work product at issue happened to occur through testimony.  That circumstance does not thereby limit applicability of waiver doctrine to all such fact patterns.[7]

Defendants further direct the Court to Footnote 14 in *Nobles*, which provides,

_____

[7]Additionally, Defendants' position has the potential to delay discovery by precluding discovery into work product that a party puts into controversy by relying upon it as a defense, as revealed by an answer or written discovery responses, until such time as someone actually testifies to the work product.  The Court discerns no basis for insisting upon waiting until someone testifies to the work product before finding a waiver, where that party has already relied upon the work product as a defense.  In this respect, the Court can see no material difference between putting work product at issue through asserting it as a defense in an answer or discovery responses, on the one hand, and putting work product at issue by asserting it as a defense during testimony, on the other.

> What constitutes a waiver with respect to work-product materials depends, of course, upon the circumstances. Counsel necessarily makes use throughout trial of the notes, documents, and other internal materials prepared to present adequately his client's case, and often relies on them in examining witnesses. When so used, there normally is no waiver. But where, as here, counsel attempts to make a testimonial use of these materials the normal rules of evidence come into play with respect to cross-examination and production of documents.

*Id.* at 240 n.14. Based on this passage, Defendants invoke a parade of horribles where any use of counsel's notes or other materials during the course of a trial will result in an implied waiver, should the Court find a waiver in the instant matter. *See* D.E. 150 at 4. Defendants' waiver in the case at hand, however, does not result from merely "any use" of the investigation at issue, such as counsel's review of his internal notes in order to prepare Defendants' case for trial in the pending case would constitute. Rather, it arises out of Defendants' substantive reliance on his work product as a defense in the instant case. That type of substantive, affirmative use of work product is what causes the waiver in this case, as well as what resulted in the waiver in *Nobles*. Consequently, Defendants have waived their work-product protection with respect to the O'Quinn Materials and the Investigation Materials through March 27, 2007, when O'Quinn allegedly made the last statement attributed to him in the First Amended Complaint.[8]

Following the last alleged O'Quinn statement, however, the Court can identify no affirmative

---

[8]Defendants' implied waiver of the work-product protection does not necessarily extend to their client Virgie Arthur's work-product protection for the same materials. Arthur's work-product protection is not at issue before this Court at this time, as Defendants do not seek in this case to use against Arthur the work-product-protected materials for which Defendants have committed an implied waiver. *See Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 294 (4th Cir. 2003) ("[A]n attorney may not unilaterally waive the privilege that his client enjoys. The ability to protect work product normally extends to both clients and attorneys, and the attorney or the client, expressly or by conduct, can waive or forfeit it, but only as to himself."). Thus, the Court makes no determination regarding the viability of any work-product protection Arthur may have as to these materials.

acts on the part of Defendants placing the O'Quinn Materials or the Investigation Materials at issue. Consequently, the Court declines to find any implied waiver with respect to the post-statement O'Quinn Materials and Investigation Materials.

### *Disclosure Waiver*

Next, the Court considers Plaintiff's additional assertion that Defendants committed disclosure waiver. Under the theory of disclosure waiver, a party waives work-product protection by disclosing to third parties information otherwise protected by the work-product doctrine. Specifically, Plaintiff contends that even if work-product protection existed for the details surrounding the investigation conducted by Vicedomine and Clark, any such protection was waived when Clark and Vicedomine disclosed details of the investigation to Rita Cosby, the author of *Blonde Ambition*. Further, Plaintiff argues that Vicedomine also divulged information gathered by the investigation to "countless people" via the Internet and in Internet chat rooms. D.E. 121 at 17; 133 at 14. Finally, Plaintiff argues that Defendants waived any work-product protection when they revealed specific facts of their investigation to the FBI and the Florida Attorney General during their effort to persuade law enforcement authorities to prosecute Plaintiff for the deaths of the Smiths. D.E. 133 at 15. According to Plaintiff, Defendants' and their agents' actions are inconsistent with treating the information as protected work product.[9]

Defendants disagree with Plaintiff's broad contention that a waiver of *any* work product

---

[9]As a practical matter, some or all of these materials may also fall within the scope of the O'Quinn Materials or the Investigation Materials previously discussed. To the extent that they do not, the Court finds them to be relevant since they also directly address the claims raised in this matter. Nor do Defendants appear to contest the relevancy of these areas of inquiry. Because Plaintiff has not argued and the Court does not find that Defendants have put these materials at issue in this case, however, the Court analyzes these additional materials to determine whether they must be disclosed under Plaintiff's alternate theory of "disclosure" waiver.

privilege that may have existed for the investigation has occurred.  Instead, with respect to the argument that Vicedomine's alleged disclosure of investigatory details to Cosby and over the Internet effectuated a waiver, Defendants argue that any waiver must be limited to the information actually disclosed, and not to the entire subject matter allegedly discussed. D.E. 142 at 13.  Put simply, Defendants contend that Vicedomine's actions at most waived protection for actual facts that Vicedomine revealed to Cosby which were also published in *Blonde Ambition*, or statements actually posted by Vicedomine on the Internet.  Since that information is available to Plaintiff, however, Defendants contend that Plaintiff should not be permitted to depose Vicedomine in order to discover all of what Vicedomine told Cosby or all of the Firm's or Vicedomine's work product.  Additionally, Defendants argue that any waiver of the work-product protection by Vicedomine and Clark with regard to their investigation on behalf of the Firm would not constitute a waiver on the part of Arthur, its client in the related Texas Lawsuit.

Work-product protection is waived when protected materials are disclosed in a way that "substantially increases the opportunity for potential adversaries to obtain the information." *Niagra Mohawk Power Corp. v. Stone & Webster Engineering Corp.,* 125 F.R.D. 578, 587 (N.D.N.Y. 1989) (quoting *In re Grand Jury Subpoenas Dated December 18, 1981 and January 4, 1982*, 561 F.Supp 1247, 1257 (E.D.N.Y. 1982)); 8 Wright and Miller, *Federal Practice and Procedure*, § 2024 at 209-210 (1970)).  As noted in *United States v. Gulf Oil Corp.*, 760 F.2d 292, 295, "The purpose of the work product doctrine is to protect information against opposing parties, rather than against all others outside a particular confidential relationship, in order to encourage effective trial preparation . . . . A disclosure made in the pursuit of such trial preparation, and not inconsistent with maintaining secrecy against opponents, should be allowed without waiver of the privilege." (citations omitted). Thus, not every situation in which work-product materials are disclosed warrants a finding of waiver.

Rather, the circumstances surrounding the disclosure are key to determining whether an actual waiver of the work-product protection has occurred.

Generally speaking, as noted above, work-product protection is waived when protected materials are "disclosed in a manner which is either inconsistent with maintaining secrecy against opponents or substantially increases the opportunity for a potential adversary to obtain the protected information." *Niagra*, 125 F.R.D. at 590 (citing *Gulf Oil*, 760 F.2d at 295 and other cases); *Kallas v. Carnival Corp.*, 2008 WL 2222152, at * 4 (S.D. Fla. May 27, 2008) (a party waives otherwise-protected work-product materials "when the covered materials are used in a manner that is inconsistent with the protection"); *see also Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, 1996 WL 944011, at *3 (S.D.N.Y. Dec. 19, 1996) ("Work product immunity is waived only if the party has voluntarily disclosed the work product in such a manner that it is likely to be revealed to his adversary."); *Falise v. American Tobacco Co.*, 193 F.R.D. 73, 79 (E.D.N.Y. 2000) (waiver of work-product protection found only if disclosure substantially increases the opportunity for potential adversaries to obtain the information).

The finding of a waiver in these situations rests with the policy behind protection of such materials. As noted previously, the rationale for the protection is that in performing his or her duties, a lawyer must work with a certain degree of privacy. *See Hickman*, 329 U.S. at 510-11. In ths regard, preparation of a client's case requires the assembly of information, the preparation of legal theories, and the planning of strategy without undue interference. *Id.* Where, however, a lawyer or the lawyer's agents take actions that display an obvious disregard for these policies, it is appropriate to find that a waiver has occurred. As the Supreme Court has noted, "The notion is that failure to take adequate precautions to prevent an adversary from obtaining work product information warrants waiver because '[i]ndifference to such a consequence indicates that protection of the immunity was

not important to the person claiming the protection.'" *Id.* (citing Restatement (Third) of the Law Governing Lawyers § 91, cmt. b (2000)).  And as long as the disclosure of the information was voluntary, a waiver will result, even if it was not consensual.  *Id.*  Here, as authorized agents of the Firm, Vicedomine and Clark had the ability to generate materials protected by the work-product doctrine, *Nobles*, 422 U.S. at 238-39, but so, too, did they have the ability to waive work-product immunity.  *See Continental Casualty Co. v. Under Armour, Inc.*, 537 F.Supp.2d 761, 772 (D. Md. 2008) (citing Restatement (Third) of the Law Governing Lawyers § 91 (2000)).[10]

While situations exist where a disclosure is essentially compelled or made through excusable inadvertence, and courts are sometimes willing to maintain the work-product protection under such circumstances, *see id.*, this is not one of those cases.  Instead, Defendants point to nothing to suggest that Vicedomine and Clark did not purposefully and voluntarily make their statements to Cosby and on the Internet.  Moreover, the types of disclosures made (*i.e.*, to the author of a book and on the Internet) are entirely inconsistent with a desire to maintain the privacy of the information disclosed. Rather, books are published and statements are posted on the Internet precisely for the purpose of making them accessible to anyone and everyone.  Certainly, at a minimum, the disclosures substantially increased the opportunity for a potential adversary to obtain the protected information.

It is further noteworthy that the Broward County proceedings concerning the custody of Ms. Smith's body were a part of the media frenzy surrounding Ms. Smith's death.  In this regard, coverage of the proceedings appeared in the print media, on television, and on the Internet.

---

[10]Although Defendants have suggested Vicedomine could not have waived the work-product protection by engaging in her personal capacity (as opposed to her role as an agent of Defendants) in disclosures of information from the investigation, Defendants have not asserted that Clark and Vicedomine were not acting as agents of Defendants when they spoke to Cosby or made postings of information on the Internet.

Particularly under these circumstances, it is difficult to conceive of how Vicedomine could not have intended that her Internet statements be made available to anyone who wished to view them.  Such behavior plainly increased the risk that Plaintiff would learn of Vicedomine's disclosed work-product materials.  In fact, Plaintiff did find such materials.  *See Kintera, Inc. v. Convio, Inc.*, 219 F.R.D. 503, (S.D. Cal. 2003) (disclosure of witness statements on website effectuated a waiver of otherwise protected work product materials); *see also* Epstein, *The Attorney-Client Privilege and the Work Product Doctrine* 1048 (2007) ("Any generally public disclosure in contexts such as Internet web-sites or newspaper advertisements where such announcements have a commercial or competitive purpose will effect a waiver of otherwise work-product-protected materials.").

Similar reasoning applies to the disclosures made with respect to Rita Cosby, the author of *Blonde Ambition*.  Cosby interviewed Vicedomine for the purpose of writing a book, in significant part, about the very subject matter of Vicedomine's interview, and nothing suggests that Vicedomine did not know this.  In fact, *Blonde Ambition* published much of what Vicedomine told Cosby.  There is nothing about divulging facts to an author writing a book about the information being disclosed that is consistent with guarding the privacy of information that is otherwise protected by the work-product doctrine.  Obviously, such conduct increased the possibility that Plaintiff would obtain and use the material.  Under the circumstances where Vicedomine voluntarily spoke to a journalist seeking to write a book on the very subject for which information was provided, there could be no expectation that Cosby would maintain the secrecy of any of the information.  And, significantly, much of the information conveyed was apparently used and published in the book.

The Court therefore finds that Vicedomine's and Clark's actions, as agents of Defendants, are inconsistent with the maintenance of secrecy of otherwise-work-product protected materials from their adversary.  The disclosures were neither involuntary nor compelled, and they were not made

to sources that were assisting Defendants in advancing their case.  Instead, Vicedomine and Clark made the disclosures at issue to third parties and did so in such a way as to create a substantial risk that information would be received by Defendants' adversary.  Vicedomine and Clark's actions waived the work product protection since they could not reasonably expect that future use of the information could be limited.  Finally, it is significant that Plaintiff did, in fact, learn much of the information disclosed.  *See Continental Casualty Co.*, 537 F.Supp.2d at 761 (once an adversary has become aware of information disclosed, it cannot purge that information from its mind).  For all of these reasons, Defendants have waived work-product protection in these instances.

The Court, however, does not find a waiver with respect to statements made by Clark and Vicedomine to the FBI and Florida Attorney General.  In these situations, disclosure to a third party did not make it more likely that Defendants' adversary would obtain the information.  Unlike the situations already discussed, speaking with these agencies did not effectively "publish" the information disclosed.  Additionally, it is reasonable that Defendants retained an expectation that the information would maintain its secrecy.  Consequently, the Court concludes that no waiver occurred with respect to these disclosures.

As for the instances where a waiver of work-product protection did occur, the Court now addresses the scope of that waiver.  Plaintiff suggests that the disclosures constitute a waiver of the entire subject matter of the underlying work product (*i.e.,* the investigation).  Defendants disagree, arguing that any waiver is limited to those particular instances where disclosure occurred.

The Court agrees with Defendants to the extent that the disclosures by Vicedomine (and Clark) do not extend so far as to effectuate a waiver of the entire subject matter of the investigation.  Due to the sensitive nature of work-product materials and the policy behind maintaining their secrecy, generally speaking, when work-product protection has been waived, it is "limited to the

-36-

information actually disclosed, not subject matter waiver." *Continental Casualty Co.*, 537 F.Supp.2d at 773 (citing *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1223 (4th Cir. 1976); Epstein, *The Attorney-Client Privilege and the Work Product Doctrine* 612 (2001) ("[I]nadvertent or even intentional disclosure of work-product documents will not necessarily constitute waiver as to all such documents."); 6 James Wm. Moore, *et al.*, *Moore's Federal Practice* § 26.70[6][c] (3d ed. 2004) at 26-467 ("A waiver of work-product protection encompasses only the items actually disclosed. Thus disclosure of some documents does not imply that work product protection has been destroyed for other documents of the same character.")).

For instance, in *United Steelworks of America, AFL-CIO-CLC v. Ivaco, Inc.*, 2002 WL 31932875 (N.D. Ga. Jan. 13, 2003), the court determined that voluntary disclosure of a letter that otherwise would have been protected by the work-product doctrine, waived any such protection for the letter itself.  In so finding, the court explained that voluntary disclosure to an adversary waives the protection of the work-product doctrine to the items disclosed.  *Id.* at *5 (citing *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993); *In re Chrysler Motors Corp. Overnight Evaluation Program Litig.*, 860 F.2d 844, 846 (8th Cir. 1988)).  The court noted however, that "disclosure of some documents generally does not destroy work-product protection for other documents relating to the same subject matter."  *United Steelworkers*, 2002 WL 31932875 at *5 (citing *Pittman v. Frazer*, 129 F.3d 983, 988 (8th Cir. 1997)).  Thus, the court concluded, even if plaintiffs waived work-product protection, the waiver did not extend beyond that letter itself.  *Id.* at *5.

Applying this principle of law to these facts, the Court finds that although several disclosures have occurred, any waiver of the work-product protection does not extend beyond those discrete disclosures.  Put more simply, the Court finds that Vicedomine (and Clark) waived any work-product protection for anything they said or gave to Cosby in her accumulation of information for *Blonde*

*Ambition,* and Vicedomine waived the protection for any statements she actually posted or caused to be posted on her behalf on the Internet.  These disclosures, however, do not open the door to all materials or information relating to the investigation directed by Defendants.  *See Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1222-23 (4th Cir. 1976) (finding that subject matter waiver does not apply to work product protected materials in cases where the disclosure was inadvertent *or* partial and where no testimonial use was made of the work product); Epstein, *The Attorney-Client Privilege and the Work Product Doctrine* 1116 (2007) ("disclosure of *some* work-product materials does not thereby necessarily constitute a waiver permitting discovery of *all* work product prepared in the same litigation.").

With respect to the allegation that Vicedomine disclosed otherwise-work-product-protected information in Internet chat rooms, the particular statements that can be attributed to Vicedomine in this respect are not entirely clear, as the poster or posters of many of the statements at issue used pseudonyms.  Therefore, Vicedomine shall verify all screen names and pseudonyms that she used on the Internet while discussing in public fora matters pertaining to the deaths of the Smiths, the paternity of Dannielynn, or Plaintiff.  Defendants shall also be entitled to obtain copies of all postings that Vicedomine made in these public fora that relate to the underlying investigation conducted in furtherance of the Broward County proceedings.  *See Kintera*, 219 F.R.D. at 512 (court found disclosure of witness statements on website constituted a waiver of the work product protection for the specific communications referenced and declined to find waiver for all related documents that contained similar information).  Furthermore, Defendants will be permitted to ask Vicedomine about these Internet postings during her deposition.

Additionally, with respect to Vicedomine's (and Clark's)  statements made to Cosby, the Court finds that any actual statements made by Vicedomine or Clark to Cosby regarding the

investigation have been waived and, thus, are discoverable.  As for Defendants' contention that discovery of this information is limited to statements that were actually published by Cosby in *Blonde Ambition*, the Court concludes to the contrary.  Instead, Defendants are entitled to discovery of all statements Vicedomine and Clark made to Cosby relating to the investigation.  Although some of the information provided by Vicedomine and Clark may not have been incorporated into *Blonde Ambition*, such a fact has no bearing on the scope of the waiver in this case.  As noted above, Vicedomine voluntarily spoke to a journalist seeking to write a book on the very subject for which information was provided, and Defendants have not suggested that she had any expectation that Cosby would maintain the secrecy of any of the information conveyed.  Consequently, Vicedmone made disclosures to Cosby in such a way as to create a substantial risk that information would be received by Defendants' adversary.

The fact that all of the information provided by Vicedomine and Clark was not included in *Blonde Ambition* also refutes Defendants' contention that the information is readily available to Plaintiff and, therefore, should not be compelled to be disclosed.  *See* D.E. 142 at 13-14.  In making this argument, Defendants contend that Plaintiff should not be allowed to depose Vicedomine in order to discover the "full gamut of her work product."  *Id.*  Although the Court agrees that Plaintiff is not entitled to discovery of all of Vicedomine's work product, he is entitled to information disclosed to Cosby, whether included in *Blonde Ambition* or not.  In this regard, the Court will permit Plaintiff to ask questions during Vicedomine's deposition about what she told Cosby relating to her investigation.

           c.       **Substantial Need and Undue Hardship**

As for any O'Quinn Materials and Investigation Materials that were prepared after March 27, 2007, and for which Defendants did not otherwise waive the work-product protection, Plaintiff urges

the Court to compel production under Rule 26(b)(3), Fed. R. Civ. P.  That rule provides, in relevant

part,

> Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.  In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation. . . .

R. 26(b)(3), Fed. R. Civ. P.  Thus, consistent with the teachings of *Hickman v. Taylor*, 329 U.S. 495

(1947), and its progeny, Rule 26(b)(3) recognizes two categories of "documents and tangible things"

subject to the protections of the work-product doctrine: (1) opinion work product, which is defined

as "documents and tangible things . . . prepared in anticipation of litigation or for trial by or for

another party or by or for that other party's representative," which contain "the mental impressions,

conclusions, opinions, or legal theories of an attorney or other representative of the party concerning

the litigation;" *id.*, and (2) fact work-product, which includes all other "documents and tangible

things . . . prepared in anticipation of litigation or for trial by or for another party or by or for that

other party's representative . . . ." *Id.*

Under the rule, opinion work product enjoys "almost absolute immunity" from discovery.

*See Williamson v. Moore*, 221 F.3d 1177, 1182-83 (11th Cir. 2000) (citing *Cox v. Administrator*

*United States Steel & Carnegie*, 17 F.3d 1386, 1422 (11th Cir.1994)).  While the same level of

protection does not apply to fact work product, a court may not order disclosure of fact work product

where the doctrine has not been waived or otherwise precluded, unless the party seeking the discovery demonstrates "substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means."

Here, Plaintiff seeks fact work product under Rule 26(b)(3) to the extent that Plaintiff requests documents generated in the course of Defendants' investigation by Defendants and their agents, that summarize or otherwise purport to relate factual information obtained during the investigation.  Such items differ from mere facts, which are not protected by the work-product doctrine, and the disposition of which are discussed at Section III.B.1.d, *infra*.  *See AAB Joint Venture v. U.S.*, 75 Fed. Cl. 448, 454 ("Although the work product privilege protects work product created by the attorney, the privilege does not protect facts contained within or underlying attorney work product.") (citing *In re Unilin Decor N.V.*, 153 Fed. Appx. 726, 728 (Fed. Cir. 2005); *Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 266 (10th Cir. 1995); *Dunkin' Donuts, Inc. v. Mary's Donuts, Inc.*, 206 F.R.D. 518, 520-21 (S.D. Fla. 2002); *Onwuka v. Fed. Express Corp.*, 178 F.R.D. 508, 515 (D. Minn. 1997); *Phillips Elecs. N. Am. Corp. v. Universal Elecs., Inc.*, 892 F.Supp. 108, 110 (D. Del. 1995); *Swarthmore Radiation Oncology v. Lapes*, 155 F.R.D. 90, 92 (E.D. Pa. 1994)); *cf. Fisher v. Nat'l R.R. Passenger Corp.*, 152 F.R.D. 145, 156 (S.D. Ind. 1993) (work product protection "consistently . . . held not to prohibit discovery of mere facts")  (collecting cases); *cf. Hickman v. Taylor*, 329 U.S. at 513 (discussing pre-Rule 26(b)(3) denial of discovery into what is effectively both opinion and fact work product, and noting that such denial will not "unduly hinder" the petitioner in "the discovery of facts").

Thus, to overcome the work-product protection, Plaintiff must demonstrate both a substantial need for the items he seeks and an inability without undue hardship to obtain the substantial

equivalent.  With respect to substantial need, Plaintiff urges that he "must have access to the 'specific facts' O'Quinn contends support the Statements and the details of the Clark/Vicedomine investigation if he is to fully test O'Quinn's claim that his claims of murder are true and that O'Quinn did not act negligently or with actual malice in uttering his statements."  D.E. 133 at 12. In other words, Plaintiff argues that he needs the post-statement information from the investigation in order to address the truth or falsity of the statements attributed to O'Quinn.  He further argues that he needs the post-statement O'Quinn Materials and Investigation Materials to demonstrate that O'Quinn continued to investigate the truth or falsity of his statements even after he made them, suggesting that O'Quinn acted with actual malice at the time he made the alleged statements. Finally, Plaintiff asserts that he cannot otherwise obtain these materials because "only Defendants know the persons they have spoken with and the facts they have gathered."  D.E. 154 at 10.

       The Court finds that Plaintiff has failed to demonstrate the requisite substantial need and undue burden necessary to sustain a breach of the work-product protection.  As to post-statement O'Quinn Materials and Investigation Materials bearing on the truth or falsity of the statements, as discussed below at Section III.B.1.c., *infra*, Plaintiff can employ interrogatories to learn the identities of all individuals with any information regarding the truth or falsity of the particular allegations contained within the alleged statements.  He can then conduct his own interviews and other discovery as it relates to those people.  Allowing Plaintiff to review Defendants' post-statement investigation simply to provide a short-cut for Plaintiff to prepare his case does not amount to "substantial need."  Indeed, *Hickman v. Taylor*, *supra*, stands for precisely this point.

       As to the ability of the post-statement O'Quinn Materials and Investigation Materials to provide evidence regarding actual malice, as discussed previously at Section III.A., *supra*, any such evidence bears only minimally on the determination of actual malice, if at all.  It seems doubtful that

Plaintiff could make a showing of actual malice based principally on such evidence, or even that such evidence would be of any real significance.  Moreover, Plaintiff has other ways of obtaining more probative evidence regarding actual malice, such as the O'Quinn Materials and Investigation Materials generated through March 27, 2007, which, presumably, would reflect exactly the non-public information at O'Quinn's fingertips at the time he made the alleged statements.  Under these circumstances, the Court declines Plaintiff's invitation to abrogate the work-product protection as it pertains to the post-statement O'Quinn Materials and Investigation Materials.

### d.   Underlying Facts

As for any underlying facts contained within any work-product-protected documents for which no waiver has occurred, Plaintiff asserts that he is entitled to all such facts.  Plaintiff is correct that he may discover facts that support Defendants' claims or defenses.  *See Dunkin Donuts, Inc. v. Mary's Donuts, Inc.*, 206 F.R.D. 518 (S.D. Fla. 2002) (finding facts supporting plaintiff's claims were not supported protected as work product).  And Defendants do not contest this general point.  While underlying facts do not enjoy the protection of the work-product doctrine, as explained above, that fact does not necessarily mean that Plaintiff is entitled to obtain work-product documents and tangible materials that contain facts.  Indeed, as discussed above, *see supra* at Section III.B.1.c., here, Plaintiff has not made the requisite showing to obtain documents and tangible items containing facts, which are otherwise subject to the work-product doctrine.

When the facts are so intertwined with the mental impressions of the attorney or other work-product protected materials, other methods exist for obtaining the factual information without disturbing the work-product protection.  *ECDC Envtl. LC v. New York Marine & Gen. Ins. Co.*, 1998 U.S. Dist. LEXIS 8808 (S.D.N.Y. June 4, 1998).  "If a document constitutes protected work product, the party possessing the document generally need not produce it – even if the document contains only

factual information.  However, because the work product privilege does not protect the facts in that document (the privilege protects documents, not facts), the party seeking those facts may obtain them through other means of discovery, such as through depositions and interrogatories."  *Id.* at *44 (citations omitted); *see also Casson Constr. Co. v. Armco Steel Corp.*, 91 F.R.D. 376 (D. Kan. 1980).

The work-product doctrine does not protect factual *information* from disclosure.  Rather, it protects a party only from disclosing particular *documents* containing the information.  To accommodate these principles, a party may propound interrogatories and take depositions to obtain the sought-after factual information.  *See* Fed. R. Civ. P. 26(b)(3) Advisory Comm. Note (1970) ("No change is made in the existing doctrine, noted in the *Hickman* case, that one party may discover relevant facts known or available to the other party, even though such facts are contained in a document which is not itself discoverable.").  Here, although Plaintiff may not discover work-product documents[11] containing factual information, he is well within his rights to discover the underlying facts of the case via alternative methods.  *See* Epstein, *The Attorney-Client Privilege and the Work Product Doctrine* 802 (2007) ("A document may be protected from compelled disclosure . . . .  That does not, however, mean that the underlying facts thereby are absolutely protected from discovery, either by way of depositions of other knowledgeable witnesses, discovered through interrogatories.").

In sum, the Court concludes that Plaintiff is entitled to discover any facts that go to the truth or falsity of any of the eight statements allegedly made by O'Quinn and as set forth in the Amended

---

[11]In order to obtain these tangible documents containing work product privileged materials, Plaintiff is required to meet the substantial need requirement set forth in Rule 26(b)(3)(A)(ii), Fed. R. Civ. P. (party may only discover work product if the party shows that it has a substantial need for the materials and cannot, without undue hardship, obtain the substantial equivalent by other means).

Complaint.  Plaintiff may obtain this information through appropriate interrogatories or depositions.

### 2.    Attorney-Client Privilege

With respect to the issue of attorney-client privileged information, Defendants conceded that no such privileged materials responsive to the subpoena *duces tecum* directed to Vicedomine exist. *See* D.E. 150 at n. 2.  Defendants clarified that they inadvertently discussed attorney-client privilege in their objections to discovery.  After further review of the documents at issue, however, Defendants realized that only the work-product doctrine protects the information listed on the Vicedomine privilege log.  *Id.*  Defendants stated, "At this time, there do not appear to be any documents protected by the attorney-client privilege."  D.E. 152 at n. 9.

For any remaining materials that might be covered by the attorney-client privilege, Plaintiff's counsel stated during the August 13, 2008, hearing that he is not seeking any such information. Furthermore, Plaintiff did not argue entitlement to attorney-client-privileged materials in his briefs. For these reasons, the Court shall not discuss the application of the attorney-client privilege, and Defendants need not provide Defendants with any materials or information protected by the attorney-client privilege.

### C.    Specific Discovery Sought

### 1.    Privilege Logs

One of the motions filed by Plaintiff and upon which arguments were heard during the August 13, 2008, hearing, was Plaintiff's Motion to Compel Defendants' Compliance With Local Rule 26.1 ("Motion to Compel Privilege Log").  [D.E. 126].  In his Motion to Compel Privilege Log, Plaintiff states that in response to his Request for Production, Defendants produced two privilege logs – the Law Firm's Privilege Log and the Vicedomine Privilege Log.  Plaintiff complains, however, that both privilege logs violate Local Rule 26.1 for multiple reasons.  First, Plaintiff asserts

that Defendants failed to provide the general subject matter for the documents identified in the privilege log, and, as a result, Plaintiff cannot discern whether an asserted privilege actually applies. Additionally, Plaintiff argues that logs fail to provide the dates of the documents and further notes that the Vicedomine Privilege Log lists documents together in groups.  Moreover, according to Plaintiff, the logs list documents not protected by the work-product doctrine because they were created or distributed by third-parties.  Finally, Plaintiff protests that the logs contain no information about responsive documents withheld on the basis of privilege that were created or received by counsel <u>after</u> this lawsuit was filed.

Defendants assert that their privilege logs comply with the Federal Rules of Civil Procedure and the Local Rules of this Court.  In this regard, Defendants state that they are not required to divulge information when to do so would cause disclosure of privileged information.  According to Defendants, a more detailed description of communications and documents set forth in the privilege logs would reveal privileged information and, thus, is not required pursuant to the rules of this Court. Defendants further argue that they are not obligated to identify individual work product documents produced <u>after</u> the commencement of this lawsuit.  In support of this proposition, Defendants point to Local Rule 26.1.G.3.c.

After hearing argument from counsel at the August 13, 2008, hearing, the Court ruled from the bench with respect to Defendants' duties regarding providing a privilege log for materials created prior to the commencement of the instant lawsuit.  The Court, however, took the matter under advisement with respect to Defendants' duty to itemize alleged privileged materials that were created after this lawsuit began.  For ease of reference, a discussion of these matters is set forth below under the headings "Pre-Lawsuit Materials" and "Post-Lawsuit Materials."

a.      **Pre-Lawsuit Materials**

During the hearing of this matter, the Court ruled from the bench that all documents sought by Plaintiff which support or contradict O'Quinn's statements are relevant to this litigation and must be produced or set forth on a privilege log.  The Court also reiterated that a privilege log must provide enough detail to allow opposing counsel the opportunity to challenge the privileged nature of certain entries.  After reviewing the privilege logs provided by Defendants, the Court ultimately found the privilege logs to be deficient due to the lack of detail provided by Defendants in describing the particular documents.  Accordingly, the Court directed Defendants to provide Plaintiff with a supplemental privilege log with additional detail.

Acknowledging Defendants' alleged dilemma in providing additional detail for some of the entries, the Court announced that it would permit Defendants to submit certain documents for *in camera* review – documents for those entries that could not be logged without revealing work-product protected material.  Defendants were directed to provide the additional materials by no later than **Monday, August 18, 2008**.  Defendants provided the amended privilege log and documents for the *in camera* inspection on Wednesday, August, 20, 2008.[12]  This disclosure is timely in light

_____

[12]The Court acknowledges receipt of Plaintiff's counsel's letter dated August 20, 2008, alleging that Defendants failed to comply with the Court's rulings during the August 13, 2008, hearing.  [D.E. 162].  The Court is also in receipt of Defendants' August 20, 2008, responsive letter [D.E. 163] in which Defendants contend that they have, in fact, complied with the Court's directives.  The Court first notes that it was closed on August 18 and 19, 2008, due to Tropical Storm Fay.  Therefore, it would have been impossible for Defendants to comply with the obligation to provide *in camera* documents by Monday, August 18, 2008.  Defendants, did, however, provide the *in camera* documents the next available day that the Court was open.  Thus, the Court finds Defendants to be in compliance with its directives regarding the privilege logs.

As for the remaining discovery issues addressed in this Order, Defendants' letter states that the materials have been provided to Plaintiff.  The Court confirms that at the conclusion of the hearing, it adjusted its rulings and directed Defendants to provide supplemental responses by Wednesday, August 20, 2008.  Thus, if Defendants provided materials required by the Court as noted in their letter, the Court finds them to be in compliance with its rulings made from the

of the Court's closure on August 18 and 19, 2008, due to Tropical Storm Fay.

      **b.**   **Post-Lawsuit Materials**

In the Southern District of Florida, a policy decision has been made that, despite the relevancy of a given document, in most cases, there is no good reason to require a party to go through the expense and burden of creating a privilege log with respect to documents created after the commencement of a case. Indeed, Local Rule 26.1.G.3.c memorializes this policy and provides,

> This rule requires preparation of a privilege log with respect to all documents, electronically stored information, things and oral communications withheld on the basis of a claim of privilege or work product protection **except** the following: written and oral communications between a party and its counsel **after** commencement of the action and work product material created **after** commencement of the action.

(emphasis added).

After noting this policy at the hearing, the Court provided counsel for Plaintiff with an opportunity to distinguish this case from the norm. The Court now declines to find that Plaintiff has demonstrated good cause to exempt this case from the policy determination embodied in Local Rule 26.1.G.3.c. Although Plaintiff argued that a privilege log is necessary to analyze protections asserted, the Court does not see how this matter differs from other cases subject to the Local Rule. The parties and the Court have already thoroughly explored privilege issues pertaining to the documents and information Plaintiff seeks. Additionally, with the exception of materials actually disclosed, the Court has expressly limited production of work-product-protection materials to those generated by March 27, 2007 – a date that occurred before the filing of the instant suit. Thus, it

---

bench. However, if there are any outstanding issues with respect to Defendants' compliance with the Court's rulings, Plaintiff may file a separate pleading apprising the Court of any such alleged failure to comply. If the Court does not receive any such notification, it will assume that Defendants have complied with the Court's directives.

appears unlikely that Plaintiff would be entitled to the production of any other privileged documents generated after this lawsuit began, and no practical purpose appears to exist for requiring Defendants to expend the time and resources to undertake such a significant task as cataloguing all such items. Under these circumstances, the Court will not break from this District's policy decision  exempting parties from creating privilege logs for items developed after litigation begins. Accordingly, Plaintiff's Motion to Compel Privilege Logs [D.E. 126] is denied with respect to materials created after the commencement of this action, and Defendants need not provide a privilege log with respect to these materials.

### c.      Production of Documents for *In Camera* Review

The Court notes that in accordance with its ruling announced during the August 13, 2008, hearing, Defendants provided the Court with an amended privilege log as well as documents to be inspected *in camera*.  Some of the documents produced by Defendants for *in camera* inspection, however, may be addressed by the rulings announced in this Order.  In light of these rulings, the Court requests that Defendants review their document submission and notify the Court as to which documents still require *in camera* consideration.  Specifically, Defendants shall provide notice to the Court by Bates Number of the documents that they still claim are protected by work product. Defendants shall provide such notice by no later than **Thursday, September 4, 2008.**  If necessary, the Court will issue a separate Order with respect to these remaining documents.

### 2.      Requests for Admission

Plaintiff also filed a Motion to Determine the Sufficiency of Defendant O'Quinn's Responses to Plaintiff's First Request for Admissions [D.E. 128] in which he challenges Defendants' responses to Requests for Admission 9 through 16, and 18.  The Court now reviews its rulings with respect to the Requests for Admission.

In **Requests for Admission 9-16,** Plaintiff seeks for O'Quinn to admit that certain excerpts contained in the First Amended Complaint accurately quote the alleged statements made by O'Quinn during his eight television interviews and appearances.  O'Quinn responded to each of the requests as follows: "Denied, in that the words are taken completely out of context, with certain portions omitted, and without consideration of the medium in which those words were uttered, including the complete audio and visual components of the subject television broadcasts."  Plaintiff emphasizes that O'Quinn did not acknowledge what words, if any, were accurately quoted, and did not explain how O'Quinn's words were taken out of context or which portions were omitted.  Plaintiff argues that the response is insufficient because the qualified denial is too general, and it is not possible to determine whether it is a full denial or a partial denial.

Defendants disagree and state that O'Quinn has clearly denied the statements in Requests 9 through 16.  Defendants further contend that while the requests essentially ask O'Quinn to admit that he was quoted accurately in the Amended Complaint, a number of the quotations were taken from on-line portions of transcripts bearing the legend, "This is not a legal transcript for purposes of litigation."  Because O'Quinn has no official recording or transcript of some of the statements, O'Quinn states that he is unable to admit that he was accurately quoted.

During the August 13, 2008, hearing, Defendants' counsel represented that he was attempting to obtain the actual recordings of the broadcasts so that he could compare the broadcast with the transcripts for accuracy purposes.  Although counsel admitted that they had already obtained various recordings, at least two recordings remain outstanding.

The Court agreed that Defendants should have the opportunity to compare the transcripts with actual recordings of the interviews.  The Court, however, noted that Defendants did not raise this ground as an objection to responding to the Requests for Admissions.  Under Rule 36, a party

must deny the request or state in detail why the answering party cannot truthfully admit or deny it. Defendants have not done so.   Rule 36(a)(4), Fed. R. Civ. P.   Additionally, with respect to the statements for which Defendants have already obtained recordings, O'Quinn has not admitted the portions of those statements that can be verified.   Thus, the Court directed Defendants to amend their responses and to admit the portions of the statements that can be admitted, to the extent that the words were spoken by O'Quinn.   In this regard, the Court granted Plaintiff's Motion [D.E. 128] in part and directed Defendants to amend their responses by **Wednesday**, **August 20, 2008.**[13]

With respect to **Request for Admission 18**, Plaintiff seeks for O'Quinn to admit that he had no knowledge of any life insurance policies regarding Anna Nicole Smith.   Defendant answered that "[a]fter reasonable inquiry, the information known or readily available to O'Quinn is insufficient to enable him to admit or deny."   [D.E. 128 at 7].   In response to Plaintiff's Motion, however, Defendants ultimately admitted that O'Quinn has no present knowledge of the existence of any such life insurance policies.   Counsel for Defendants stated that he would provide to Plaintiff's counsel an amended response reflecting this fact.   Therefore, Plaintiff's Motion [D.E. 128] is denied as moot with respect to Request 18.

### 3.     Vicedomine Deposition *Duces Tecum*

Defendants' Motion for Protective Order [D.E. 111] seeks for the Court to issue a protective order precluding Plaintiff from deposing Wilma Vicedomine.   According to Defendants, the investigation conducted by Vicedomine, as the Firm's agent, and at the direction of the Firm, is subject to work-product protection.   Hence, Defendants argue that Plaintiff should not be permitted

---

[13]Although the Court initially required Defendants to provide amended responses by the following day (*i.e.*, August 14, 2008), at the conclusion of the hearing, the Court revised the deadline to the following Wednesday (*i.e.*, August 20, 2008).

to invade that privilege by deposing Vicedomine about the fruits of her investigation.

Plaintiff, in response, asserts that he should be permitted to take Vicedomine's deposition for various reasons. First, Plaintiff argues that Defendants failed to satisfy their burden under Rule 26, Fed. R. Civ. P., to demonstrate good cause precluding the requested discovery. Second, Plaintiff contends that Defendants waived any applicable work-product protection by placing the investigation at issue. Third, Plaintiff urges that Vicedomine waived any applicable work-product protection by disclosing details of the investigation to third-parties, and finally, Plaintiff claims entitlement to discovery of the underlying facts supporting or contradicting O'Quinn's statements.

After careful consideration of these issues, including the briefs presented and the arguments made during the August 13, 2008, hearing, the Court has made a determination with respect to the scope of Vicedomine's deposition *duces tecum*. As discussed previously, the Court finds that Defendants put at issue the investigation conducted by Vicedomine and Clark and, thus, waived any work-product protection associated with those materials *through the date of O'Quinn's last alleged statement on March 27, 2008*. Likewise, the Court finds that Vicedomine (and Clark) waived any applicable work product protection when they disclosed certain details of her investigation to Rita Cosby and third-parties on Internet web-sites. This waiver applies to all materials actually disclosed by Vicedomine or Clark, *including information disclosed after the date of O'Quinn's last alleged statement on March 27, 2008.* Finally, the Court concludes that Plaintiff is entitled to discover the underlying facts that pertain to the truth or falsity of any of the alleged statements set forth in the First Amended Complaint. If, however, these underlying facts are set forth in work-product protected documents that were created *after* O'Quinn's last alleged statement on March 27, 2007, Plaintiff must obtain the information through means other than document production. Consequently, Plaintiff may inquire into these materials during Vicedomine's deposition, but Vicedomine is not

required to provide any work-product protected documents created *after* March 27, 2007, that contain underlying facts.

Accordingly, Defendants' Motion for Protective Order [D.E. 111] is denied, at least to the extent that it seeks a wholesale ban on Vicedomine's deposition.  With respect to the *duces tecum* attachment to the Vicedomine subpoena, the Court acknowledges that some of the document requests are extremely over broad.  Indeed, at the August 13, 2008, hearing, Plaintiff's counsel conceded that the requests were overly broad.  Nevertheless, it is undeniable that certain documents that fall within a narrower subset of the requests are discoverable.

To summarize, Plaintiff may proceed with the deposition of Vicedomine and may pursue the following areas of inquiry:

(1)    All underlying facts regarding the truth or falsity of the eight statements allegedly made by O'Quinn (*i.e.*, the causes of the Smiths' deaths and other allegations pertaining to Stern made in the statements at issue);

(2)    All information (including work-product materials) regarding the Firm's investigation *up through March 27, 2008* (the date of O'Quinn's alleged last challenged statement); and

(3)    With respect to investigative materials or information gathered *after* March 27, 2008, Plaintiff may inquire about any otherwise-work-product-protected information where, as determined by the Court, a waiver of the protection has occurred through disclosure to third-parties.  These categories include (a) anything disclosed by Vicedomine to Rita Cosby (whether or not such information was ultimately published in *Blonde Ambition*) and (b) any statements regarding the investigation, Stern, or the Smiths, as disclosed by Vicedomine on publicly accessible Internet websites.

With respect to the *duces tecum* demand attached to the Vicedomine subpoena, Plaintiff can obtain documents that fall within the categories announced above, except for facts which may be set forth in work-product protected documents that were created *after* O'Quinn's last alleged statement on March 27, 2007, and which were not otherwise disclosed by Vicedomine to Cosby. Plaintiff must obtain this category of information through means other than document production (*i.e.*, interrogatories or depositions).

### 4.     Requests for Production

Plaintiff has filed two similar motions to compel with respect to document requests directed to the Firm and O'Quinn: Motion to Compel Production of Documents Responsive to Plaintiff's First Request for Production of Documents From Defendant John M. O'Quinn & Associates PLLC, d/b/a The O'Quinn Law Firm [D.E. 131], and Plaintiff's Motion to Compel Production of Documents Responsive to Plaintiff's First Request for Production of Documents From Defendant John M. O'Quinn. [D.E. 132]. The substance of the underlying document requests is identical except for to whom the requests are directed. Likewise, both the Firm and O'Quinn raised similar objections to the documents requested – primarily on the basis of work-product protection. As such, although two separate motions to compel are currently pending, the Court addresses them together below.

First, it is significant to note that during the August 13, 2008, hearing, the parties ultimately agreed that the underlying facts of the case are discoverable. Accordingly, at the conclusion of the hearing, the Court directed Defendants to review their responses to the Requests for Production and verify that Defendants have produced all non-privileged documents relating to the underlying facts (*i.e.*, the truth or falsity of O'Quinn's statements). Defendants were required to provide such verification as well as any additional responsive documents regarding the underlying facts by August

20, 2008.

With respect to **Firm Requests for Production 1-8 (O'Quinn Requests 2-9)**, Plaintiff seeks documents supporting or contradicting the statements attributed to O'Quinn in the Amended Complaint. Defendants objected to the requests as overly broad with respect to the time frame involved as well as the fact that the requests are not limited in scope to this litigation. Based upon the conclusions set forth previously in this Order, the Court finds that Defendants must produce all O'Quinn Materials and Investigation Materials that contain underlying facts regarding the truth or falsity of O'Quinn's statements, which were created through March 27, 2007. As discussed above, the Court finds that any work-product protection has been waived by Defendants by placing their investigation at issue. If facts pertaining to the truth or falsity of the statements in controversy are contained in work-product-protected materials created *after* the last statement, Defendants are not required to produce the documents, since Plaintiff has not shown a substantial need for these materials, except that Defendants must produce responsive documents that would otherwise be protected as work product if such documents were created after March 27, 2007, if the documents were disclosed to Rita Cosby or on the Internet. Plaintiff's Motion is denied in all other respects.

With respect to **Firm Request for Production 9 (O'Quinn Request 10)**, Plaintiff seeks documents concerning O'Quinn's or the Firm's communications with the media about Plaintiff or the deaths of the Smiths. Defendants object to the request as overly broad with respect to the time frame involved, as well as on the grounds that the request is not limited in scope to this litigation. Defendants also object to the request on the basis of attorney-client privilege and on the basis that the request seeks to invade work-product protection.

The Court finds that the request is overly broad as phrased due to the use of the term "concerning" and because it is not limited to issues relevant to this case. To address these

deficiencies, the Court finds that the request should be limited to actual communications with the media regarding matters relevant to this case (*i.e.*, the eight statements attributed to O'Quinn in the First Amended Complaint as well as any underlying facts that go to the truth or falsity of the statements).  Plaintiff's Motion to Compel is denied in all other respects.

With respect to **Firm Request for Production 10 (O'Quinn Request 11)**, Plaintiff seeks documents concerning Defendants' efforts to investigate whether O'Quinn's alleged statements regarding Plaintiff were true or false.  Defendants object to the request as overly broad with respect to the time frame involved and assert that the request is not limited in scope to this litigation. Defendants also object to the request on the basis that it seeks to invade the work-product protection and the attorney-client privilege.  The Court finds that the request is overly broad as phrased, due to the use of the term "concerning."  Such documents could potentially include any document tangentially relating to O'Quinn's alleged statements, including the Firm's communications with its client, Virgie Arthur.  The Court further finds that the request should be limited to the investigative efforts that Defendants undertook to determine whether O'Quinn's statements were true.

Although the Court recognizes Defendants' objection on the basis of work product, as noted above, the Court finds that Defendants waived any such protection by placing the investigation at issue in this case.  Therefore, the Court finds that Plaintiff is entitled to discover all Investigation Materials and O'Quinn Materials through the time of O'Quinn's last statement (*i.e.,* March 27, 2007).  Additionally, Plaintiff is entitled to discover any Investigation Materials and O'Quinn Materials created after March 27, 2007, if such documents have been disclosed to Rita Cosby or on the Internet.  Plaintiff's Motion is denied in all other respects.

_____With respect to **Firm Requests for Production 15 and 16 (O'Quinn Requests 20 and 21)**, Plaintiff seeks documents concerning communications with Rita Cosby or her representatives, as

well as all documents concerning *Blonde Ambition*.  Defendants object to the requests as overly broad with respect to the time frame involved and assert that the request is not limited in scope to this litigation.  Defendants also object to the requests on the grounds that the requests seek to breach the work-product protection.  The Court agrees that the request is overly broad in scope since it is not limited to issues presented in this case.  However, the Court finds that Defendants have waived some of the work-product protection when Vicedomine disclosed facts of the Firm's investigation to Rita Cosby, the author of *Blonde Ambition*.

Based on this waiver by disclosure, the Court finds that Plaintiff is entitled to discover any communications made to Rita Cosby regarding the investigation conducted by the Firm, whether or not those communications or materials were included in the *Blonde Ambition* book.  The Court finds, however, that the request seeking all documents concerning *Blonde Ambition* is overly broad in scope.  Therefore, the Court sustains Defendants' objections to Request for Production 16 and Plaintiff's Motion to Compel is denied with respect to Request 16.

With respect to **Firm Requests for Production 18-23 (O'Quinn Requests 23-28)**, Plaintiff seeks documents concerning Defendants' knowledge of and attempts to substantiate the cause of the Smiths' deaths.  Specifically, Plaintiff seeks documents regarding the law enforcement investigations of the Smiths, any medical investigations into the deaths of the Smiths, the inquest held in the Bahamas concerning the death of Daniel Smith, and any law enforcement investigation of Plaintiff.  Defendants agreed to produce any source documents that they possess.  Defendants, however, object to the requests on the grounds that they seek work-product-protected materials.

If they have not already done so, Defendants are directed to provide the source documents promised to Plaintiff.  With respect to the investigation conducted on behalf of the Firm, the Court directs the parties to its ruling with regard to Requests 9 and 10.  For the reasons set forth above, the

Court finds that Defendants have waived any work-product protection through March 27, 2007, by placing the investigation at issue in this case. Therefore, the Court finds that Plaintiff is entitled to discover all of the Investigation Materials and O'Quinn Materials through the time of O'Quinn's last statement. Additionally, Plaintiff is entitled to discover any of the Investigation Materials and O'Quinn Materials created after O'Quinn's last statement if they have been disclosed to Rita Cosby or on the Internet. Plaintiff's Motion is denied in all other respects.

With respect to **Firm Request for Production 24 (O'Quinn Request 30)**, Plaintiff seeks documents received by investigators Don Clark and Wilma Vicedomine concerning the Smiths and Plaintiff. Defendants object to the requests as overly broad with respect to the time frame involved and assert that the request is not limited in scope to this litigation. Defendants also object to the requests on the grounds that the requests seek work-product protected materials. The Court finds that the request is overly broad as phrased, due to the use of the term "concerning." Such documents could potentially include any document tangentially relating to the Smiths or Plaintiff, including the Firm's communications with its client Virgie Arthur. The Court further finds that the request should be limited to the investigative efforts that Defendants undertook to determine whether O'Quinn's statements were true.

Although the Court recognizes Defendants' objection on the basis of work product, as noted above, the Court finds that Defendants waived any such protection through March 27, 2007, by placing the investigation at issue in this case. Therefore, the Court finds that Plaintiff is entitled to discover all of the Investigation Materials and O'Quinn Materials through the time of O'Quinn's last statement. Additionally, Plaintiff is entitled to discover any Investigation Materials and O'Quinn Materials created after O'Quinn's last statement if they have been disclosed to Rita Cosby or on the Internet. Plaintiff's Motion is denied in all other respects.

With respect to **Firm Request for Production 25 (O'Quinn Request 32)**, Plaintiff seeks documents concerning statements that Defendants requested or otherwise sought from any person regarding Plaintiff or the Smiths.  Defendants object to the requests as overly broad with respect to the time frame involved and assert that the request is not limited in scope to this litigation. Defendants also object to the requests on the grounds that the requests seek work-product protected materials.  Again, the Court finds that the request is overly broad as phrased, due to the use of the term "concerning."  Such documents could potentially include any document tangentially relating to the Smiths or Plaintiff, including the Firm's communications with its client Virgie Arthur.  The Court further finds that the request should be limited to documents sought in furtherance of the Firm's investigative efforts.

Although the Court recognizes Defendants' objection on the basis of work product, as noted above, the Court finds that Defendants waived any such protection for these materials created through March 27, 2007, by placing the investigation at issue in this case.  Therefore, the Court finds that Plaintiff is entitled to discover all of Defendants' Investigation Materials and O'Quinn Materials through the time of O'Quinn's last statement.  Additionally, Plaintiff is entitled to discover any Investigation Materials and O'Quinn Materials created after O'Quinn's last statement if they have been waived by disclosure to Rita Cosby or on the Internet.  Plaintiff's Motion is denied in all other respects.

_____As for **Requests for Production 16 and 17 (to O'Quinn only)**, Plaintiff seeks documents provided to or received from the investigator mentioned in O'Quinn's March 20, 2007, appearance on the *Nancy Grace Show* and the March 27, 2007, appearance on *On the Record With Greta Van Susteren*.  Plaintiff also seeks documents supporting O'Quinn's statements made on those shows. As noted previously, the Court finds that Defendants put the investigation conducted by O'Quinn

-59-

and the Firm at issue and, thus, waived any work product protection associated with those materials *through the date of O'Quinn's last alleged statement on March 27, 2008*.  Therefore, the Court concludes that O'Quinn must provide the documents sought through the date of O'Quinn's last alleged statement on March 27, 2008.  Plaintiff's Motion to Compel is granted in part with respect to these Production Requests.

In sum, Plaintiff's Motions to Compel [D.E. 131, 132] are hereby granted in part and denied in part.  Defendants must produce these responsive documents to Plaintiff by no later than **Friday, September 5, 2008.**

### 5. **Interrogatories**

Plaintiff's Motion to Compel Responses to Interrogatories From Defendant John M. O'Quinn [D.E. 130] seeks for the Court to compel O'Quinn to provide more complete responses to Interrogatories 2-11.  These interrogatories seek information on various subjects, but center primarily around materials that Defendants contend are protected by the work-product doctrine.  However, as noted above, during the August 13, 2008, hearing, the parties ultimately agreed that the underlying facts of the case are discoverable.  Accordingly, at the conclusion of the hearing, the Court directed Defendants to go back through their responses to the Interrogatories and reevaluate their responses to ensure that they are complete.  If the responses were complete, Defendants were instructed to verify that to Plaintiff.  Defendants were required to provide such verification as well as any additional responsive information regarding the underlying facts by August 20, 2008.

With respect to **Interrogatory 1**, Plaintiff seeks for O'Quinn to state whether he was accurately quoted regarding the eight statements attributed to him in the First Amended Complaint.  In response to the interrogatory, O'Quinn stated that he was unable to address any misquotation because he lacked the necessary information to provide a complete answer.  The inability stems from

the fact that O'Quinn has not received actual recordings of the eight interviews to which Defendants could compare the accuracy of the statements attributed to him. Interrogatory 1 is similar to Requests for Admission 9-16 discussed above. Hence, the Court will treat the interrogatory as it did those Requests for Admissions. Specifically, the Court agrees that Defendants should have the opportunity to compare the transcripts with actual recordings of the interviews, some of which they have already obtained, and some of which they await receipt. The Court hereby directs Defendants to amend their response to Interrogatory 1 and to provide additional information relating to the statements for which Defendants have already obtained transcripts. Plaintiff's Motion to Compel [D.E. 130] is, therefore, granted as set forth herein. Obviously, once Defendants obtain the remaining transcripts, they must supplement their response to address those particular statements in a timely fashion.

With respect to **Interrogatories 2 and 3,** Plaintiff seeks for Defendants to identify the source of O'Quinn's claims that Ms. Smith had several life insurance policies and that Plaintiff requested a copy of Ms. Smith's will days before she died. Although O'Quinn responded in part, it is unclear whether the response is complete since it suggests that additional responsive information was withheld on the basis of work-product protection. As noted previously, the Court finds that Defendants put the investigation conducted by O'Quinn and the Firm at issue and, thus, waived any work product protection associated with those materials *through the date of O'Quinn's last alleged statement on March 27, 2008*. Therefore, the Court concludes that O'Quinn must provide the identity of the source or sources requested in Interrogatories 2 and 3 (as they relate to the statements O'Quinn allegedly made). Plaintiff's Motion to Compel is therefore granted in part with respect to these interrogatories.

With respect to **Interrogatories 4, 5, and 6** , Plaintiff seeks for Defendants to provide facts

supporting their contention that Plaintiff is criminally responsible for the deaths of the Smiths. Defendants responded in part to the interrogatories, but also objected to the requests as overly broad with respect to the time frame involved as well as on the grounds that the requests are not limited in scope to this litigation. Defendants also objected to the requests on the basis that they seek to invade the work-product protection.

Although the Court recognizes Defendants' objection on the basis of work product, as noted above, the Court finds that Defendants waived any such protection by placing the Firm's investigation at issue in this case. Additionally, the interrogatories seek underlying facts of the case that are not privileged (*i.e.*, the truth or falsity of O'Quinn's alleged statements). Therefore, the Court finds that Plaintiff is entitled to an answer to these discovery requests. The Court, notes, however, that it may be more fruitful to take the deposition of O'Quinn to obtain the full scope of these relevant facts.

With respect to **Interrogatories 7, 8, 9, and 10**, Plaintiff seeks the identity of sources who allegedly provided O'Quinn with information related to the statements attributed to O'Quinn in the First Amended Complaint. In other words, Plaintiff seeks the names of any investigators or other people who provided O'Quinn with information that supports his eight alleged statements. These interrogatories are similar to Interrogatories 2 and 3 and, hence, will be handled similarly. As noted previously, the Court finds that Defendants put the investigation conducted by O'Quinn and the Firm at issue and, thus, waived any work product protection associated with those materials *through the date of O'Quinn's last alleged statement on March 27, 2008*. Therefore, the Court concludes that O'Quinn must provide the identity of the source or sources requested in Interrogatories 7-10. Plaintiff's Motion to Compel is granted in part with respect to these interrogatories.

With regard to **Interrogatory 11**, Plaintiff seeks information pertaining to whether O'Quinn

hired investigators to investigate Plaintiff and the deaths of the Smiths. The Interrogatory also seeks the identity of any such investigators. As explained above, the Court finds that Defendants put the investigation conducted by the Firm at issue and, thus, waived any work product protection associated with those materials *through the date of O'Quinn's last alleged statement on March 27, 2008*. Therefore, O'Quinn must provide the identity of the source or sources requested in Interrogatory 11 for the time period through March 27, 2008. Plaintiff's Motion to Compel is granted in part with respect to Interrogatory 11.

In sum, Plaintiff's Motions to Compel [D.E. 131, 132] are hereby granted in part and denied in part as set forth herein. Defendants must supplement their interrogatory responses by no later than **Friday, September 5, 2008**.

**D.     Entitlement to Attorneys' Fees**

Plaintiff has also requested his attorneys' fees incurred in making his motions to compel. Federal Rule of Civil Procedure 37(a)(4) provides that the court shall require reasonable expenses incurred in making a motion, including attorney's fees, to be paid by the opposing party, unless the opposing party's opposition to the protective order was "substantially justified, or that other circumstances make an award of expenses unjust." "The Supreme Court has clarified that [a party's] discovery conduct should be found 'substantially justified' under Rule 37 if it is a response to a 'genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action.'" *Devaney v. Continental Amer. Ins. Co.*, 989 F.2d 1154, 1163 (11th Cir. 1993) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)); *Maddow v. Procter & Gamble Co., Inc.*, 107 F.3d 846, 853 (11th Cir. 1997).

The Court respectfully disagrees with Plaintiff's contention that Defendants' arguments are so lacking in merit as to entitle Plaintiff to his reasonable attorneys' fees. Instead, the Court finds

that the issues presented in the motions set forth complex legal matters over which reasonable people could differ.  The in-depth discussion by the parties and the Court during the hearing, as well as in the briefs, reveals the intellectually challenging nature of the issues before the Court.  Thus, the Court finds that both Plaintiff and Defendants presented their respective arguments in good faith and that a genuine dispute existed regarding the discoverability of the materials sought.  For these reasons, the Court declines to award attorneys' fees to either Plaintiff or Defendants in this matter.

## IV. *CONCLUSION*

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.     Defendant's Motion for Protective Order [D.E. 111] is **GRANTED IN PART AND DENIED IN PART,** consistent with the terms of this Order.

2.     Plaintiff's Motion to Compel Defendants' Compliance With Local Rule 26.1 [D.E. 126] is **GRANTED IN PART AND DENIED IN PART,** consistent with the terms of this Order.

3.     Plaintiff's Motion to Determine the Sufficiency of Defendant John M. O'Quinn's Responses to Plaintiff's First Request for Admissions [D.E. 128] is **GRANTED IN PART AND DENIED IN PART,** consistent with the terms of this Order.

4.     Plaintiff's Motion to Compel Responses to Interrogatories From Defendant John M. O'Quinn [D.E. 130] is **GRANTED IN PART AND DENIED IN PART,** consistent with the terms of this Order.

5.     Plaintiff's Motion to Compel Production of Documents Responsive to Plaintiff's First Request for Production of Documents From Defendant John M. O'Quinn & Associates PLLC, d/b/a The O'Quinn Law Firm [D.E. 131] is **GRANTED IN PART AND DENIED IN PART,** consistent with the terms of this Order.

6.      Plaintiff's Motion to Compel Production of Documents Responsive to Plaintiff's First

Request for Production of Documents From Defendant John M. O'Quinn [D.E. 132] is **GRANTED**

**IN PART AND DENIED IN PART,** consistent with the terms of this Order.

**DONE AND ORDERED** at Fort Lauderdale, Florida, this 29th day of August, 2008.

ROBIN S. ROSENBAUM
United States Magistrate Judge

cc:     Honorable William P. Dimitrouleas
        Counsel of Record